Victor M. Felix, SBN 179622
Victor.Felix@procopio.com
PROCOPIO, CORY, HARGREAVES
  & SAVITCH LLP
525 B Street, Suite 2200
San Diego, CA 92101
Tel.  (619) 515-3229
Fax  (619) 744-5409

Leslie V. Payne (TX. Bar No. 00784736) (to be admitted *Pro Hac Vice*)
lpayne@hpcllp.com
Eric J. Enger (TX. Bar No. 24045833) (to be admitted *Pro Hac Vice*)
eenger@hpcllp.com
Christopher M. First (TX. Bar No. 24095112) (to be admitted *Pro Hac Vice*)
cfirst@hpcllp.com
HEIM, PAYNE & CHORUSH LLP
1111 Bagby St., Suite 2100
Houston, TX 77002
T: (713)221-2000   F: (713)221-2021

Attorneys for Plaintiff *Wi-LAN*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WI-LAN, INC.; WI-LAN USA, INC.; & WI-LAN LABS, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> LG ELECTRONICS, INC.; LG ELECTRONICS U.S.A., INC.; LG ELECTRONICS MOBILECOMM U.S.A., INC. <br><br> Defendants. | Case No. **'17CV358  MMABGS** <br><br> **COMPLAINT FOR INFRINGEMENT OF U.S. PATENT NOS. 8,787,924, 8,867,351, 9,226,320, & 9,497,743** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Wi-LAN Inc., Wi-LAN USA, Inc. and Wi-LAN Labs, Inc. (collectively, "Wi-LAN" or "Plaintiffs") hereby submit this Complaint against Defendants  LG Electronics, Inc., LG Electronics U.S.A., Inc., LG Electronics Mobilecomm U.S.A., Inc. (collectively, "LG" or "Defendants").

## NATURE OF ACTION

1.     This is an action for infringement of U.S. Patent Nos. 8,787,924 ("the '924 Patent"), 8,867,351 ("the '351 Patent"), 9,226,320 ("the '320 Patent"), and 9,497,743 ("the '743 Patent").  The '924 Patent, '351 Patent, '320 Patent, and '743 Patent are hereby incorporated by reference.

## THE PARTIES

2.     Plaintiff Wi-LAN, Inc. is a corporation organized and existing under the laws of Canada with its principal place of business at 303 Terry Fox Drive, Suite 300, Ottawa, ON, K2K 3J1, Canada.

3.     Plaintiff Wi-LAN USA, Inc. is a corporation organized and existing under the laws of Florida with its principal executive office at 303 Terry Fox Drive, Suite 300, Ottawa, ON, K2K 3J1, Canada, and a principal business office at 600 Anton Blvd., Suite 1350, Costa Mesa, CA, 92626.

4.     Plaintiff Wi-LAN Labs, Inc. is a corporation organized and existing under the laws of Delaware with its principal executive office at 303 Terry Fox Drive, Suite 300, Ottawa, ON, K2K 3J1, Canada, and a principal business office at 5962 La Place Court Suite 265, Carlsbad, CA 92008.

5.     LG Electronics, Inc. is incorporated under the laws of South Korea with its principal place of business at LG Twin Towers 20, Yeouido-dong, Yeongdeunspo-gu, Seoul 150-721, South Korea.  Upon information and belief, LG Electronics, Inc. owns and controls, directly and/or indirectly, LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc.

6.     LG Electronics U.S.A., Inc. is a Delaware corporation with its principal place of business at 1000 Sylvan Ave, Englewood Cliffs, New Jersey. LG Electronics U.S.A., Inc. may be served via its registered agent, United States Corporation Company, 2711 Centerville Rd. Ste. 400, Wilmington, DE 19808.

7.     LG Electronics Mobilecomm U.S.A., Inc. is a California corporation with its principal place of business at 10225 Willow Creek Rd., San Diego, California 92131.  LG Electronics Mobilecomm U.S.A., Inc. may be served via its registered agent, Corporation Service Company (Which will do Business in California as CSC - Lawyers Incorporating Service), 2710 Gateway Oaks Dr. Ste. 150N Sacramento, CA 95833.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 101 *et seq*.

9.     This Court has personal jurisdiction over LG as personal jurisdiction over LG in this action comports with due process. LG has conducted and regularly conducts business within the United States and this judicial district. LG has continuous and systematic contacts with California and this judicial district. Furthermore, LG has purposefully availed itself of the privileges of conducting business in the United States and this judicial district. LG has sought protection and benefit from the laws of the State of California by maintaining offices in California and this judicial district, by selling products with the expectation and/or knowledge that they will be purchased by consumers in this judicial district, and/or by offering advertisements targeted at consumers in this judicial district, and/or by having partners and customers in this judicial district. In California and in this judicial district, LG regularly does or solicits business and engages in other persistent courses of conduct. LG derives substantial revenue from services

provided to individuals in California and in this judicial district. Plaintiff's causes of action arise directly from LG's activities in this judicial district.  In particular, LG's research and development division is based in San Diego.  And LG's San Diego-based division is the center of LG's 3GPP and standardization efforts.  LG has even sought to transfer other patent cases involving LTE technology to the Southern District of California.

10.    Joinder of Defendants is proper because Defendants are related parties who are either jointly and severally liable for infringement, or who make, use, sell, offer for sale, or import the same or similar accused products that practice the same 4G LTE standards. Further, upon information and belief, Defendants use the same chip suppliers and chipsets in their infringing products, meaning the factual question of infringement will substantially overlap between Defendants. Further, Plaintiffs anticipate that there will be substantial overlap during the discovery process.

11.    Venue is proper in this federal district pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b) in that one or all Defendants reside in this District, have done business in this District, have regular and established places of business in this District, have committed acts of infringement in this District, and continue to commit acts of infringement in this District, entitling Plaintiffs to relief.

12.    No other venue is more convenient than the Southern District of California.  Plaintiff Wi-LAN Labs, Inc. resides in this district.  Two of the three patents in suit were developed in this district (and the other was developed elsewhere in California).  Further, many of the inventors of the patents-in-suit, including Ken Stanwood, Yair Bourlas, Adam Newham, and Lei Wang currently reside in this district.  And Wi-LAN's current U.S. headquarters is also located in California (600 Anton Boulevard, Suite 1350, Costa Mesa, California 92626).

Also, important third-party suppliers for Defendants' infringing products reside in this district.

## BACKGROUND OF THE TECHNOLOGY

13.    Wi-LAN Labs developed advanced 4G technologies and products for Wi-LAN and others in the wireless industry that enhance the capacity, quality of user experience, and connectivity of 4G (and next generation 5G) mobile devices and networks.

14.    Several of the 4G patents asserted in this action were developed by Wi-LAN's own Ken Stanwood, the former president of Wi-LAN Labs and current CTO at Wi-LAN, Inc., and his team.

15.    Mr. Stanwood has played a leadership role in the development of 4G technologies and standards for more than a decade, starting with the industry's first major 4G cellular initiative, referred to as WiMAX. He served as Vice Chair of the IEEE 802.16 standards committee for WiMAX from 2003-2006 and as a principal contributor to the original IEEE 802.16 standard for 4G cellular networks and mobile devices.

16.    Mr. Stanwood has written extensively on 4G technologies, including coauthoring a popular textbook on the subject, and has been awarded 125 U.S. patents, with many more patent applications currently pending before the United States Patent Office and worldwide, many of which relate to 4G technologies.

17.    Like Ken Stanwood, Wi-LAN's founders, Michel Fattouche and Hatim Zaghloul, are widely recognized and acknowledged as wireless industry pioneers. Their technologies, patents and writings have been cited in patents and publications written by thousands of engineers and scientists in the wireless industry.

18.    Wi-LAN's founders developed key cellular "data" technologies, including the W-OFDM air interface, to enable data to be exchanged at desktop

speeds over a wireless channel, such as in Wi-Fi networks, or from mobile devices in 4G cellular networks. Wi-LAN's technologies have made Wi-Fi and 4G in mobile devices possible.[1]

19.   The Wi-LAN success story is featured in major publications worldwide, including in such publications as Scientific American[2] and Time Magazine,[3] and in many others. Wi-LAN and its founders have also been the subject of numerous industry awards for their wireless innovations, and for their contribution to the growth in wireless data capability present in today's smartphones, tablets, and other mobile devices.

20.   One of Wi-LAN's co-founders is featured in one of Canada's leading business publications as among the Top 100 Canadians of the 20th century for Wi-LAN's wireless innovations.[4] And Wi-LAN's original wireless designs and first

---

[1] *See, e.g., Ergen, Mustafa, Mobile Broadband: Including WiMAX and LTE*, John Wiley & Sons, 2009 at p. 110, Section 4.1 "Principles of OFDM: Introduction" (recognizing one of Wi-LAN's first patents, U.S. Patent No. 5,282,222, to W-OFDM as a major milestone in the development of Wi-Fi and 4G technologies, turning a single lane wireless communication channel into a multi-lane super highway, and enabling mobile devices to transmit and receive data at desktop speeds).

[2] The Future of Wireless, *Scientific American*, October 2000 at p. 57 ("To date, wireless multiplexing hasn't been exploited for cellular systems…. That may change soon…. Wi-LAN holds a number of key patents for multiplexing technology known as wideband orthogonal frequency division multiplexing, or W-OFDM").

[3] Wi-LAN Shows How to be Successful-and-Canadian-in the Global Economy, *Time Magazine*, April 3, 2000.

[4] Great Canadians, *Maclean's*, July 1, 2000 ("Riding the wave of invention ... Wi-LAN is one of those next generation companies. Its technology may well become the base for what some call the coming wireless revolution: the ability to e-mail, surf the Net, adjust the lights in your home and order theater tickets from a cellphone or handheld computer.")

wireless mobile device have been displayed in the Canadian equivalent of the Smithsonian Institution.

21.   Enabling high-speed wireless data capability in mobile devices was no small task–it posed incredible challenges–something we take for granted today with desktop speeds now standard in 4G mobile devices.

22.   Over the years, Wi-LAN, Wi-LAN Labs, and their predecessors have invested hundreds of millions of dollars in developing, making and selling many of the world's first fixed and mobile devices capable of transmitting and receiving wireless data at desktop speeds.

23.   Wi-LAN's products which had 4G data speeds include, among others, the I.WILL, BWS 300, LIBRA 3000, LIBRA 5800, LIBRA MX, and the LIBRA Mobilis.

24.   Wi-LAN was the first company in the world to build Wi-Fi and 4G data speeds into mobile devices, with speeds reaching up to 100 megabits per second (Mbps), and it did so a decade before 4G would become the standard in the wireless industry that it is today.

25.   A number of Wi-LAN's advanced 4G technologies have their origin in work started by Wi-LAN's Ken Stanwood and his team while at Ensemble Communications ("Ensemble"), a San Diego company that Mr. Stanwood helped grow (then, as Ensemble's Chief Technology Officer) to over 200 engineers, scientists, and support personnel.

26.   Others of Wi-LAN's advanced 4G technologies have their origin in work created at NextWave Communications, another San Diego company where Mr. Stanwood served as a Vice President.  And yet other technologies were first developed at SOMA network, a California-based company involved in 4G technologies.

27.    The advanced 4G technologies developed by Mr. Stanwood and his team were employed in the network stacks utilizing the 4G WiMAX cellular standard, and were subsequently adopted for use in the network stacks utilizing the 4G LTE cellular standard used in today's 4G mobile devices.

28.    These advanced 4G technologies include:

(i) the bandwidth-on-demand and periodic bandwidth services built into 4G mobile devices to enable apps installed on such devices to have the bandwidth they need, when they need it, in real-time;

(ii) the quality-of-service functions built into 4G mobile devices to enable mobile devices to prioritize the services that have the most pressing need for bandwidth; and

(iii) the handoff functionality built into 4G mobile devices to identify particular devices and use pre-allocated codes to respond faster to requests from mobile devices.

29.    The efforts of Mr. Stanwood and other Wi-LAN inventors in developing these advanced 4G technologies have enabled 4G mobile devices to support a variety of services popular among users of Defendants' 4G LTE mobile devices, such as voice, conversational video, live streaming of video and music, real-time gaming, video and photo sharing, email, and instant messaging, all in the palm of your hand ("4G Network Services").

30.    Wi-LAN's wireless technologies and patents, including its advanced 4G technologies, have been licensed by nearly all companies in the wireless industry, comprising more than 130 companies.

31.    Defendants' infringement gives them an unfair advantage over their competitors, many of whom have chosen to do the right thing and license their use of Wi-LAN's wireless technologies and patents. Many of Defendants' major

competitors in the mobile device industry, including Samsung, HTC, Nokia and BlackBerry have licensed Wi-LAN's wireless technologies and patents.

32.    Wi-LAN has made numerous efforts to license the unauthorized use of its wireless technologies by the Defendants, but Defendants have consistently refused to take a license, choosing to use Wi-LAN's 4G technologies without paying anything for that right.

33.    Defendants have willfully chosen to not respect the intellectual property of Wi-LAN, including the three 4G patents asserted in this action directed to Wi-LAN's advanced 4G technologies, and it does so despite understanding the importance of intellectual property.

34.    Before initiating litigation, Wi-LAN made substantial efforts to license Defendants' use of Wi-LAN's advanced 4G technologies and patents in their 4G LTE mobile devices, expecting that Defendants would proceed in good faith.

35.    During the spring of 2016, Wi-LAN contacted the Defendants to engage in licensing the patents-in-suit relating to LTE and 4G wireless technology. Defendants initially expressed interest.  But despite Wi-LAN's repeated efforts, Defendants failed to take a license.

36.    Defendants' actions have forced Wi-LAN's hand, leaving it with no choice but to protect its intellectual property through litigation.

## **DEFENDANTS' INFRINGING PRODUCTS**

37.    LG directly or indirectly through subsidiaries or affiliated companies markets, distributes, manufactures, imports, sells, and/or offers for sale wireless communication products, such as products compliant with the 3rd Generation Partnership Project ("3GPP") 4G LTE standard, including but not limited to the LG V20, LG Watch Urbane 2nd Edition LTE, LG Stylus 3, LG Stylo 2 V, LG Stylo 2 Plus, LG Stylo 3, LG K3 2017, LG K4 2017, LG K8 2017, LG K10 2017,

LG K8V, LG G Stylo, LG Stylo 2, LG Tribute HD, LG Aristo, LG G5, LG G4, LG G4c, LG G3, LG G3 S, LG G3 Beat, LG G3 Vigor, LG G2, LG K7, LG X Power, LG X Mach, LG X cam, LG X screen, LG Leon LTE, LG K10, LG B470, LG B471, LG Escape 3, LG Volt, LG Premier LTE, LG Treasure LTE,LG Classic, LG Rebel, LG Treasure, LG X style, LG Premier, LG K3, LG K8, LG K4, LG Optimus Zone 3, LG Optimus G Pro, LG K8 V, LG K8, LG Phoenix 2, LG Tribute 5, LG Wine 4, LG V10, LG Tribute 5, LG Spree, LG G Vista 2, LG Risio, LG Terra, LG Exalt II, LG Sunrise, LG G Flex 2, LG Destiny, LG Sunset, LG 441G, LG Access, LG Envoy III, LG 450, LG True, LG Revere 3, LG Extravert 2, LG XPression 2, LG G Flex, LG Cosmos 3, LG G Pad X II, LG G Pad X, LG G Pad F, and LG G Pad, in the United States and in this district. As some of these products, and additional LG LTE devices, are known by internal model numbers, codenames, or have alternate versions and iterations, discovery will be necessary to finalize a list of devices that infringe the patents-in-suit. LG's products support at least Release 8, et seq. of the 4G LTE standard.

38.     Upon information and belief, LG's products also include software and associated hardware that prioritize the transmission of data generated by various applications that run on these LG products, and in doing such prioritization utilize the claimed inventions of the patents asserted in this action.

## **WILLFUL INFRINGEMENT**

39.     Prior to the filing of this complaint, Defendants knew or should have known that they infringed the patents-in-suit.  On April 7, 2016, Wi-LAN invited LG to renew its license to Wi-LAN's "wireless portfolio," including its patents covering "LTE."  LG knew or reasonably should have known based on its prior license that such patents in the "wireless portfolio" covering "LTE" included the three patents-in-suit.  Yet despite repeated requests from Wi-LAN on May 16, June

10, and June 27, 2016, LG declined to substantively engage in licensing negotiations with Wi-LAN or take a license.

40.     Accordingly, LG has had knowledge, or reasonably should have had knowledge, of the patents-in-suit since at least April 7, 2016 and certainly by the filing of this complaint.  Despite such knowledge, Defendants have proceeded to infringe the patents-in-suit with full and complete knowledge of their applicability to their respective 4G LTE products without taking a license and without a good faith belief that the patents-in-suit are invalid and not infringed. Defendants' infringement of the patents-in-suit thus occurs with knowledge of infringement and/or objective recklessness and has been and continues to be willful and deliberate.  Thus, Defendants' infringement of the patents-in-suit is willful and deliberate, entitling Wi-LAN to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## INFRINGEMENT OF U.S. PATENT NO. 8,787,924

41.     Wi-LAN incorporates the allegations of paragraphs 1 through 40 above as if set forth verbatim herein.

42.     On July 22, 2014, United States Patent No. 8,787,924 ("the '924 Patent") was duly and legally issued for inventions entitled "Methods and Systems for Transmission of Multiple Modulated Signals Over Wireless Networks." Wi-LAN owns the '924 Patent and holds the right to sue and recover damages for infringement thereof.

43.     On information and belief, Defendants have directly infringed and continue to directly infringe numerous claims of the '924 Patent, including at least claims 1 and 17, by manufacturing, using, selling, offering to sell, and/or importing their respective accused 4G LTE devices. Defendants are liable for infringement of the '924 Patent pursuant to 35 U.S.C. § 271(a).

44.     For example, the LG accused 4G LTE devices comply with the 4G LTE standards, including the UL-SCH data transfer procedure specified by 3GPP TS 36.321 at section 5.4.  In particular, the accused 4G LTE devices first transmit a Scheduling Request (*i.e.*, "a one bit message to the base station to request an allocation of UL bandwidth in which to transmit a bandwidth request") and then subsequently transmit a Buffer Status Report (*i.e.*, a "bandwidth request indicative of an amount of pending UL data").  Thereafter, the accused devices dynamically allocate the assigned UL bandwidth amongst their respective "UL services based on a QoS parameter of a respective service."

45.     Defendants have been and are now indirectly infringing at least one claim of the '924 Patent in accordance with 35 U.S.C. § 271(b) in this district and elsewhere in the United States. More specifically, Defendants have been and are now actively inducing direct infringement by other persons (*e.g.*, Defendants' customers who use, sell or offer for sale products that embody and/or otherwise practice one or more claims of the '924 Patent).

46.     By at least the filing of this complaint, Defendants had knowledge of the '924 Patent, and that their actions resulted in a direct infringement of the '924 Patent, and knew or were willfully blind that their actions would induce direct infringement by others and intended that their actions would induce direct infringement by others.

47.     Defendants actively induce such infringement by, among other things, providing user manuals and other instruction material for their devices that induce their customers to use Defendants' devices in their normal and customary way to infringe the '924 Patent.  For example, LG's website provides instructions for using the LG devices on 4G LTE networks.  *See*, *e.g.*, http://www.lg.com/us/4g-lte-phones (noting that "LG 4G LTE phones feature forward-thinking designs and innovative technology" and emphasizing the "4G LTE phone Network," which

permits the accused LG 4G LTE devices to "stay connected wherever you go on a super-fast LTE network, for seamless and reliable use."). As does LG's user documentation for the accused devices. *See*, *e.g.*, http://www.lg.com/us/support-mobile/lg-H910-Silver (encouraging customers to use the "Enhanced LTE Service"). Through its manufacture and sales of their devices, Defendants specifically intended for their customers to infringe the '924 Patent. Further, Defendants were aware that these normal and customary activities would infringe the '924 Patent. Defendants performed the acts that constitute induced infringement, and that would induce actual infringement, with knowledge of the '924 Patent and with the knowledge or willful blindness that the induced acts would constitute direct infringement.

48. Accordingly, a reasonable inference is that Defendants specifically intend for others, such as their customers, to directly infringe one or more claims of the '924 Patent in the United States because Defendants had knowledge of, and were aware of Wi-LAN's infringement allegations concerning, the '924 Patent and actively induced others (*e.g.*, its customers) to directly infringe the '924 Patent by using, selling, or offering to sell Defendants' 4G LTE devices.

49. Defendants have been and are now indirectly infringing at least one claim of the '924 Patent in accordance with 35 U.S.C. § 271(c) in this district and elsewhere in the United States. More specifically, Defendants have been and are now providing non-staple articles of commerce to others for use in an infringing system or method with knowledge of the '924 Patent, and with knowledge that the use of their products resulted in a direct infringement of the '924 Patent by their customers, and with knowledge that these non-staple articles of commerce are used as a material part of the claimed invention of the '924 Patent.

50. Defendants' devices compliant with 4G LTE include components comprising an application processor and a baseband processor specifically

designed to support communication and transmission of data over 4G LTE-compliant networks. These components are mounted to a circuit board in Defendants' accused devices and, absent these components, Defendants' devices compliant with 4G LTE would not function in an acceptable manner to send or receive data over 4G LTE networks. A reasonable inference to be drawn from the facts set forth is that these components in Defendants' devices are especially made or especially adapted to operate in the accused devices to provide wireless communication, including the transmission of data in accordance with the 4G LTE standard. Further, a reasonable inference to be drawn from the facts is that these components comprising an application processor and a baseband processor are intended to support communication of data over a 4G LTE network and are not staple articles or commodities of commerce, and that the use of the components is required for operation of the devices to send or receive data over a 4G LTE-compliant network. Any other use would be unusual, far-fetched, illusory, occasional, aberrant, or experimental.

51.   The components comprising an application processor and a baseband processor designed to support communication of data using 4G LTE in Defendants' devices are each a material part of the invention of the '924 Patent and are especially made for the infringing manufacture, sale, and use of Defendants' accused devices. Defendants' devices, including those components, are especially made or adapted to infringe the '924 Patent, and have no substantial non-infringing uses.

52.   The '924 Patent is valid and enforceable.

53.   Defendants' infringement of the '924 Patent has damaged Wi-LAN, and Defendants are liable to Wi-LAN in an amount to be determined at trial that compensates Wi-LAN for the infringement, which by law can be no less than a reasonable royalty.

54.    As a result of Defendants' infringement of the '924 Patent, Wi-LAN has suffered irreparable harm and will continue to suffer loss and injury unless Defendants are enjoined by this Court.

## INFRINGEMENT OF U.S. PATENT NO. 9,497,743

55.    Wi-LAN incorporates the allegations of paragraphs 1 through 40 above as if set forth verbatim herein.

56.    On November 15, 2016, United States Patent No. 9.497.743 ("the '743 Patent") was duly and legally issued for inventions entitled "Methods and Systems for Transmission of Multiple Modulated Signals Over Wireless Networks." Wi-LAN owns the '743 Patent and holds the right to sue and recover damages for infringement thereof.

57.    On information and belief, Defendants have directly infringed and continue to directly infringe numerous claims of the '743 Patent, including at least claims 1 and 6, by manufacturing, using, selling, offering to sell, and/or importing their respective accused 4G LTE devices. Defendants are liable for infringement of the '743 Patent pursuant to 35 U.S.C. § 271(a).

58.    For example, the LG accused 4G LTE devices comply with the 4G LTE standards, including the UL-SCH data transfer procedure specified by 3GPP TS 36.321 at section 5.4.  In particular, the accused 4G LTE devices first transmit a Scheduling Request (*i.e.*, "an explicit message to the base station informing the base station that the cellular telephone has data awaiting transmission to the base station over the UL connection between the cellular telephone and the base station") and then subsequently transmit a Buffer Status Report (*i.e.*, a "information indicative of an amount of data awaiting transmission to the base station over the UL connection between the cellular telephone and the base station").

59.    Defendants have been and are now indirectly infringing at least one claim of the '743 Patent in accordance with 35 U.S.C. § 271(b) in this district and elsewhere in the United States. More specifically, Defendants have been and are now actively inducing direct infringement by other persons (*e.g.*, Defendants' customers who use, sell or offer for sale products that embody and/or otherwise practice one or more claims of the '743 Patent).

60.    By at least the filing of this complaint, Defendants had knowledge of the '743 Patent, and that their actions resulted in a direct infringement of the '743 Patent, and knew or were willfully blind that their actions would induce direct infringement by others and intended that their actions would induce direct infringement by others.

61.    Defendants actively induce such infringement by, among other things, providing user manuals and other instruction material for their devices that induce their customers to use Defendants' devices in their normal and customary way to infringe the '743 Patent.  For example, LG's website provides instructions for using the LG devices on 4G LTE networks.  *See*, *e.g.*, http://www.lg.com/us/4g-lte-phones (noting that "LG 4G LTE phones feature forward-thinking designs and innovative technology" and emphasizing the "4G LTE phone Network," which permits the accused LG 4G LTE devices to "stay connected wherever you go on a super-fast LTE network, for seamless and reliable use.").  As does LG's user documentation for the accused devices.  *See*, *e.g.*, http://www.lg.com/us/support-mobile/lg-H910-Silver (encouraging customers to use the "Enhanced LTE Service").  Through its manufacture and sales of their devices, Defendants specifically intended for their customers to infringe the '743 Patent. Further, Defendants were aware that these normal and customary activities would infringe the '743 Patent.  Defendants performed the acts that constitute induced infringement, and that would induce actual infringement, with knowledge of the

'743 Patent and with the knowledge or willful blindness that the induced acts would constitute direct infringement.

62.   Accordingly, a reasonable inference is that Defendants specifically intend for others, such as their customers, to directly infringe one or more claims of the '743 Patent in the United States because Defendants had knowledge of, and were aware of Wi-LAN's infringement allegations concerning, the '743 Patent and actively induced others (*e.g.*, its customers) to directly infringe the '743 Patent by using, selling, or offering to sell Defendants' 4G LTE devices.

63.   Defendants have been and are now indirectly infringing at least one claim of the '743 Patent in accordance with 35 U.S.C. § 271(c) in this district and elsewhere in the United States. More specifically, Defendants have been and are now providing non-staple articles of commerce to others for use in an infringing system or method with knowledge of the '743 Patent, and with knowledge that the use of their products resulted in a direct infringement of the '743 Patent by their customers, and with knowledge that these non-staple articles of commerce are used as a material part of the claimed invention of the '743 Patent.

64.   Defendants' devices compliant with 4G LTE include components comprising an application processor and a baseband processor specifically designed to support communication and transmission of data over 4G LTE-compliant networks. These components are mounted to a circuit board in Defendants' accused devices and, absent these components, Defendants' devices compliant with 4G LTE would not function in an acceptable manner to send or receive data over 4G LTE networks. A reasonable inference to be drawn from the facts set forth is that these components in Defendants' devices are especially made or especially adapted to operate in the accused devices to provide wireless communication, including the transmission of data in accordance with the 4G LTE standard. Further, a reasonable inference to be drawn from the facts is that these

components comprising an application processor and a baseband processor are intended to support communication of data over a 4G LTE network and are not staple articles or commodities of commerce, and that the use of the components is required for operation of the devices to send or receive data over a 4G LTE-compliant network. Any other use would be unusual, far-fetched, illusory, occasional, aberrant, or experimental.

65.     The components comprising an application processor and a baseband processor designed to support communication of data using 4G LTE in Defendants' devices are each a material part of the invention of the '743 Patent and are especially made for the infringing manufacture, sale, and use of Defendants' accused devices.  Defendants' devices, including those components, are especially made or adapted to infringe the '743 Patent, and have no substantial non-infringing uses.

66.     The '743 Patent is valid and enforceable.

67.     Defendants' infringement of the '743 Patent has damaged Wi-LAN, and Defendants are liable to Wi-LAN in an amount to be determined at trial that compensates Wi-LAN for the infringement, which by law can be no less than a reasonable royalty.

68.     As a result of Defendants' infringement of the '743 Patent, Wi-LAN has suffered irreparable harm and will continue to suffer loss and injury unless Defendants are enjoined by this Court.

## INFRINGEMENT OF U.S. PATENT NO. 8,867,351

69.     Wi-LAN incorporates the allegations of paragraphs 1 through 40 above as if set forth verbatim herein.

70.     On October 21, 2014, United States Patent No. 8,867,351 ("the '351 Patent") was duly and legally issued for inventions entitled "Apparatus, System, and Method for the Transmission of Data with Different QoS Attributes." Wi-LAN

owns the '351 Patent and holds the right to sue and recover damages for infringement thereof.

71.   On information and belief, Defendants have directly infringed and continue to directly infringe numerous claims of the '351 Patent, including at least claims 1 and 7, by manufacturing, using, selling, offering to sell, and/or importing their respective accused 4G LTE devices. Defendants are liable for infringement of the '351 Patent pursuant to 35 U.S.C. § 271(a).

72.   For example, the LG accused 4G LTE devices comply with the 4G LTE standards, including the UL-SCH data transfer procedure specified by 3GPP TS 36.321 at section 5.4 and, even more specifically, the Logical Channel Prioritization procedure specified at section 5.4.3.1.  In particular, the accused 4G LTE devices transfer data on "logical channels."  Prior to transfer, the MAC entity (*i.e.*, "link controller") queues data into "logical channel queues" that can have a "priority" and a prioritized bit rate (*i.e.*, "traffic shaping rate").  The accused 4G LTE devices then examine the available channels to determine which queues to assign to which channels, and attempt to fill the transmission capacity of the channels. In this way, highest priority transmissions will be made first.

73.   Defendants have been and are now indirectly infringing at least one claim of the '351 Patent in accordance with 35 U.S.C. § 271(b) in this district and elsewhere in the United States. More specifically, Defendants have been and are now actively inducing direct infringement by other persons (*e.g.*, Defendants' customers who use, sell or offer for sale products that embody and/or otherwise practice one or more claims of the '351 Patent).

74.   By at least the filing of this complaint, Defendants had knowledge of the '351 Patent, and that their actions resulted in a direct infringement of the '351 Patent, and knew or were willfully blind that their actions would induce direct

1   infringement by others and intended that their actions would induce direct
2   infringement by others.

3        75.    Defendants actively induce such infringement by, among other things,
4   providing user manuals and other instruction material for their devices that induce
5   their customers to use Defendants' devices in their normal and customary way to
6   infringe the '351 Patent.  For example, LG's website provides instructions for
7   using the LG devices on 4G LTE networks.  *See*, *e.g.*, http://www.lg.com/us/4g-
8   lte-phones (noting that "LG 4G LTE phones feature forward-thinking designs and
9   innovative technology" and emphasizing the "4G LTE phone Network," which
10  permits the accused LG 4G LTE devices to "stay connected wherever you go on a
11  super-fast LTE network, for seamless and reliable use.").  As does LG's user
12  documentation for the accused devices.  *See*, *e.g.*, http://www.lg.com/us/support-
13  mobile/lg-H910-Silver (encouraging customers to use the "Enhanced LTE
14  Service").  Through its manufacture and sales of their devices, Defendants
15  specifically intended for their customers to infringe the '351 Patent. Further,
16  Defendants were aware that these normal and customary activities would infringe
17  the '351 Patent.  Defendants performed the acts that constitute induced
18  infringement, and that would induce actual infringement, with knowledge of the
19  '351 Patent and with the knowledge or willful blindness that the induced acts
20  would constitute direct infringement.

21       76.    Accordingly, a reasonable inference is that Defendants specifically
22  intend for others, such as their customers, to directly infringe one or more claims
23  of the '351 Patent in the United States because Defendants had knowledge of, and
24  were aware of Wi-LAN's infringement allegations concerning, the '351 Patent and
25  actively induced others (*e.g.*, its customers) to directly infringe the '351 Patent by
26  using, selling, or offering to sell Defendants' 4G LTE devices.

27

28

77.   Defendants have been and are now indirectly infringing at least one claim of the '351 Patent in accordance with 35 U.S.C. § 271(c) in this district and elsewhere in the United States. More specifically, Defendants have been and are now providing non-staple articles of commerce to others for use in an infringing system or method with knowledge of the '351 Patent, and with knowledge that the use of their products resulted in a direct infringement of the '351 Patent by their customers, and with knowledge that these non-staple articles of commerce are used as a material part of the claimed invention of the '351 Patent.

78.   Defendants' devices compliant with 4G LTE include components comprising an application processor and a baseband processor specifically designed to support communication and transmission of data over 4G LTE-compliant networks. These components are mounted to a circuit board in Defendants' accused devices and, absent these components, Defendants' devices compliant with 4G LTE would not function in an acceptable manner to send or receive data over 4G LTE networks. A reasonable inference to be drawn from the facts set forth is that these components in Defendants' devices are especially made or especially adapted to operate in the accused devices to provide wireless communication, including the transmission of data in accordance with the 4G LTE standard. Further, a reasonable inference to be drawn from the facts is that these components comprising an application processor and a baseband processor are intended to support communication of data over a 4G LTE network and are not staple articles or commodities of commerce, and that the use of the components is required for operation of the devices to send or receive data over a 4G LTE-compliant network. Any other use would be unusual, far-fetched, illusory, occasional, aberrant, or experimental.

79.   The components comprising an application processor and a baseband processor designed to support communication of data using 4G LTE in

Defendants' devices are each a material part of the invention of the '351 Patent and are especially made for the infringing manufacture, sale, and use of Defendants' accused devices. Defendants' devices, including those components, are especially made or adapted to infringe the '351 Patent, and have no substantial non-infringing uses.

80.     The '351 Patent is valid and enforceable.

81.     Defendants' infringement of the '351 Patent has damaged Wi-LAN, and Defendants are liable to Wi-LAN in an amount to be determined at trial that compensates Wi-LAN for the infringement, which by law can be no less than a reasonable royalty.

82.     As a result of Defendants' infringement of the '351 Patent, Wi-LAN has suffered irreparable harm and will continue to suffer loss and injury unless Defendants are enjoined by this Court.

## INFRINGEMENT OF U.S. PATENT NO. 9,226,320

83.     Wi-LAN incorporates the allegations of paragraphs 1 through 40 above as if set forth verbatim herein.

84.     On December 29, 2015, United States Patent No. 9,226,320 ("the '320 Patent") was duly and legally issued for inventions entitled "Pre-Allocated Random Access Identifiers." Wi-LAN owns the '320 Patent and holds the right to sue and recover damages for infringement thereof.

85.     On information and belief, Defendants LG have directly infringed and continue to directly infringe numerous claims of the '320 Patent, including at least claim 27, by manufacturing, using, selling, offering to sell, and/or importing their respective accused 4G LTE devices. Defendants are liable for infringement of the '320 Patent pursuant to 35 U.S.C. § 271(a).

86.     For example, the LG accused 4G LTE devices comply with the 4G LTE standards, including the non-contention based random access procedure

specified by 3GPP TS 36.300 at section 10.1.5.2.  In particular, during handover, the accused 4G LTE devices receive an information element (IE) message (RACH-ConfigDedicated) that explicitly signals the   non-contention Random Access Preamble for use on the random access channel (*i.e.*, "an indication of a non-contention reserved access identifier") that uniquely identifies the mobile device, as well as System Information Blocks containing Random Access Channel related configuration information (*i.e.*, "information about a shared random access channel").  The accused 4G LTE devices then transmit the assigned non-contention Random Access preamble to the target base station.  Next, the accused 4G LTE devices receive from the target base station a Random Access Response that conveys Timing Alignment information (*i.e.*, a feedback message comprising a timing adjustment"), including a timing advance command.  Finally, the accused 4G LTE devices adjust uplink transmission timing (*i.e.*, "adjust uplink transmission timing").

87.     Defendants have been and are now indirectly infringing at least one claim of the '320 Patent in accordance with 35 U.S.C. § 271(b) in this district and elsewhere in the United States. More specifically, Defendants have been and are now actively inducing direct infringement by other persons (*e.g.*, Defendants' customers who use, sell or offer for sale products that embody and/or otherwise practice one or more claims of the '320 Patent).

88.     By at least the filing of this complaint, Defendants had knowledge of the '320 Patent, and that their actions resulted in a direct infringement of the '320 Patent, and knew or were willfully blind that their actions would induce direct infringement by others and intended that their actions would induce direct infringement by others.

89.     Defendants actively induce such infringement by, among other things, providing user manuals and other instruction material for their devices that induce

their customers to use Defendants' devices in their normal and customary way to infringe the '320 Patent.  For example, LG's website provides instructions for using the LG devices on 4G LTE networks.  *See*, *e.g.*, http://www.lg.com/us/4g-lte-phones (noting that "LG 4G LTE phones feature forward-thinking designs and innovative technology" and emphasizing the "4G LTE phone Network," which permits the accused LG 4G LTE devices to "stay connected wherever you go on a super-fast LTE network, for seamless and reliable use.").  As does LG's user documentation for the accused devices.  *See*, *e.g.*, http://www.lg.com/us/support-mobile/lg-H910-Silver (encouraging customers to use the "Enhanced LTE Service").  Through its manufacture and sales of their devices, Defendants specifically intended for their customers to infringe the '320 Patent. Further, Defendants were aware that these normal and customary activities would infringe the '320 Patent.   Defendants performed the acts that constitute induced infringement, and that would induce actual infringement, with knowledge of the '320 Patent and with the knowledge or willful blindness that the induced acts would constitute direct infringement.

90.    Accordingly, a reasonable inference is that Defendants specifically intend for others, such as their customers, to directly infringe one or more claims of the '320 Patent in the United States because Defendants had knowledge of, and were aware of Wi-LAN's infringement allegations concerning, the '320 Patent and actively induced others (*e.g.*, its customers) to directly infringe the '320 Patent by using, selling, or offering to sell Defendants' 4G LTE devices.

91.    Defendants have been and are now indirectly infringing at least one claim of the '320 Patent in accordance with 35 U.S.C. § 271(c) in this district and elsewhere in the United States. More specifically, Defendants have been and are now providing non-staple articles of commerce to others for use in an infringing system or method with knowledge of the '320 Patent, and with knowledge that the

use of their products resulted in a direct infringement of the '320 Patent by their customers, and with knowledge that these non-staple articles of commerce are used as a material part of the claimed invention of the '320 Patent.

92.     Defendants' devices compliant with 4G LTE include components comprising an application processor and a baseband processor specifically designed to support communication and transmission of data over 4G LTE-compliant networks. These components are mounted to a circuit board in Defendants' accused devices and, absent these components, Defendants' devices compliant with 4G LTE would not function in an acceptable manner to send or receive data over 4G LTE networks. A reasonable inference to be drawn from the facts set forth is that these components in Defendants' devices are especially made or especially adapted to operate in the accused devices to provide wireless communication, including the transmission of data in accordance with the 4G LTE standard. Further, a reasonable inference to be drawn from the facts is that these components comprising an application processor and a baseband processor are intended to support communication of data over a 4G LTE network and are not staple articles or commodities of commerce, and that the use of the components is required for operation of the devices to send or receive data over a 4G LTE-compliant network. Any other use would be unusual, far-fetched, illusory, occasional, aberrant, or experimental.

93.     The components comprising an application processor and a baseband processor designed to support communication of data using 4G LTE in Defendants' devices are each a material part of the invention of the '320 Patent and are especially made for the infringing manufacture, sale, and use of Defendants' accused devices.  Defendants' devices, including those components, are especially made or adapted to infringe the '320 Patent, and have no substantial non-infringing uses.

94.     The '320 Patent is valid and enforceable.

95.     Defendants' infringement of the '320 Patent has damaged Wi-LAN, and Defendants are liable to Wi-LAN in an amount to be determined at trial that compensates Wi-LAN for the infringement, which by law can be no less than a reasonable royalty.

96.     As a result of Defendants' infringement of the '320 Patent, Wi-LAN has suffered irreparable harm and will continue to suffer loss and injury unless Defendants are enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Wi-LAN prays for the following relief:

97.     A judgment in favor of Wi-LAN that Defendants have infringed and are infringing U.S. Patent Nos. 8,787,924; 8,867,351; 9,226,320; and 9.497,743.

98.     An order permanently enjoining Defendants, their respective officers, agents, employees, and those activing in privity with it, from further direct and/or indirect infringement of U.S. Patent Nos. 8,787,924; 8,867,351; 9,226,320; and 9.497,743.

99.     An award of damages to Wi-LAN arising out of Defendants' infringement of U.S. Patent Nos. 8,787,924; 8,867,351; 9,226,320; and 9.497,743, including enhanced damages pursuant to 35 U.S.C. § 284, together with prejudgment and post-judgment interest, in an amount according to proof;

100.    An award of an ongoing royalty for Defendants' post-judgment infringement in an amount according to proof;

101.    Declaring that Defendants' infringement is willful and that this is an exceptional case under 35 U.S.C. § 285 and awarding attorneys' fees and costs in this action.

102.    Granting Wi-LAN its costs and further relief as the Court may deem just and proper.

# DEMAND FOR JURY TRIAL

103.   Wi-LAN demands a trial by jury of any and all issues triable of right before a jury.

Dated: February 22, 2017          By: s/ Victor M. Felix

Victor M. Felix
California Bar No. 179622
Victor.Felix@procopio.com
PROCOPIO, CORY, HARGREAVES
   & SAVITCH LLP
525 B Street, Suite 2200
San Diego, CA 92101
Tel.  (619) 515-3229
Fax  (619) 744-5409

Leslie V. Payne
TX. Bar No. 00784736 (*pro hac vice* pending)
lpayne@hpcllp.com
Eric J. Enger
TX. Bar No. 24045833 (*pro hac vice* pending)
eenger@hpcllp.com
Christopher M. First
TX. Bar No. 24095112 (*pro hac vice* pending)
cfirst@hpcllp.com
HEIM, PAYNE & CHORUSH LLP
1111 Bagby St., Suite 2100
Houston, TX 77002
T: (713)221-2000   F: (713)221-2021

Attorneys for Plaintiff *Wi-LAN*.