Joseph S. Leventhal
Joseph.leventhal@dinsmore.com
DINSMORE & SHOHL LLP
655 West Broadway, Suite 840
San Diego, CA 92101
(619) 356-3518 (T) / (619) 400-0501 (F)

Richard D. Harris (*pro hac vice*)
harrisr@gtlaw.com
James J. Lukas, Jr. (*pro hac vice*)
lukasj@gtlaw.com
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
(312) 456-8400 (T) / (312) 456-8435 (F)

*Attorneys for Defendants and Counterclaim-Plaintiffs,*
*LG Electronics, Inc., LG Electronics U.S.A., Inc., and LG*
*Electronics Mobilecomm U.S.A., Inc.*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WI-LAN, INC., WI-LAN USA, INC., and WI-LAN LABS, INC., | CASE NO. 3:17-cv-00358-BEN-BGS |
| Plaintiffs, | **DEFENDANTS LG ELECTRONICS, INC., LG ELECTRONICS U.S.A., INC., AND LG ELECTRONICS MOBILECOMM U.S.A., INC.'S ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS** |
| v. | |
| LG ELECTRONICS, INC., LG ELECTRONICS U.S.A., INC., and LG ELECTRONICS MOBILECOMM U.S.A., INC., | |
| Defendants. | Judge: Hon. Roger T. Benitez |

17cv00358

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LG ELECTRONICS, INC., LG
ELECTRONICS U.S.A., INC., and LG
ELECTRONICS MOBILECOMM
U.S.A., INC.,

          Counterclaim-Plaintiffs,

v.

WI-LAN, INC., WI-LAN USA, INC.,
and WI-LAN LABS, INC.,

          Counterclaim-Defendants.

Defendants LG Electronics, Inc., LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc. (collectively, "LG") by and through their undersigned counsel of record and for its Answer to the Complaint of Plaintiffs Wi-LAN, Inc., Wi-LAN USA, Inc., and Wi-LAN Labs, Inc. (collectively, "Wi-LAN") herein states as follows:

## NATURE OF ACTION

1.      This is an action for infringement of U.S. Patent Nos. 8,787,924 ("the '924 Patent"), 8,867,351 ("the '351 Patent"), 9,226,320 ("the '320 Patent"), and 9,497,743 ("the '743 Patent").   The '924 Patent, '351 Patent, '320 Patent, and '743 Patent are hereby incorporated by reference.

**Answer:**      LG admits that the Complaint purports to state causes of action for infringement of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent against LG.   LG denies that any such claims are meritorious with respect to LG.   LG admits that the Complaint purports to incorporate the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent by reference, but denies that they can be incorporated because they are not attached to the Complaint.   LG denies all of the remaining allegations of this Paragraph.

## THE PARTIES

2.      Plaintiff Wi-LAN, Inc. is a corporation organized and existing under the laws of Canada with its principal place of business at 303 Terry Fox Drive, Suite 300, Ottawa, ON, K2K 3J1, Canada.

**Answer:**      LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

3.      Plaintiff Wi-LAN USA, Inc. is a corporation organized and existing under the laws of Florida with its principal executive office at 303 Terry Fox Drive, Suite 300, Ottawa, ON, K2K 3J1, Canada, and a principal business office at 600 Anton Blvd., Suite 1350, Costa Mesa, CA, 92626.

**Answer:**      LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

4.     Plaintiff Wi-LAN Labs, Inc. is a corporation organized and existing under the laws of Delaware with its principal executive office at 303 Terry Fox Drive, Suite 300, Ottawa, ON, K2K 3J1, Canada, and a principal business office at 5962 La Place Court Suite 265, Carlsbad, CA 92008.

**Answer:**     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

5.     LG Electronics, Inc. is incorporated under the laws of South Korea with its principal place of business at LG Twin Towers 20, Yeouido-dong, Yeongdeunspo-gu, Seoul 150-721, South Korea.  Upon information and belief, LG Electronics, Inc. owns and controls, directly and/or indirectly, LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc.

**Answer:**     Admitted that LG Electronics, Inc. is a South Korean corporation and has a principal place of business in Seoul, South Korea.  Admitted that LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc. are wholly owned subsidiaries of LG Electronics, Inc.  LG denies all of the remaining allegations of this Paragraph.

6.     LG Electronics U.S.A., Inc. is a Delaware corporation with its principal place of business at 1000 Sylvan Ave, Englewood Cliffs, New Jersey.  LG Electronics U.S.A., Inc. may be served via its registered agent, United States Corporation Company, 2711 Centerville Rd. Ste. 400, Wilmington, DE 19808.

**Answer:**     Admitted that LG Electronics U.S.A., Inc. is a Delaware corporation and has a principal place of business in Englewood Cliffs, New Jersey.  To the extent the remaining allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG admits that LG Electronics U.S.A., Inc. may be served via its registered agent.

7.     LG Electronics Mobilecomm U.S.A., Inc. is a California corporation with its principal place of business at 10225 Willow Creek Rd., San Diego, California 92131. LG Electronics Mobilecomm U.S.A., Inc. may be served via its registered agent,

Corporation Service Company (Which will do Business in California as CSC - Lawyers Incorporating Service), 2710 Gateway Oaks Dr. Ste. 150N Sacramento, CA 95833.

**Answer:**   Admitted that LG Electronics Mobilecomm U.S.A., Inc. is a California corporation and has a principal place of business in San Diego, California.  To the extent the remaining allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG admits that LG Electronics Mobilecomm U.S.A., Inc. may be served via its registered agent.

### JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 101 *et seq.*

**Answer:**   To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG admits that 28 U.S.C. §§ 1331 and 1338(a) provide jurisdiction to this Court for cases arising under federal patent law.

9.     This Court has personal jurisdiction over LG as personal jurisdiction over LG in this action comports with due process.  LG has conducted and regularly conducts business within the United States and this judicial district.  LG has continuous and systematic contacts with California and this judicial district.  Furthermore, LG has purposefully availed itself of the privileges of conducting business in the United States and this judicial district.  LG has sought protection and benefit from the laws of the State of California by maintaining offices in California and this judicial district, by selling products with the expectation and/or knowledge that they will be purchased by consumers in this judicial district, and/or by offering advertisements targeted at consumers in this judicial district, and/or by having partners and customers in this judicial district.  In California and in this judicial district, LG regularly does or solicits business and engages in other persistent courses of conduct.  LG derives substantial

revenue from services provided to individuals in California and in this judicial district. Plaintiff's causes of action arise directly from LG's activities in this judicial district. In particular, LG's research and development division is based in San Diego. And LG's San Diego-based division is the center of LG's 3GPP and standardization efforts. LG has even sought to transfer other patent cases involving LTE technology to the Southern District of California.

**Answer:** To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required. To the extent a response is deemed to be required, LG denies the allegations of this Paragraph, but states that it does not contest personal jurisdiction over LG.

10. Joinder of Defendants is proper because Defendants are related parties who are either jointly and severally liable for infringement, or who make, use, sell, offer for sale, or import the same or similar accused products that practice the same 4G LTE standards. Further, upon information and belief, Defendants use the same chip suppliers and chipsets in their infringing products, meaning the factual question of infringement will substantially overlap between Defendants. Further, Plaintiffs anticipate that there will be substantial overlap during the discovery process.

**Answer:** To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required. To the extent a response is deemed to be required, LG denies the allegations of this Paragraph.

11. Venue is proper in this federal district pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b) in that one or all Defendants reside in this District, have done business in this District, have regular and established places of business in this District, have committed acts of infringement in this District, and continue to commit acts of infringement in this District, entitling Plaintiffs to relief.

**Answer:** To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required. To the extent a response is deemed to be

required, LG admits that 28 U.S.C. §§ 1391(b) and (c) and 1400(b) provide for venue in this District.  LG denies all of the remaining allegations of this Paragraph.

12.     No other venue is more convenient than the Southern District of California. Plaintiff Wi-LAN Labs, Inc. resides in this district.  Two of the three patents in suit were developed in this district (and the other was developed elsewhere in California).  Further, many of the inventors of the patents-in-suit, including Ken Stanwood, Yair Bourlas, Adam Newham, and Lei Wang currently reside in this district.  And Wi-LAN's current U.S. headquarters is also located in California (600 Anton Boulevard, Suite 1350, Costa Mesa, California 92626).   Also, important third-party suppliers for Defendants' infringing products reside in this district.

**Answer:**     To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG states that it does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.  LG also denies that any of its products are infringing.

## **BACKGROUND OF THE TECHNOLOGY**

13.     Wi-LAN Labs developed advanced 4G technologies and products for Wi-LAN and others in the wireless industry that enhance the capacity, quality of user experience, and connectivity of 4G (and next generation 5G) mobile devices and networks.

**Answer:**     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

14.     Several of the 4G patents asserted in this action were developed by Wi-LAN's own Ken Stanwood, the former president of Wi-LAN Labs and current CTO at Wi-LAN, Inc., and his team.

**Answer:**     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

15.     Mr. Stanwood has played a leadership role in the development of 4G technologies and standards for more than a decade, starting with the industry's first major 4G cellular initiative, referred to as WiMAX.  He served as Vice Chair of the IEEE 802.16 standards committee for WiMAX from 2003-2006 and as a principal contributor to the original IEEE 802.16 standard for 4G cellular networks and mobile devices.

**Answer**:     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

16.     Mr. Stanwood has written extensively on 4G technologies, including coauthoring a popular textbook on the subject, and has been awarded 125 U.S. patents, with many more patent applications currently pending before the United States Patent Office and worldwide, many of which relate to 4G technologies.

**Answer**:     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

17.     Like Ken Stanwood, Wi-LAN's founders, Michel Fattouche and Hatim Zaghloul, are widely recognized and acknowledged as wireless industry pioneers.  Their technologies, patents and writings have been cited in patents and publications written by thousands of engineers and scientists in the wireless industry.

**Answer**:     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

18.     Wi-LAN's founders developed key cellular "data" technologies, including the W-OFDM air interface, to enable data to be exchanged at desktop speeds over a wireless channel, such as in Wi-Fi networks, or from mobile devices in 4G cellular networks.  Wi-LAN's technologies have made Wi-Fi and 4G in mobile devices possible.[1]

**Answer**:     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph (including footnote 1) and, therefore, denies same.

---

[1] *See, e.g., Ergen, Mustafa, Mobile Broadband: Including WiMAX and LTE*, John Wiley & Sons, 2009 at p. 110, Section 4.1 "Principles of OFDM: Introduction" (recognizing one of Wi-LAN's first patents, U.S. Patent No. 5,282,222, to WOFDM as a major milestone in the development of Wi-Fi and 4G technologies, turning a single lane wireless communication channel into a multi-lane super highway, and enabling mobile devices to transmit and receive data at desktop speeds).

19.   The Wi-LAN success story is featured in major publications worldwide, including in such publications as Scientific American[2] and Time Magazine,[3] and in many others.   Wi-LAN and its founders have also been the subject of numerous industry awards for their wireless innovations, and for their contribution to the growth in wireless data capability present in today's smartphones, tablets, and other mobile devices.

**Answer:**   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph (including footnotes 2 and 3) and, therefore, denies same.

20.   One of Wi-LAN's co-founders is featured in one of Canada's leading business publications as among the Top 100 Canadians of the 20th century for Wi-LAN's wireless innovations.[4] And Wi-LAN's original wireless designs and first wireless mobile device have been displayed in the Canadian equivalent of the Smithsonian Institution.

**Answer**:   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph (including footnote 4) and, therefore, denies same.

21.   Enabling high-speed wireless data capability in mobile devices was no small task–it posed incredible challenges–something we take for granted today with desktop speeds now standard in 4G mobile devices.

**Answer**:   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

22.   Over the years, Wi-LAN, Wi-LAN Labs, and their predecessors have invested hundreds of millions of dollars in developing, making and selling many of the

---

[2] The Future of Wireless, *Scientific American*, October 2000 at p. 57 ("To date, wireless multiplexing hasn't been exploited for cellular systems…. That may change soon…. Wi LAN holds a number of key patents for multiplexing technology known as wideband orthogonal frequency division multiplexing, or WOFDM").

[3] Wi-LAN Shows How to be Successful-and-Canadian-in the Global Economy, *Time Magazine*, April 3, 2000.

[4] Great Canadians, *Maclean's*, July 1, 2000 ("Riding the wave of invention ... Wi-LAN is one of those next generation companies.  Its technology may well become the base for what some call the coming wireless revolution: the ability to e-mail, surf the Net, adjust the lights in your home and order theater tickets from a cellphone or handheld computer.")

world's first fixed and mobile devices capable of transmitting and receiving wireless data at desktop speeds.

**Answer:**   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

23.   Wi-LAN's products which had 4G data speeds include, among others, the I.WILL, BWS 300, LIBRA 3000, LIBRA 5800, LIBRA MX, and the LIBRA Mobilis.

**Answer:**   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

24.   Wi-LAN was the first company in the world to build Wi-Fi and 4G data speeds into mobile devices, with speeds reaching up to 100 megabits per second (Mbps), and it did so a decade before 4G would become the standard in the wireless industry that it is today.

**Answer:**   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

25.   A number of Wi-LAN's advanced 4G technologies have their origin in work started by Wi-LAN's Ken Stanwood and his team while at Ensemble Communications ("Ensemble"), a San Diego company that Mr. Stanwood helped grow (then, as Ensemble's Chief Technology Officer) to over 200 engineers, scientists, and support personnel.

**Answer**:   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

26.   Others of Wi-LAN's advanced 4G technologies have their origin in work created at NextWave Communications, another San Diego company where Mr. Stanwood served as a Vice President.  And yet other technologies were first developed at SOMA network, a California-based company involved in 4G technologies.

**Answer**:   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

27.     The advanced 4G technologies developed by Mr. Stanwood and his team were employed in the network stacks utilizing the 4G WiMAX cellular standard, and were subsequently adopted for use in the network stacks utilizing the 4G LTE cellular standard used in today's 4G mobile devices.

**Answer**:     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

28.     These advanced 4G technologies include:

(i) the bandwidth-on-demand and periodic bandwidth services built into 4G mobile devices to enable apps installed on such devices to have the bandwidth they need, when they need it, in real-time;

(ii) the quality-of-service functions built into 4G mobile devices to enable mobile devices to prioritize the services that have the most pressing need for bandwidth; and

(iii) the handoff functionality built into 4G mobile devices to identify particular devices and use pre-allocated codes to respond faster to requests from mobile devices.

**Answer**:     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

29.     The efforts of Mr. Stanwood and other Wi-LAN inventors in developing these advanced 4G technologies have enabled 4G mobile devices to support a variety of services popular among users of Defendants' 4G LTE mobile devices, such as voice, conversational video, live streaming of video and music, real-time gaming, video and photo sharing, email, and instant messaging, all in the palm of your hand ("4G Network Services").

**Answer**:     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

30.     Wi-LAN's wireless technologies and patents, including its advanced 4G technologies, have been licensed by nearly all companies in the wireless industry, comprising more than 130 companies.

**Answer**:      LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

31.      Defendants' infringement gives them an unfair advantage over their competitors, many of whom have chosen to do the right thing and license their use of Wi-LAN's wireless technologies and patents. Many of Defendants' major competitors in the mobile device industry, including Samsung, HTC, Nokia and BlackBerry have licensed Wi-LAN's wireless technologies and patents.

**Answer**:      To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG states that it does not have sufficient information to admit or deny the allegation that LG's competitors have licensed Wi-LAN's wireless technologies and patents and, therefore, denies same.  LG denies the remaining allegations set forth in this Paragraph.

32.      Wi-LAN has made numerous efforts to license the unauthorized use of its wireless technologies by the Defendants, but Defendants have consistently refused to take a license, choosing to use Wi-LAN's 4G technologies without paying anything for that right.

**Answer**:      LG admits that Wi-LAN sought to license its wireless patent portfolio to LG.  LG denies the remaining allegations set forth in this Paragraph.

33.      Defendants have willfully chosen to not respect the intellectual property of Wi-LAN, including the three 4G patents asserted in this action directed to Wi-LAN's advanced 4G technologies, and it does so despite understanding the importance of intellectual property.

**Answer**:      Denied.

34.      Before initiating litigation, Wi-LAN made substantial efforts to license Defendants' use of Wi-LAN's advanced 4G technologies and patents in their 4G LTE mobile devices, expecting that Defendants would proceed in good faith.

**Answer**:      Denied.

35.    During the spring of 2016, Wi-LAN contacted the Defendants to engage in licensing the patents-in-suit relating to LTE and 4G wireless technology.  Defendants initially expressed interest.  But despite Wi-LAN's repeated efforts, Defendants failed to take a license.

**Answer**:    LG admits that Wi-LAN contacted LG in the spring of 2016 to renew its license to Wi-LAN's wireless patent portfolio, and that LG did not renew its license. LG denies the remaining allegations set forth in this Paragraph.

36.    Defendants' actions have forced Wi-LAN's hand, leaving it with no choice but to protect its intellectual property through litigation.

**Answer**:    Denied.

## DEFENDANTS' INFRINGING PRODUCTS

37.    LG directly or indirectly through subsidiaries or affiliated companies markets, distributes, manufactures, imports, sells, and/or offers for sale wireless communication products, such as products compliant with the 3rd Generation Partnership Project ("3GPP") 4G LTE standard, including but not limited to the LG V20, LG Watch Urbane 2nd Edition LTE, LG Stylus 3, LG Stylo 2 V, LG Stylo 2 Plus, LG Stylo 3, LG K3 2017, LG K4 2017, LG K8 2017, LG K10 2017, LG K8V, LG G Stylo, LG Stylo 2, LG Tribute HD, LG Aristo, LG G5, LG G4, LG G4c, LG G3, LG G3 S, LG G3 Beat, LG G3 Vigor, LG G2, LG K7, LG X Power, LG X Mach, LG X cam, LG X screen, LG Leon LTE, LG K10, LG B470, LG B471, LG Escape 3, LG Volt, LG Premier LTE, LG Treasure LTE, LG Classic, LG Rebel, LG Treasure, LG X style, LG Premier, LG K3, LG K8, LG K4, LG Optimus Zone 3, LG Optimus G Pro, LG K8 V, LG K8, LG Phoenix 2, LG Tribute 5, LG Wine 4, LG V10, LG Tribute 5, LG Spree, LG G Vista 2, LG Risio, LG Terra, LG Exalt II, LG Sunrise, LG G Flex 2, LG Destiny, LG Sunset, LG 441G, LG Access, LG Envoy III, LG 450, LG True, LG Revere 3, LG Extravert 2, LG XPression 2, LG G Flex, LG Cosmos 3, LG G Pad X II, LG G Pad X, LG G Pad F, and LG G Pad, in the United States and in this district.  As some of these products, and additional LG LTE devices, are known by internal model numbers, codenames, or have alternate versions

and iterations, discovery will be necessary to finalize a list of devices that infringe the patents-in-suit. LG's products support at least Release 8, et seq. of the 4G LTE standard.

**Answer**: LG admits that LG Electronics, Inc. makes the above-listed products and LG Electronics Mobilecomm U.S.A., Inc. sells the above-listed products, but LG states that LG Electronics U.S.A., Inc. does not market, distribute, manufacture, import, sell, or offer for sale any of the above-listed products. LG denies the remaining allegations set forth in this Paragraph.

38. Upon information and belief, LG's products also include software and associated hardware that prioritize the transmission of data generated by various applications that run on these LG products, and in doing such prioritization utilize the claimed inventions of the patents asserted in this action.

**Answer**: Denied.

## WILLFUL INFRINGEMENT

39. Prior to the filing of this complaint, Defendants knew or should have known that they infringed the patents-in-suit. On April 7, 2016, Wi-LAN invited LG to renew its license to Wi-LAN's "wireless portfolio," including its patents covering "LTE." LG knew or reasonably should have known based on its prior license that such patents in the "wireless portfolio" covering "LTE" included the three patents-in-suit. Yet despite repeated requests from Wi-LAN on May 16, June 10, and June 27, 2016, LG declined to substantively engage in licensing negotiations with Wi-LAN or take a license.

**Answer**: LG admits that Wi-LAN contacted LG in the spring of 2016 to renew its license to Wi-LAN's wireless patent portfolio, and that LG did not renew its license. LG denies the remaining allegations set forth in this Paragraph.

40. Accordingly, LG has had knowledge, or reasonably should have had knowledge, of the patents-in-suit since at least April 7, 2016 and certainly by the filing of this complaint. Despite such knowledge, Defendants have proceeded to infringe the patents-in-suit with full and complete knowledge of their applicability to their respective 4G LTE products without taking a license and without a good faith belief that the

patents-in-suit are invalid and not infringed.  Defendants' infringement of the patents-in-suit thus occurs with knowledge of infringement and/or objective recklessness and has been and continues to be willful and deliberate.  Thus, Defendants' infringement of the patents-in-suit is willful and deliberate, entitling Wi-LAN to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

**Answer**:     Denied.

### INFRINGEMENT OF U.S. PATENT NO. 8,787,924

41.     Wi-LAN incorporates the allegations of paragraphs 1 through 40 above as if set forth verbatim herein.

**Answer**:     LG incorporates by reference its answers to Paragraphs 1 through 40, *supra*, as if set forth in full herein.

42.     On July 22, 2014, United States Patent No. 8,787,924 ("the '924 Patent") was duly and legally issued for inventions entitled "Methods and Systems for Transmission of Multiple Modulated Signals Over Wireless Networks."  Wi-LAN owns the '924 Patent and holds the right to sue and recover damages for infringement thereof.

**Answer**:     LG admits that the '924 Patent is titled "Methods and Systems for Transmission of Multiple Modulated Signals Over Wireless Networks."  LG admits that the face of the '924 Patent indicates that it was issued on July 22, 2014.  LG admits that the face of the '924 Patent indicates that Wi-LAN, Inc. is the applicant and assignee of the '924 Patent at least as of the issue date.  LG denies that the '924 Patent was duly and legally issued.  LG denies the remaining allegations set forth in this Paragraph, and notes that the '924 Patent was not attached to the Complaint.

43.     On information and belief, Defendants have directly infringed and continue to directly infringe numerous claims of the '924 Patent, including at least claims 1 and 17, by manufacturing, using, selling, offering to sell, and/or importing their respective accused 4G LTE devices.  Defendants are liable for infringement of the '924 Patent pursuant to 35 U.S.C. § 271(a).

1    **Answer**:      Denied.

2         44.    For example, the LG accused 4G LTE devices comply with the 4G LTE

3    standards, including the UL-SCH data transfer procedure specified by 3GPP TS 36.321 at

4    section 5.4.   In particular, the accused 4G LTE devices first transmit a Scheduling

5    Request (*i.e.*, "a one bit message to the base station to request an allocation of UL

6    bandwidth in which to transmit a bandwidth request") and then subsequently transmit a

7    Buffer Status Report (*i.e.*, a "bandwidth request indicative of an amount of pending UL

8    data").   Thereafter, the accused devices dynamically allocate the assigned UL bandwidth

9    amongst their respective "UL services based on a QoS parameter of a respective service."

10    **Answer**:      Denied.

11        45.    Defendants have been and are now indirectly infringing at least one claim of

12    the '924 Patent in accordance with 35 U.S.C. § 271(b) in this district and elsewhere in the

13    United States.   More specifically, Defendants have been and are now actively inducing

14    direct infringement by other persons (*e.g.*, Defendants' customers who use, sell or offer

15    for sale products that embody and/or otherwise practice one or more claims of the '924

16    Patent).

17    **Answer**:      Denied.

18        46.    By at least the filing of this complaint, Defendants had knowledge of the

19    '924 Patent, and that their actions resulted in a direct infringement of the '924 Patent, and

20    knew or were willfully blind that their actions would induce direct infringement by others

21    and intended that their actions would induce direct infringement by others.

22    **Answer**:      To the extent the allegations of this Paragraph purport to state a legal

23    conclusion, no response thereto is required.   To the extent a response is deemed to be

24    required, LG admits that LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm

25    U.S.A., Inc. were aware of the '924 Patent as of the date of service of Wi-LAN's

26    Complaint, but states that LG Electronics, Inc. was not aware of the '924 Patent as of the

27    date of service of Wi-LAN's Complaint.   LG denies all of the remaining allegations of

28    this Paragraph.

47.     Defendants actively induce such infringement by, among other things, providing user manuals and other instruction material for their devices that induce their customers to use Defendants' devices in their normal and customary way to infringe the '924 Patent.  For example, LG's website provides instructions for using the LG devices on 4G LTE networks.  *See*, *e.g.*, http://www.lg.com/us/4glte-phones (noting that "LG 4G LTE phones feature forward-thinking designs and innovative technology" and emphasizing the "4G LTE phone Network," which permits the accused LG 4G LTE devices to "stay connected wherever you go on a super-fast LTE network, for seamless and reliable use.").  As does LG's user documentation for the accused devices.  *See*, *e.g.*, http://www.lg.com/us/supportmobile/lg-H910-Silver (encouraging customers to use the "Enhanced LTE Service").   Through its manufacture and sales of their devices, Defendants specifically intended for their customers to infringe the '924 Patent. Further, Defendants were aware that these normal and customary activities would infringe the '924 Patent.  Defendants performed the acts that constitute induced infringement, and that would induce actual infringement, with knowledge of the '924 Patent and with the knowledge or willful blindness that the induced acts would constitute direct infringement.

**Answer**:     Denied.

48.     Accordingly, a reasonable inference is that Defendants specifically intend for others, such as their customers, to directly infringe one or more claims of the '924 Patent in the United States because Defendants had knowledge of, and were aware of Wi-LAN's infringement allegations concerning, the '924 Patent and actively induced others (*e.g.*, its customers) to directly infringe the '924 Patent by using, selling, or offering to sell Defendants' 4G LTE devices.

**Answer**:     Denied.

49.     Defendants have been and are now indirectly infringing at least one claim of the '924 Patent in accordance with 35 U.S.C. § 271(c) in this district and elsewhere in the United States.  More specifically, Defendants have been and are now providing non-staple articles of commerce to others for use in an infringing system or method with

knowledge of the '924 Patent, and with knowledge that the use of their products resulted in a direct infringement of the '924 Patent by their customers, and with knowledge that these non-staple articles of commerce are used as a material part of the claimed invention of the '924 Patent.

**Answer**:     Denied.

50.     Defendants' devices compliant with 4G LTE include components comprising an application processor and a baseband processor specifically designed to support communication and transmission of data over 4G LTE-compliant networks. These components are mounted to a circuit board in Defendants' accused devices and, absent these components, Defendants' devices compliant with 4G LTE would not function in an acceptable manner to send or receive data over 4G LTE networks.   A reasonable inference to be drawn from the facts set forth is that these components in Defendants' devices are especially made or especially adapted to operate in the accused devices to provide wireless communication, including the transmission of data in accordance with the 4G LTE standard.  Further, a reasonable inference to be drawn from the facts is that these components comprising an application processor and a baseband processor are intended to support communication of data over a 4G LTE network and are not staple articles or commodities of commerce, and that the use of the components is required for operation of the devices to send or receive data over a 4G LTE-compliant network.  Any other use would be unusual, far-fetched, illusory, occasional, aberrant, or experimental.

**Answer**:     Denied.

51.     The components comprising an application processor and a baseband processor designed to support communication of data using 4G LTE in Defendants' devices are each a material part of the invention of the '924 Patent and are especially made for the infringing manufacture, sale, and use of Defendants' accused devices. Defendants' devices, including those components, are especially made or adapted to infringe the '924 Patent, and have no substantial non-infringing uses.

1    **Answer**:     Denied.

2    52.    The '924 Patent is valid and enforceable.

3    **Answer**:     Denied.

4    53.    Defendants' infringement of the '924 Patent has damaged Wi-LAN, and

5    Defendants are liable to Wi-LAN in an amount to be determined at trial that compensates

6    Wi-LAN for the infringement, which by law can be no less than a reasonable royalty.

7    **Answer**:     Denied.

8    54.    As a result of Defendants' infringement of the '924 Patent, Wi-LAN has

9    suffered irreparable harm and will continue to suffer loss and injury unless Defendants

10   are enjoined by this Court.

11   **Answer**:     Denied.

12   **INFRINGEMENT OF U.S. PATENT NO. 9,497,743**

13   55.    Wi-LAN incorporates the allegations of paragraphs 1 through 40 above as if

14   set forth verbatim herein.

15   **Answer**:     LG incorporates by reference its answers to Paragraphs 1 through 54,

16   *supra*, as if set forth in full herein.

17   56.    On November 15, 2016, United States Patent No. 9.497.743 ("the '743

18   Patent") was duly and legally issued for inventions entitled "Methods and Systems for

19   Transmission of Multiple Modulated Signals Over Wireless Networks."  Wi-LAN owns

20   the '743 Patent and holds the right to sue and recover damages for infringement thereof.

21   **Answer**:     LG admits that the '743 Patent is titled "Methods and Systems for

22   Transmission of Multiple Modulated Signals Over Wireless Networks."  LG admits that

23   the face of the '743 Patent indicates that it was issued on November 15, 2016.  LG admits

24   that the face of the '743 Patent indicates that Wi-LAN, Inc. is the applicant and assignee

25   of the '743 Patent at least as of the issue date.  LG denies that the '743 Patent was duly

26   and legally issued.  LG denies the remaining allegations set forth in this Paragraph, and

27   notes that the '743 Patent was not attached to the Complaint.

28

57.   On information and belief, Defendants have directly infringed and continue to directly infringe numerous claims of the '743 Patent, including at least claims 1 and 6, by manufacturing, using, selling, offering to sell, and/or importing their respective accused 4G LTE devices.  Defendants are liable for infringement of the '743 Patent pursuant to 35 U.S.C. § 271(a).

**Answer**:   Denied.

58.   For example, the LG accused 4G LTE devices comply with the 4G LTE standards, including the UL-SCH data transfer procedure specified by 3GPP TS 36.321 at section 5.4.  In particular, the accused 4G LTE devices first transmit a Scheduling Request (*i.e.*, "an explicit message to the base station informing the base station that the cellular telephone has data awaiting transmission to the base station over the UL connection between the cellular telephone and the base station") and then subsequently transmit a Buffer Status Report (*i.e.*, a "information indicative of an amount of data awaiting transmission to the base station over the UL connection between the cellular telephone and the base station").

**Answer**:   Denied.

59.   Defendants have been and are now indirectly infringing at least one claim of the '743 Patent in accordance with 35 U.S.C. § 271(b) in this district and elsewhere in the United States.  More specifically, Defendants have been and are now actively inducing direct infringement by other persons (*e.g.*, Defendants' customers who use, sell or offer for sale products that embody and/or otherwise practice one or more claims of the '743 Patent).

**Answer**:   Denied.

60.   By at least the filing of this complaint, Defendants had knowledge of the '743 Patent, and that their actions resulted in a direct infringement of the '743 Patent, and knew or were willfully blind that their actions would induce direct infringement by others and intended that their actions would induce direct infringement by others.

**Answer**:     To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG admits that LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc. were aware of the '743 Patent as of the date of service of Wi-LAN's Complaint, but states that LG Electronics, Inc. was not aware of the '743 Patent as of the date of service of Wi-LAN's Complaint.  LG denies all of the remaining allegations of this Paragraph.

61.     Defendants actively induce such infringement by, among other things, providing user manuals and other instruction material for their devices that induce their customers to use Defendants' devices in their normal and customary way to infringe the '743 Patent.  For example, LG's website provides instructions for using the LG devices on 4G LTE networks.  *See*, *e.g.*, http://www.lg.com/us/4glte-phones (noting that "LG 4G LTE phones feature forward-thinking designs and innovative technology" and emphasizing the "4G LTE phone Network," which permits the accused LG 4G LTE devices to "stay connected wherever you go on a super-fast LTE network, for seamless and reliable use.").  As does LG's user documentation for the accused devices.  *See*, *e.g.*, http://www.lg.com/us/supportmobile/lg-H910-Silver (encouraging customers to use the "Enhanced LTE Service").     Through its manufacture and sales of their devices, Defendants specifically intended for their customers to infringe the '743 Patent.  Further, Defendants were aware that these normal and customary activities would infringe the '743 Patent.  Defendants performed the acts that constitute induced infringement, and that would induce actual infringement, with knowledge of the '743 Patent and with the knowledge or willful blindness that the induced acts would constitute direct infringement.

**Answer**:     Denied.

62.     Accordingly, a reasonable inference is that Defendants specifically intend for others, such as their customers, to directly infringe one or more claims of the '743 Patent in the United States because Defendants had knowledge of, and were aware of Wi-LAN's infringement allegations concerning, the '743 Patent and actively induced others

(*e.g.*, its customers) to directly infringe the '743 Patent by using, selling, or offering to sell Defendants' 4G LTE devices.

**Answer**:     Denied.

63.     Defendants have been and are now indirectly infringing at least one claim of the '743 Patent in accordance with 35 U.S.C. § 271(c) in this district and elsewhere in the United States.   More specifically, Defendants have been and are now providing non-staple articles of commerce to others for use in an infringing system or method with knowledge of the '743 Patent, and with knowledge that the use of their products resulted in a direct infringement of the '743 Patent by their customers, and with knowledge that these non-staple articles of commerce are used as a material part of the claimed invention of the '743 Patent.

**Answer**:     Denied.

64.     Defendants' devices compliant with 4G LTE include components comprising an application processor and a baseband processor specifically designed to support communication and transmission of data over 4G LTE-compliant networks. These components are mounted to a circuit board in Defendants' accused devices and, absent these components, Defendants' devices compliant with 4G LTE would not function in an acceptable manner to send or receive data over 4G LTE networks.   A reasonable inference to be drawn from the facts set forth is that these components in Defendants' devices are especially made or especially adapted to operate in the accused devices to provide wireless communication, including the transmission of data in accordance with the 4G LTE standard.   Further, a reasonable inference to be drawn from the facts is that these components comprising an application processor and a baseband processor are intended to support communication of data over a 4G LTE network and are not staple articles or commodities of commerce, and that the use of the components is required for operation of the devices to send or receive data over a 4G LTE-compliant network.   Any other use would be unusual, far-fetched, illusory, occasional, aberrant, or experimental.

**Answer**:      Denied.

65.    The components comprising an application processor and a baseband processor designed to support communication of data using 4G LTE in Defendants' devices are each a material part of the invention of the '743 Patent and are especially made for the infringing manufacture, sale, and use of Defendants' accused devices. Defendants' devices, including those components, are especially made or adapted to infringe the '743 Patent, and have no substantial non-infringing uses.

**Answer**:      Denied.

66.    The '743 Patent is valid and enforceable.

**Answer**:      Denied.

67.    Defendants' infringement of the '743 Patent has damaged Wi-LAN, and Defendants are liable to Wi-LAN in an amount to be determined at trial that compensates Wi-LAN for the infringement, which by law can be no less than a reasonable royalty.

**Answer**:      Denied.

68.    As a result of Defendants' infringement of the '743 Patent, Wi-LAN has suffered irreparable harm and will continue to suffer loss and injury unless Defendants are enjoined by this Court.

**Answer**:      Denied.

## **INFRINGEMENT OF U.S. PATENT NO. 8,867,351**

69.    Wi-LAN incorporates the allegations of paragraphs 1 through 40 above as if set forth verbatim herein.

**Answer**:      LG incorporates by reference its answers to Paragraphs 1 through 68, *supra*, as if set forth in full herein.

70.    On October 21, 2014, United States Patent No. 8,867,351 ("the '351 Patent") was duly and legally issued for inventions entitled "Apparatus, System, and Method for the Transmission of Data with Different QoS Attributes."  Wi-LAN owns the '351 Patent and holds the right to sue and recover damages for infringement thereof.

**Answer**:     LG admits that the '351 Patent is titled "Apparatus, System, and Method for the Transmission of Data with Different QoS Attributes."  LG admits that the face of the '351 Patent indicates that it was issued on October 21, 2014.  LG admits that the face of the '351 Patent indicates that Wi-LAN, Inc. is the applicant and assignee of the '351 Patent at least as of the issue date.  LG denies that the '351 Patent was duly and legally issued.  LG denies the remaining allegations set forth in this Paragraph, and notes that the '351 Patent was not attached to the Complaint.

71.     On information and belief, Defendants have directly infringed and continue to directly infringe numerous claims of the '351 Patent, including at least claims 1 and 7, by manufacturing, using, selling, offering to sell, and/or importing their respective accused 4G LTE devices. Defendants are liable for infringement of the '351 Patent pursuant to 35 U.S.C. § 271(a).

**Answer**:     Denied.

72.     For example, the LG accused 4G LTE devices comply with the 4G LTE standards, including the UL-SCH data transfer procedure specified by 3GPP TS 36.321 at section 5.4 and, even more specifically, the Logical Channel Prioritization procedure specified at section 5.4.3.1.  In particular, the accused 4G LTE devices transfer data on "logical channels."  Prior to transfer, the MAC entity (*i.e.*, "link controller") queues data into "logical channel queues" that can have a "priority" and a prioritized bit rate (*i.e.*, "traffic shaping rate").   The accused 4G LTE devices then examine the available channels to determine which queues to assign to which channels, and attempt to fill the transmission capacity of the channels.  In this way, highest priority transmissions will be made first.

**Answer**:     Denied.

73.     Defendants have been and are now indirectly infringing at least one claim of the '351 Patent in accordance with 35 U.S.C. § 271(b) in this district and elsewhere in the United States.  More specifically, Defendants have been and are now actively inducing direct infringement by other persons (*e.g.*, Defendants' customers who use, sell or offer

1  for sale products that embody and/or otherwise practice one or more claims of the '351

2  Patent).

3       **Answer**:      Denied.

4       74.    By at least the filing of this complaint, Defendants had knowledge of the

5  '351 Patent, and that their actions resulted in a direct infringement of the '351 Patent, and

6  knew or were willfully blind that their actions would induce direct infringement by others

7  and intended that their actions would induce direct infringement by others.

8       **Answer**:      To the extent the allegations of this Paragraph purport to state a legal

9  conclusion, no response thereto is required.  To the extent a response is deemed to be

10 required, LG admits that LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm

11 U.S.A., Inc. were aware of the '351 Patent as of the date of service of Wi-LAN's

12 Complaint, but states that LG Electronics, Inc. was not aware of the '351 Patent as of the

13 date of service of Wi-LAN's Complaint.  LG denies all of the remaining allegations of

14 this Paragraph.

15      75.    Defendants actively induce such infringement by, among other things,

16 providing user manuals and other instruction material for their devices that induce their

17 customers to use Defendants' devices in their normal and customary way to infringe the

18 '351 Patent.  For example, LG's website provides instructions for using the LG devices

19 on 4G LTE networks.  *See*, *e.g.*, http://www.lg.com/us/4glte-phones (noting that "LG 4G

20 LTE phones feature forward-thinking designs and innovative technology" and

21 emphasizing the "4G LTE phone Network," which permits the accused LG 4G LTE

22 devices to "stay connected wherever you go on a super-fast LTE network, for seamless

23 and reliable use.").  As does LG's user documentation for the accused devices.  *See*, *e.g.*,

24 http://www.lg.com/us/supportmobile/lg-H910-Silver (encouraging customers to use the

25 "Enhanced LTE Service").   Through its manufacture and sales of their devices,

26 Defendants specifically intended for their customers to infringe the '351 Patent.  Further,

27 Defendants were aware that these normal and customary activities would infringe the

28 '351 Patent.  Defendants performed the acts that constitute induced infringement, and

that would induce actual infringement, with knowledge of the '351 Patent and with the knowledge or willful blindness that the induced acts would constitute direct infringement.

**Answer**:    Denied.

76.    Accordingly, a reasonable inference is that Defendants specifically intend for others, such as their customers, to directly infringe one or more claims of the '351 Patent in the United States because Defendants had knowledge of, and were aware of Wi-LAN's infringement allegations concerning, the '351 Patent and actively induced others (*e.g.*, its customers) to directly infringe the '351 Patent by using, selling, or offering to sell Defendants' 4G LTE devices.

**Answer**:    Denied.

77.    Defendants have been and are now indirectly infringing at least one claim of the '351 Patent in accordance with 35 U.S.C. § 271(c) in this district and elsewhere in the United States.   More specifically, Defendants have been and are now providing non-staple articles of commerce to others for use in an infringing system or method with knowledge of the '351 Patent, and with knowledge that the use of their products resulted in a direct infringement of the '351 Patent by their customers, and with knowledge that these non-staple articles of commerce are used as a material part of the claimed invention of the '351 Patent.

**Answer**:    Denied.

78.    Defendants' devices compliant with 4G LTE include components comprising an application processor and a baseband processor specifically designed to support communication and transmission of data over 4G LTE-compliant networks. These components are mounted to a circuit board in Defendants' accused devices and, absent these components, Defendants' devices compliant with 4G LTE would not function in an acceptable manner to send or receive data over 4G LTE networks.   A reasonable inference to be drawn from the facts set forth is that these components in Defendants' devices are especially made or especially adapted to operate in the accused devices to provide wireless communication, including the transmission of data in

accordance with the 4G LTE standard.  Further, a reasonable inference to be drawn from the facts is that these components comprising an application processor and a baseband processor are intended to support communication of data over a 4G LTE network and are not staple articles or commodities of commerce, and that the use of the components is required for operation of the devices to send or receive data over a 4G LTE-compliant network.  Any other use would be unusual, far-fetched, illusory, occasional, aberrant, or experimental.

**Answer**:    Denied.

79.    The components comprising an application processor and a baseband processor designed to support communication of data using 4G LTE in Defendants' devices are each a material part of the invention of the '351 Patent and are especially made for the infringing manufacture, sale, and use of Defendants' accused devices. Defendants' devices, including those components, are especially made or adapted to infringe the '351 Patent, and have no substantial non-infringing uses.

**Answer**:    Denied.

80.    The '351 Patent is valid and enforceable.

**Answer**:    Denied.

81.    Defendants' infringement of the '351 Patent has damaged Wi-LAN, and Defendants are liable to Wi-LAN in an amount to be determined at trial that compensates Wi-LAN for the infringement, which by law can be no less than a reasonable royalty.

**Answer**:    Denied.

82.    As a result of Defendants' infringement of the '351 Patent, Wi-LAN has suffered irreparable harm and will continue to suffer loss and injury unless Defendants are enjoined by this Court.

**Answer**:    Denied.

### INFRINGEMENT OF U.S. PATENT NO. 9,226,320

83.    Wi-LAN incorporates the allegations of paragraphs 1 through 40 above as if set forth verbatim herein.

1
2

**Answer**:      LG incorporates by reference its answers to Paragraphs 1 through 82, *supra*, as if set forth in full herein.

3
4
5
6

84.      On December 29, 2015, United States Patent No. 9,226,320 ("the '320 Patent") was duly and legally issued for inventions entitled "Pre-Allocated Random Access Identifiers." Wi-LAN owns the '320 Patent and holds the right to sue and recover damages for infringement thereof.

7
8
9
10
11
12
13

**Answer**:      LG admits that the '320 Patent is titled "Pre-Allocated Random Access Identifiers." LG admits that the face of the '320 Patent indicates that it was issued on December 29, 2015. LG admits that the face of the '320 Patent indicates that Wi-LAN, Inc. is the applicant and assignee of the '320 Patent at least as of the issue date. LG denies that the '320 Patent was duly and legally issued. LG denies the remaining allegations set forth in this Paragraph, and notes that the '320 Patent was not attached to the Complaint.

14
15
16
17
18

85.      On information and belief, Defendants LG have directly infringed and continue to directly infringe numerous claims of the '320 Patent, including at least claim 27, by manufacturing, using, selling, offering to sell, and/or importing their respective accused 4G LTE devices. Defendants are liable for infringement of the '320 Patent pursuant to 35 U.S.C. § 271(a).

19

**Answer**:      Denied.

20
21
22
23
24
25
26
27
28

86.      For example, the LG accused 4G LTE devices comply with the 4G LTE standards, including the non-contention based random access procedure specified by 3GPP TS 36.300 at section 10.1.5.2. In particular, during handover, the accused 4G LTE devices receive an information element (IE) message (RACH-ConfigDedicated) that explicitly signals the non-contention Random Access Preamble for use on the random access channel (*i.e.*, "an indication of a non-contention reserved access identifier") that uniquely identifies the mobile device, as well as System Information Blocks containing Random Access Channel related configuration information (*i.e.*, "information about a shared random access channel"). The accused 4G LTE devices then transmit the

assigned non-contention Random Access preamble to the target base station.  Next, the accused 4G LTE devices receive from the target base station a Random Access Response that conveys Timing Alignment information (*i.e.*, a feedback message comprising a timing adjustment"), including a timing advance command.  Finally, the accused 4G LTE devices adjust uplink transmission timing (*i.e.*, "adjust uplink transmission timing").

**Answer**:    Denied.

87.    Defendants have been and are now indirectly infringing at least one claim of the '320 Patent in accordance with 35 U.S.C. § 271(b) in this district and elsewhere in the United States.  More specifically, Defendants have been and are now actively inducing direct infringement by other persons (*e.g.*, Defendants' customers who use, sell or offer for sale products that embody and/or otherwise practice one or more claims of the '320 Patent).

**Answer**:    Denied.

88.    By at least the filing of this complaint, Defendants had knowledge of the '320 Patent, and that their actions resulted in a direct infringement of the '320 Patent, and knew or were willfully blind that their actions would induce direct infringement by others and intended that their actions would induce direct infringement by others.

**Answer**:    To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG admits that LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc. were aware of the '320 Patent as of the date of service of Wi-LAN's Complaint, but states that LG Electronics, Inc. was not aware of the '320 Patent as of the date of service of Wi-LAN's Complaint.  LG denies all of the remaining allegations of this Paragraph.

89.    Defendants actively induce such infringement by, among other things, providing user manuals and other instruction material for their devices that induce their customers to use Defendants' devices in their normal and customary way to infringe the '320 Patent.  For example, LG's website provides instructions for using the LG devices

on 4G LTE networks. *See*, *e.g.*, http://www.lg.com/us/4glte-phones (noting that "LG 4G LTE phones feature forward-thinking designs and innovative technology" and emphasizing the "4G LTE phone Network," which permits the accused LG 4G LTE devices to "stay connected wherever you go on a super-fast LTE network, for seamless and reliable use."). As does LG's user documentation for the accused devices. *See*, *e.g.*, http://www.lg.com/us/supportmobile/lg-H910-Silver (encouraging customers to use the "Enhanced LTE Service"). Through its manufacture and sales of their devices, Defendants specifically intended for their customers to infringe the '320 Patent. Further, Defendants were aware that these normal and customary activities would infringe the '320 Patent. Defendants performed the acts that constitute induced infringement, and that would induce actual infringement, with knowledge of the '320 Patent and with the knowledge or willful blindness that the induced acts would constitute direct infringement.

**Answer**:   Denied.

90.   Accordingly, a reasonable inference is that Defendants specifically intend for others, such as their customers, to directly infringe one or more claims of the '320 Patent in the United States because Defendants had knowledge of, and were aware of Wi-LAN's infringement allegations concerning, the '320 Patent and actively induced others (*e.g.*, its customers) to directly infringe the '320 Patent by using, selling, or offering to sell Defendants' 4G LTE devices.

**Answer**:   Denied.

91.   Defendants have been and are now indirectly infringing at least one claim of the '320 Patent in accordance with 35 U.S.C. § 271(c) in this district and elsewhere in the United States. More specifically, Defendants have been and are now providing non staple articles of commerce to others for use in an infringing system or method with knowledge of the '320 Patent, and with knowledge that the use of their products resulted in a direct infringement of the '320 Patent by their customers, and with knowledge that these non-staple articles of commerce are used as a material part of the claimed invention of the '320 Patent.

1    **Answer**:    Denied.

2        92.    Defendants' devices compliant with 4G LTE include components

3    comprising an application processor and a baseband processor specifically designed to

4    support communication and transmission of data over 4G LTE-compliant networks.

5    These components are mounted to a circuit board in Defendants' accused devices and,

6    absent these components, Defendants' devices compliant with 4G LTE would not

7    function in an acceptable manner to send or receive data over 4G LTE networks.   A

8    reasonable inference to be drawn from the facts set forth is that these components in

9    Defendants' devices are especially made or especially adapted to operate in the accused

10   devices to provide wireless communication, including the transmission of data in

11   accordance with the 4G LTE standard.   Further, a reasonable inference to be drawn from

12   the facts is that these components comprising an application processor and a baseband

13   processor are intended to support communication of data over a 4G LTE network and are

14   not staple articles or commodities of commerce, and that the use of the components is

15   required for operation of the devices to send or receive data over a 4G LTE-compliant

16   network.   Any other use would be unusual, far-fetched, illusory, occasional, aberrant, or

17   experimental.

18       **Answer**:    Denied.

19       93.    The components comprising an application processor and a baseband

20   processor designed to support communication of data using 4G LTE in Defendants'

21   devices are each a material part of the invention of the '320 Patent and are especially

22   made for the infringing manufacture, sale, and use of Defendants' accused devices.

23   Defendants' devices, including those components, are especially made or adapted to

24   infringe the '320 Patent, and have no substantial non-infringing uses.

25       **Answer**:    Denied.

26       94.    The '320 Patent is valid and enforceable.

27       **Answer**:    Denied.

28

95.     Defendants' infringement of the '320 Patent has damaged Wi-LAN, and Defendants are liable to Wi-LAN in an amount to be determined at trial that compensates Wi-LAN for the infringement, which by law can be no less than a reasonable royalty.

**Answer**:     Denied.

96.     As a result of Defendants' infringement of the '320 Patent, Wi-LAN has suffered irreparable harm and will continue to suffer loss and injury unless Defendants are enjoined by this Court.

**Answer**:     Denied.

## **PRAYER FOR RELIEF**

WHEREFORE, Wi-LAN prays for relief as follows:

97.     A judgment in favor of Wi-LAN that Defendants have infringed and are infringing U.S. Patent Nos. 8,787,924; 8,867,351; 9,226,320; and 9.497,743.

**Answer**:     LG denies that Wi-LAN is entitled to any relief from LG, much less the relief set forth above, at least because the claims of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not valid or infringed, either directly or indirectly, by LG, and the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not enforceable.  LG specifically denies all of the allegations in paragraph 97 of Wi-LAN's Prayer for Relief.

98.     An order permanently enjoining Defendants, their respective officers, agents, employees, and those acting in privity with it, from further direct and/or indirect infringement of U.S. Patent Nos. 8,787,924; 8,867,351; 9,226,320; and 9.497,743.

**Answer**:     LG denies that Wi-LAN is entitled to any relief from LG, much less the relief set forth above, at least because the claims of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not valid or infringed, either directly or indirectly, by LG, and the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not enforceable.  LG specifically denies all of the allegations in paragraph 98 of Wi-LAN's Prayer for Relief.

99.    An award of damages to Wi-LAN arising out of Defendants' infringement of U.S. Patent Nos. 8,787,924; 8,867,351; 9,226,320; and 9.497,743, including enhanced damages pursuant to 35 U.S.C. § 284, together with prejudgment and post-judgment interest, in an amount according to proof;

**Answer**:    LG denies that Wi-LAN is entitled to any relief from LG, much less the relief set forth above, at least because the claims of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not valid or infringed, either directly or indirectly, by LG, and the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not enforceable.  LG specifically denies all of the allegations in paragraph 99 of Wi-LAN's Prayer for Relief.

100.    An award of an ongoing royalty for Defendants' post-judgment infringement in an amount according to proof;

**Answer**:    LG denies that Wi-LAN is entitled to any relief from LG, much less the relief set forth above, at least because the claims of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not valid or infringed, either directly or indirectly, by LG, and the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not enforceable.  LG specifically denies all of the allegations in paragraph 100 of Wi-LAN's Prayer for Relief.

101.    Declaring that Defendants' infringement is willful and that this is an exceptional case under 35 U.S.C. § 285 and awarding attorneys' fees and costs in this action.

**Answer**:    LG denies that Wi-LAN is entitled to any relief from LG, much less the relief set forth above, at least because the claims of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not valid or infringed, either directly or indirectly, by LG, and the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not enforceable.  LG specifically denies all of the allegations in paragraph 101 of Wi-LAN's Prayer for Relief.

102.   Granting Wi-LAN its costs and further relief as the Court may deem just and proper.

**Answer**:   LG denies that Wi-LAN is entitled to any relief from LG, much less the relief set forth above, at least because the claims of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not valid or infringed, either directly or indirectly, by LG, and the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not enforceable.  LG specifically denies all of the allegations in paragraph 102 of Wi-LAN's Prayer for Relief.

## WI-LAN'S DEMAND FOR JURY TRIAL

103.   Wi-LAN demands a trial by jury of any and all issues triable of right before a jury.

**Answer**:   LG admits that Wi-LAN requests a trial by jury.  LG denies any express or implied allegations of the Complaint not otherwise responded to in this Answer.

## GENERAL DENIAL

Except as explicitly admitted herein, LG denies each and every allegation contained in Wi-LAN's Complaint.

## LG'S AFFIRMATIVE DEFENSES

LG pleads the following affirmative defenses to the allegations in Wi-LAN's Complaint:

### First Affirmative Defense
### Non-Infringement

LG does not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claims of the '924, '351, '320, and/or '743 Patents ("Patents-in-Suit").

### Second Affirmative Defense
### Invalidity Pursuant to 35 U.S.C. § 101

At least one or more of the claims of each of the Patents-in-Suit is invalid for failure to meet the statutory requirements set forth in 35 U.S.C. § 101, including but not limited to improper inventorship and non-patentable subject matter.

## Third Affirmative Defense

## Invalidity Pursuant to 35 U.S.C. § 102

At least one or more of the claims of each of the Patents-in-Suit is invalid for failure to meet the statutory requirements set forth in 35 U.S.C. § 102, in view of prior art.

## Fourth Affirmative Defense

## Invalidity Pursuant to 35 U.S.C. § 103

At least one or more of the claims of each of the Patents-in-Suit is invalid for failure to meet the statutory requirements set forth in 35 U.S.C. § 103, in view of prior art.

## Fifth Affirmative Defense

## Invalidity Pursuant to 35 U.S.C. § 112

Each of the Patents-in-Suit does not meet the requirements set forth in 35 U.S.C. § 112 and is invalid and void against LG, for either or both of the following reasons:

(a) The specifications of the Patents-in-Suit are incomplete, vague and indefinite and do not contain a written description of the alleged invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable a person skilled in the art to which it pertains, to make and use the same; and

(b) The claims of the Patents-in-Suit are vague and indefinite and fail to particularly point out and distinctly claim the subject matter of the alleged invention.

## Sixth Affirmative Defense

## Limitation on Damages Pursuant to 35 U.S.C. §§ 286 and/or 288

Wi-LAN's claim for damages, if any, against LG is statutorily limited by 35 U.S.C. §§ 286 and/or 288.

**Seventh Affirmative Defense**

**Failure to Mark Pursuant to 35 U.S.C. § 287**

Any recovery by Wi-LAN is limited to any alleged infringement that occurred after the filing of the Complaint or after Wi-LAN provided actual notice of the Patents-in-Suit, as Wi-LAN, the prior owners of the Patents-in-Suit, and/or Wi-LAN's licensees have failed to mark any products made under the Patents-in-Suit in conformance with the requirements of 35 U.S.C. § 287.

**Eighth Affirmative Defense**

**Limitation on Direct Infringement Claims**

To the extent Wi-LAN's Complaint includes claims of direct infringement, such claims are barred because Wi-LAN's Complaint does not allege that any specific device, person, entity, and/or party directly infringes any asserted claim.  To the extent Wi-LAN's Complaint includes claims of direct infringement of any method claims, such claims are barred because Wi-LAN does not allege that all steps of any claimed method are performed by a single entity or that all steps are attributable to a single entity that directs or controls the performance of others.

**Ninth Affirmative Defense**

**Unclean Hands**

Wi-LAN's claims are barred by the equitable doctrine of unclean hands.

**Tenth Affirmative Defense**

**Prosecution History Estoppel and Prosecution Disclaimer**

Wi-LAN's claims are barred in whole or in part under the doctrines of prosecution history estoppel and/or prosecution disclaimer.

**Eleventh Affirmative Defense**

**Patent Misuse**

Wi-LAN's claims are barred under the doctrine of patent misuse.

**Twelfth Affirmative Defense**

**Waiver, Implied License, Estoppel, and Acquiescence**

Wi-LAN's claims are barred by the doctrines of waiver, acquiescence, implied license, and/or equitable estoppel.

## Thirteenth Affirmative Defense

## Failure to State a Claim

Wi-LAN's Complaint fails to state a claim upon which relief can be granted.

## Fourteenth Affirmative Defense

## Lack of Standing

Wi-LAN lacks standing to assert the Patents-in-Suit.

## Fifteenth Affirmative Defense

## Limitation on Indirect Infringement Claims

To the extent Wi-LAN's Complaint includes claims of indirect infringement, such claims are barred because Wi-LAN's Complaint does not allege that LG: (i) had actual knowledge of the Patents-in-Suit; (ii) had actual knowledge of the alleged infringement of the Patents-in-Suit by any third-parties; and/or (iii) had any specific intent for any third parties to infringe the Patents-in-Suit.

## Sixteenth Affirmative Defense

## No Willful Infringement or Enhanced Damages

Wi-LAN is not entitled to a willful infringement finding and enhanced damages because it has failed to plead the requirements for willful infringement and enhanced damages.  Further, Wi-LAN is not entitled to assert a charge of willful infringement and request enhanced damages because it cannot show LG's actual knowledge of the Patents-in-Suit prior to Wi-LAN's filing of the Complaint and/or LG's actual knowledge of the alleged infringement of the Patents-in-Suit, prior to Wi-LAN's filing of the Complaint.  Any claim and recovery for willful infringement is limited to the period after which Wi-LAN can make such a showing.

## Seventeenth Affirmative Defense

## No Injunctive Relief

Neither preliminary nor permanent injunctive relief is available to Wi-LAN under the legal standards for injunctions because, among other things, Wi-LAN is not likely to succeed on the merits, Wi-LAN will not suffer irreparable harm, and LG is not practicing the alleged invention(s) disclosed in the Patents-in-Suit.  In addition, the balance of hardships and public interest do not favor an injunction in this case.

## Eighteenth Affirmative Defense
### License

Wi-LAN's claims are barred because LG, its suppliers, and/or its customers are licensed.

## Nineteenth Affirmative Defense
### Judicial Estoppel, Collateral Estoppel, and Law of the Case

Wi-LAN's claims are barred in whole or in part under the doctrines of judicial estoppel, collateral estoppel, and/or law of the case.

## Twentieth Affirmative Defense
### Unenforceability Based on Waiver, Estoppel, Implied License, Implied Waiver, and/or Unclean Hands for Failure to Disclose

As set forth with particularity in the Counterclaims set forth below, which LG hereby incorporates as if set forth herein verbatim,  at least three of the four Patents-in are unenforceable because of Wi-LAN's and/or Wi-LAN's predecessors' failure to disclose them to the applicable standards-setting organizations prior to the voting, approval, and/or publication dates of the applicable standards.

## Twenty-first Affirmative Defense
### Limitation on Damages Based on FRAND Obligations

As set forth with particularity in the Counterclaims set forth below, which LG hereby incorporates as if set forth herein verbatim, on information and belief, Wi-LAN has undertaken, in accordance with the relevant rules and intellectual property rights policies of applicable Standard Setting Organizations ("SSOs"), to grant

licenses to some entities under each of the Patents-in-Suit on fair, reasonable, and nondiscriminatory ("FRAND") terms and conditions. Wi-LAN has not, however, offered LG reasonable and nondiscriminatory royalty terms and rates that are proportionate to royalty terms and rates offered to similarly situated companies. As a beneficiary of the rules and intellectual property rights policies of the relevant SSOs, LG has the right to be granted license(s) to the Patents-in-Suit on FRAND terms and conditions. Wi-LAN has failed to do so. Wi-LAN's failure to comply with its FRAND obligations limit the damages, if any, available to Wi-LAN in this action.

**Twenty-second Affirmative Defense**

**Limitation on Damages Based on License**

Wi-LAN may not recover damages, if any, for any alleged infringement that occurred while LG was licensed to the Patents-in-Suit. LG was licensed to the Patents-in-Suit from December 21, 2010, to December 31, 2016. Accordingly, Wi-LAN may recover pre-filing damages (if any) only from January 1, 2017, until the filing of its Complaint.

**Twenty-third Affirmative Defense**

**Limitation on Damages Pursuant to 28 U.S.C. § 1498**

Wi-LAN's requested relief is barred, at least in part, by 28 U.S.C. § 1498 to the extent it claims infringement of devices used by, sold to, and/or designed for the United States.

**Twenty-fourth Affirmative Defense**

**Exhaustion, Express and Implied License, First Sale, and Double Recovery**

Wi-LAN's requested relief is barred or otherwise limited based on patent exhaustion, express or implied license, the "first sale" doctrine, and/or restrictions on double recovery of the Patents-in-Suit.

**Reservation of Defenses**

Further responding, LG states that it currently has insufficient knowledge or information on which to form a belief as to whether it may have additional, as yet

unstated, affirmative defenses available.   LG reserves the right to assert additional affirmative defenses in the event that discovery indicates it would be appropriate.

## DEFENDANTS LG ELECTRONICS, INC., LG ELECTRONICS U.S.A., INC., AND LG ELECTRONICS MOBILECOMM U.S.A., INC.'S COUNTERCLAIMS

For its Counterclaims against Wi-LAN, Inc., Wi-LAN USA, INC., and Wi-LAN Labs, Inc. (collectively, "Wi-LAN"), Counterclaim-Plaintiffs LG Electronics, Inc., LG Electronics U.S.A., Inc., and LG Electronics Mobilecomm U.S.A., Inc. (collectively, "LG") allege as follows:

## NATURE OF THE COUNTERCLAIMS

1.     Counterclaim-Plaintiffs LG's Counterclaims are for declarations of non-infringement and invalidity of U.S. Patent Nos. 8,787,924 ("the '924 patent"), 8,867,351 ("the '351 patent"), 9,226,320 ("the '320 patent"), and 9,497,743 ("the '743 patent") (collectively, the "Patents-in-Suit"); a declaration of unenforceability of the '924 patent, the '320 patent, and the '743 patent; a declaration that LG is entitled to license the Patents-in-Suit from Wi-LAN on fair, reasonable, and non-discriminatory terms and conditions; breach of contract; unfair business practices under Cal. Bus. & Prof. Code § 17200; monopolization in violation of Section 2 of the Sherman Act; and attempted monopolization in violation of Section 2 of the Sherman Act.

## THE PARTIES

2.     Counterclaim-Plaintiff LG Electronics, Inc. is a South Korean corporation, with its principal place of business in Seoul, South Korea.

3.     Counterclaim-Plaintiff LG Electronics U.S.A., Inc. is a Delaware corporation, with its principal place of business in Englewood Cliffs, New Jersey.

4.     Counterclaim-Plaintiff LG Electronics Mobilecomm U.S.A., Inc. is a California corporation, with its principal place of business in San Diego, California.

5.     On information and belief, Counterclaim-Defendant Wi-LAN, Inc. is a Canadian corporation, with its principal place of business in Ottawa, Ontario, Canada.

6.     On information and belief, Counterclaim-Defendant Wi-LAN USA, Inc. is a Florida corporation, with a principal business office in Costa Mesa, California.

7.     On information and belief, Counterclaim-Defendant Wi-LAN Labs, Inc. is a Delaware corporation, with a principal business office in Carlsbad, California.

## JURISDICTION

8.     Counterclaim-Plaintiffs LG's Counterclaims are for declaratory relief relating to the Patents-in-Suit, among other counterclaims arising under federal law. Accordingly, this Court has subject matter jurisdiction over the Counterclaim-Plaintiffs' Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202, as well as the Patent Act, 35 U.S.C. § 1, *et seq.*

9.     This Court has supplemental subject matter jurisdiction over the Counterclaim-Plaintiffs' state law counterclaims pursuant to 28 U.S.C. §§ 1367 because Counterclaim-Plaintiffs' state law counterclaims are so related to claims and counterclaims in this action that are within the original jurisdiction of this Court such that they form part of the same case or controversy under Article III of the United States Constitution.

10.     Wi-LAN alleges that it owns all right, title and interest in, and has standing to sue for infringement of the Patents-in-Suit.

11.     Wi-LAN has submitted itself to this Court's jurisdiction by alleging, in the present lawsuit, that LG infringes the Patents-in-Suit.  Accordingly, an actual case or controversy between Counterclaim-Plaintiffs LG and Wi-LAN exists and is of such immediacy and reality to warrant the issuance of a declaratory judgment.

## COUNT I

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT
## OF U.S. PATENT NO. 8,787,924

12.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-11, above, as if set forth fully herein.

13.     Counterclaim-Plaintiffs LG do not infringe and have not infringed, directly or indirectly, literally or pursuant to the doctrine of equivalents, any claim of the '924 patent.

14.     Counterclaim-Plaintiffs LG seek a declaratory judgment that they have not and do not infringe any claim of the '924 patent.

## COUNT II

## DECLARATORY JUDGMENT OF INVALIDITY

## OF U.S. PATENT NO. 8,787,924

15.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-14, above, as if set forth fully herein.

16.     The claims of the '924 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

17.     Counterclaim-Plaintiffs LG seek a declaratory judgment that the claims of the '924 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

## COUNT III

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT

## OF U.S. PATENT NO. 8,867,351

18.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-15, above, as if set forth fully herein.

19.     Counterclaim-Plaintiffs LG do not infringe and have not infringed, directly or indirectly, literally or pursuant to the doctrine of equivalents, any claim of the '351 patent.

20.     Counterclaim-Plaintiffs LG seek a declaratory judgment that they have not and do not infringe any claim of the '351 patent.

## COUNT IV

## DECLARATORY JUDGMENT OF INVALIDITY

## OF U.S. PATENT NO. 8,867,351

21.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-20, above, as if set forth fully herein.

22.     The claims of the '351 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

23.     Counterclaim-Plaintiffs LG seek a declaratory judgment that the claims of the '351 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

## COUNT V

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT

## OF U.S. PATENT NO. 9,226,320

24.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-23, above, as if set forth fully herein.

25.     Counterclaim-Plaintiffs LG do not infringe and have not infringed, directly or indirectly, literally or pursuant to the doctrine of equivalents, any claim of the '320 patent.

26.     Counterclaim-Plaintiffs LG seek a declaratory judgment that they have not and do not infringe any claim of the '320 patent.

## COUNT VI

## DECLARATORY JUDGMENT OF INVALIDITY

## OF U.S. PATENT NO. 9,226,320

27.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-26, above, as if set forth fully herein.

28.     The claims of the '320 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

29.     Counterclaim-Plaintiffs LG seek a declaratory judgment that the claims of the '320 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

## COUNT VII

### DECLARATORY JUDGMENT OF NON-INFRINGEMENT
### OF U.S. PATENT NO. 9,497,743

30.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-29, above, as if set forth fully herein.

31.     Counterclaim-Plaintiffs LG do not infringe and have not infringed, directly or indirectly, literally or pursuant to the doctrine of equivalents, any claim of the '743 patent.

32.     Counterclaim-Plaintiffs LG seek a declaratory judgment that they have not and do not infringe any claim of the '743 patent.

## COUNT VIII

### DECLARATORY JUDGMENT OF INVALIDITY
### OF U.S. PATENT NO. 9,497,743

33.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-32, above, as if set forth fully herein.

34.     The claims of the '743 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

35.     Counterclaim-Plaintiffs LG seek a declaratory judgment that the claims of the '743 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

**COUNT IX**

**<u>DECLARATORY JUDGMENT OF UNENFORCEABILITY FOR FAILURE TO DISCLOSE TO STANDARD SETTING ORGANIZATIONS</u>**

36.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-35, above, as if set forth fully herein.

37.     Wi-LAN and/or Wi-LAN's predecessors-in-interest with respect to one or more of the Patents-in-Suit have engaged in standards-setting misconduct, including without limitation breach of the commitment to disclose standard-essential patents.

**Wi-LAN Alleges That the Patents-in-Suit are Essential to the 3GPP LTE and IEEE 802.16 Standards**

38.     Wi-LAN alleges, or has alleged, that the Patents-in-Suit are essential to, read on, and/or require the Third Generation Partnership Project ("3GPP") LTE standard—specifically, the 3GPP TS 36.300 and 36.321 standards—and the Institute of Electrical and Electronics Engineers ("IEEE") 802.16 standard.  Wi-LAN has also alleged that certain products that purportedly have wireless capability compliant with the 3GPP LTE and IEEE 802.16 standards infringe the Patents-in-Suit.

**The Patents-in-Suit, the Related Patents, and Wi-LAN's Predecessors-in-Interest**

39.     Wi-LAN has represented that it is the owner or assignee of the Patents-in-Suit.

40.     The '924 patent is a continuation of U.S. App. No. 12/645,937 (filed December 23, 2009, now U.S. Patent No. 8,315,640), which is a continuation of U.S. App. No. 11/170,392 (filed June 29, 2005, now U.S. Patent No. 8,189,514), which is a continuation of U.S. App. No. 09/859,561 (filed May 16, 2001, now U.S. Patent No. 6,956,834 ("the '834 patent")), which is a continuation of U.S. App. No. 09/316,518

("the '518 application") (filed May 21, 1999, now U.S. Patent No. 6,925,068 ("the '068 patent")) (collectively, "the '924 patent priority patents and applications").

41.     As continuation patents and applications, the '924 patent and the '924 patent priority patents and applications all have similar specifications that purportedly do not contain any new matter.

42.     The '743 patent is a continuation of U.S. App. No. 14/523,573 (filed on October 24, 2014, now U.S. Patent No. 9,414,368) and U.S. App. No. 14/523,755 (filed on October 24, 2014, now U.S. Patent No. 9,420,573), which are a continuation of U.S. App. No. 14/338,103 (filed on July 22, 2014), which is a continuation of U.S. App. No. 14/170,271 (filed on January 31, 2014), which is a divisional of U.S. App. No. 14/139,159 (filed December 23, 2013, now U.S. Patent No. 8,929,905), which is a divisional of U.S. App. No. 13/089,075 (filed April 18, 2011, now U.S. Patent No. 8,654,664), which is a divisional of U.S. App. No. 12/645,937 (filed December 23, 2009, now U.S. Patent No. 8,315,640), which is a continuation of U.S. App. No. 11/170,392 (filed June 29, 2005, now U.S. Patent No. 8,189,514), which is a continuation of U.S. App. No. 09/859,561 (filed May 16, 2001, now the '834 patent), said U.S. App. No. 14/338,103 is also a continuation of U.S. App. No. 13/649,986 (filed October 11, 2012, now the '924 patent), which is a continuation of U.S. App. No. 12/645,937 (filed December 23, 2009, now U.S. Patent No. 8,315,640), which is a continuation of U.S. App. No. 11/170,392 (filed June 29, 2005, now U.S. Patent No. 8,189,514), which is a continuation of the '518 application (filed May 21, 1999, now the '068 patent) (collectively, "the '743 patent priority patents and applications").

43.     The '924 patent and the '743 patent both claim priority to the '518 application.

44.     James Mollenauer, Israel Jay Klein, Sheldon Gilbert, and Wi-LAN's Kenneth Stanwood are listed as inventors on the face of the '924 and '743 patents, as well as on the face of the '518 application.

45. The '518 application was previously assigned to Ensemble Communications, Inc. ("Ensemble"). Ensemble assigned its interest in the '518 application to Wi-LAN on May 25, 2004. Accordingly, Ensemble is a predecessor-in-interest of Wi-LAN with respect to the '924 and '743 patents.

46. The '351 patent is a continuation of U.S. App. No. 14/102,120 (filed on December 10, 2013), which is a continuation of U.S. App. No. 13/468,925 (filed May 10, 2012, now U.S. Patent No. 8,630,238), which is a continuation of U.S. App. No. 12/028,365 ("the '365 application") (filed February 8, 2008, now U.S. Patent No. 8,184,661), which is a continuation of U.S. App. No. 10/521,581 (filed as App. No. PCT/CA03/01043 on July 11, 2003, now U.S. Patent No. 7,333,435) ("the '435 patent") (collectively, "the '351 patent priority patents and applications").

47. As continuation patents and applications, the '351 patent and the '351 patent priority patents and applications all have similar specifications that purportedly do not contain any new matter.

48. Anthony Gerkis is listed as the sole inventor on the face of the '351 patent.

49. The '365 application and the '435 patent were originally assigned to SOMA Networks, Inc. ("SOMA"). SOMA assigned its interest in the '365 application and the '435 patent to Turtlebones Inc. ("Turtlebones") on November 10, 2010. Turtlebones assigned its interest in the '365 application and the '435 patent to Wi-LAN on the very same day (*i.e.,* November 10, 2010). Accordingly, SOMA and Turtlebones are predecessors-in-interest of Wi-LAN with respect to the '351 patent.

50. The '320 patent is a continuation of U.S. App. No. 13/957,173 (filed August 1, 2013), which is a continuation of U.S. App. No. 13/565,405 (filed August 2, 2012, now U.S. Patent No. 8,532,052), which is a continuation of U.S. App. No. 11/469,794 ("the '794 application") (filed September 1, 2006, now U.S. Patent No. 8,259,688) (collectively, "the '320 patent priority patents and applications").

51.     As continuation patents and applications, the '320 patent and the '320 patent priority patents and applications all have similar specifications that purportedly do not contain any new matter.

52.     The '794 application was previously assigned to Nextwave Broadband, Inc. ("Nextwave").  Nextwave assigned its interest in the '794 application to Wi-LAN on July 16, 2009.  Accordingly, Nextwave is a predecessor-in-interest of Wi-LAN with respect to the '320 patent.

53.     Yair Bourlas, Adam Newham, Lei Wang, and Srikanth Gummadi are listed as inventors on the face of the '320 patent, as well as on the '794 application.

54.     Yair Bourlas, Adam Newham, Lei Wang, and Srikanth Gummadi were employees or representatives of Nextwave.

**Wi-LAN and Wi-LAN's Predecessors-in-Interest Nextwave and Ensemble Were Members of 3GPP, ETSI, and/or ATIS**

55.     During all relevant times herein, Wi-LAN and Wi-LAN's predecessors-in-interest Nextwave and Ensemble were members of the following Standard Setting Organizations ("SSO") and Industry Partnership Projects ("Industry Partnerships"): 3GPP, European Telecommunications Standards Institute ("ETSI"), and/or Alliance for Telecommunications Industry Solutions ("ATIS").

56.     During all or part of the time period it owned the '794 application, Nextwave was a member of 3GPP, ETSI, and ATIS.

57.     During all or part of the time period it owned the '518 application, Ensemble was a member of 3GPP and ETSI.

58.     During all or part of the time period it has owned the Patents-in-Suit and any priority patents and applications leading thereto, Wi-LAN has been a member of ETSI.

59.     SSOs collaborate with their members to create and establish global specifications for cellular telephone transmission technologies.

60.     SSOs also collaborate with other SSOs on Industry Partnerships to create and establish similar global specifications for these technologies.  In the cellular industry,

3GPP is a well-known example of such an Industry Partnership.  The SSOs that comprise Industry Partnerships are also known as Organizational Partners.

61.    As SSOs, ETSI and ATIS are both Organizational Partners of 3GPP.   In order for Nextwave and Ensemble to be individual members of 3GPP, they must also be members of one of the Organizational Partners of 3GPP.  During all or part of the time period it owned the '794 application, Nextwave was an individual member of 3GPP. Similarly, during all or part of the time period it owned the '518 application, Ensemble was an individual member of 3GPP.

### The 3GPP, ETSI, and ATIS IPR Rules and Policies

62.    3GPP, ETSI, and ATIS have written policies and disclosure requirements relating to the Intellectual Property Rights ("IPR") of their members.

63.    3GPP's IPR policy states that its Individual Members are bound by the IPR policy of their respective Organizational Partner.  3GPP's IPR policy further provides that "Individual Members should declare at the earliest opportunity any IPRs which they believe essential or potentially essential to any work ongoing within" the partnership project.   "Declarations should be made by Individual Members to their respective Organizational Partners."

64.    The ETSI IPR policy states, in part, "each MEMBER shall use its reasonable endeavors, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted."  The ETSI IPR policy defines "IPR" as "any intellectual property right conferred by statute law including applications therefor."  The ETSI IPR policy defines "ESSENTIAL" as "it is not possible on technical (but not commercial) grounds … to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR."

65.     The ATIS IPR policy states, in part, "[i]f reference to a patented invention shall be made in a standard, guideline, or other ATIS deliverable, disclosure of the patented invention should be encouraged at the earliest possible time in the development of the standard, guideline, or other ATIS deliverable."

66.     As individual members of 3GPP, Nextwave and Ensemble were required to comply with 3GPP's IPR policy.

67.     As members of ETSI, Wi-LAN and its predecessors-in-interest Nextwave and Ensemble were required to comply with ETSI's IPR policy.

68.     As a member of ATIS, Wi-LAN's predecessor-in-interest Nextwave was required to comply with ATIS's IPR policy.

69.     As members of 3GPP, ETSI, and/or ATIS, Wi-LAN and its predecessors-in-interest Ensemble and Nextwave were obligated to declare any patents and patent applications that they believed to be essential, or potentially essential, to the standardization efforts underway at 3GPP, ETSI, and ATIS, including the development of the 3GPP LTE and IEEE 802.16 standards.

70.     On information and belief, the members and other participants of 3GPP and 3GPP's Organizational Partners, including ATIS and ETSI, did understand, at all times mentioned herein, including all times during the development and standards-setting of the 3GPP standards mentioned herein, and would have understood the IPR policies of 3GPP and 3GPP's Organizational Partners, including ATIS and ETSI, as: 1) imposing a duty, in a timely fashion, to investigate all IPR, including patents and patent applications, owned by the member, participant, and relevant third parties; and 2) as imposing a duty, in a timely fashion, to disclose all known IPR, including patents and patent applications, that is essential or potentially essential to standards of 3GPP and 3GPP's Organizational Partners, including ATIS and ETSI.  On information and belief, those members and other participants also did understand and would have understood that, in the event that certain IPR is essential or potentially essential to implementing a standard or proposed standard of 3GPP and/or 3GPP's Organizational Partners, including ATIS and ETSI, and a license

to that IPR is not available on fair, reasonable, and non-discriminatory ("FRAND") terms, the 3GPP and 3GPP's Organizational Partners, including ATIS and ETSI, would modify the standard or otherwise refuse to implement the standard.

### Wi-LAN's, Nextwave's, and Ensemble's Participation in SSOs and Industry Partnerships

71.     Wi-LAN, its predecessors-in-interest Ensemble and Nextwave, and their representatives participated in the standards-setting process at 3GPP, ETSI, and/or ATIS.

72.     3GPP is composed of specification groups responsible for drafting and amending technical specifications associated with 3GPP.

73.     3GPP specification group TSG Radio Access Network ("TSG RAN") was responsible for drafting 3GPP Technical Specifications ("TS") 36.300 and 36.321.  Wi-LAN has alleged that certain LG products purportedly having wireless capability compliant with the TS 36.300 and 36.321 standards infringe the Patents-in-Suit. Accordingly, Wi-LAN and its predecessors-in-interest Ensemble and Nextwave were obligated to disclose the Patents-in-Suit, their underlying applications, and any related patents and applications in accordance with the 3GPP, ETSI, and ATIS rules and policies.

74.     On information and belief, Nextwave and its representatives actively participated in numerous meetings of 3GPP, including through submissions, statements, communications, agreements, proposals, omissions, and/or other interactions.   On information and belief, these submissions, statements, communications, agreements, proposals, omissions, and/or other interactions of Nextwave to/with 3GPP, or parts thereof, were incorporated into 3GPP's TS 36.300 and 36.321 standards, at least as they are characterized by Wi-LAN's infringement claims (which LG expressly denies).

75.     The following Nextwave employees and representatives attended TSG RAN meetings on behalf of Nextwave: Martin Beale, Nicholas Anderson, Alan Jones, and Chandrika Worrall.

76.     Nextwave's Martin Beale attended a TSG RAN meeting on behalf of Nextwave on May 29, 2007, through June 1, 2007.

77.     Nextwave's Nicholas Anderson attended TSG RAN meetings on behalf of Nextwave on September 11-14, 2007; November 27-30, 2007; March 4-7, 2008; May 27-30, 2008; and September 9-12, 2008.

78.     Nextwave's Alan Jones attended a TSG RAN meeting on behalf of Nextwave on December 2-5, 2008.

79.     Nextwave's Chandrika Worrall attended TSG RAN meetings on behalf of Nextwave on June 25-29, 2007; and August 20-24, 2007.

80.     On information and belief, Ensemble, Wi-LAN, and/or their representatives actively participated in 3GPP meetings, including through submissions, statements, communications, agreements, proposals, omissions, and/or other interactions.    On information and belief, these submissions, statements, communications, agreements, proposals, omissions, and/or other interactions of Ensemble and/or Wi-LAN to/with 3GPP, or parts thereof, were incorporated into 3GPP's TS 36.300 and 36.321 standards, at least as they are characterized by Wi-LAN's infringement claims (which LG expressly denies).

81.     Wi-LAN's Kenneth Stanwood—who is listed as an inventor on the face of the '924 and '743 patents and is a former employee of Ensemble—participated in drafting and revising the TS 36.300 and 36.321 standards when he attended a TSG RAN meeting on November 27-30, 2007.

82.     During TSG RAN meetings attendees were informed that 3GPP Individual Members have the obligation under the IPR policies of their respective Organizational Partners to inform their respective Organizational Partners of essential IPRs of which they become aware.

**Wi-LAN, Nextwave, and Ensemble Failed to Disclose the '924 Patent, the '743 Patent, the '320 Patent, and Related Patents and Applications to SSOs and Industry Partnerships**

83.   Wi-LAN and its predecessors-in-interest Ensemble and Nextwave intentionally and knowingly failed to disclose the '924 patent, the '743 patent, the '320 patent, and any patents and applications related to those patents to 3GPP, ETSI, and ATIS, including as alleged below.

84.   The TS 36.300 specification was first published or released on October 27, 2006, and has been revised periodically since then.  The TS 36.321 specification was first published or released on September 24, 2007, and has been revised periodically since then.

85.   The '794 application, the parent application of the '320 patent, was filed on September 1, 2006, before the TS 36.300 and TS 36.321 standards were first published or released.

86.   The '518 application, the parent application of the '924 and '743 patents, was filed on May 21, 1999, many years before the TS 36.300 and TS 36.321 standards were first published or released.

87.   Nextwave knew or should have known of essential or potentially essential IPRs, including the '794 application, among others, because, *inter alia*, Nextwave had a duty to investigate its IPRs, and Nextwave's representatives attended and/or participated in numerous 3GPP meetings.  Wi-LAN knew or should have known of these patents and patent applications at least when Wi-LAN acquired any of its purported interest in the Patents-in-Suit from Nextwave, because Wi-LAN purports to be Nextwave's successor-in-interest and Nextwave was required to inform Wi-LAN of its IPR disclosure obligations.  Upon its alleged acquisition of rights to the Patents-in-Suit from Nextwave, Wi-LAN became co-obligated to perform the duties to timely investigate and timely disclose its essential or potentially essential IPRs to 3GPP.

88.   Ensemble and Wi-LAN knew or should have known of essential or potentially essential IPRs, including the '518 application, among others, because, *inter alia*, Ensemble and Wi-LAN had a duty to investigate its IPRs, and Ensemble and/or Wi-LAN's representatives, including Kenneth Stanwood—one of the inventors of the '924

patent and '732 patent—attended and/or participated in 3GPP meetings.  Wi-LAN knew or should have known of these patents and patent applications at least when Wi-LAN acquired any of its purported interest in the Patents-in-Suit from Ensemble, because Wi-LAN purports to be Ensemble's successor-in-interest, and Ensemble was required to inform Wi-LAN of its IPR disclosure obligations.  Upon its alleged acquisition of rights to the Patents-in-Suit from Ensemble, Wi-LAN became co-obligated to perform the duties to timely investigate and timely disclose its essential or potentially essential IPRs to 3GPP.

89.    Neither Nextwave nor Wi-LAN disclosed the '320 patent or any of the '320 patent priority patents and applications to 3GPP or any of the relevant Organizational Partners (*i.e.*, ETSI and ATIS).

90.    Nextwave representatives intentionally and knowingly failed to disclose the '320 patent and any of the '320 patent priority patents and applications as essential, or potentially essential, to the specifications being drafted and revised by TSG RAN, including TS 36.300 and TS 36.321.

91.    The foregoing failure to disclose the '320 patent and any of the '320 patent priority patents and applications was made in bad faith with the intent to deceive and induce reliance.

92.    Nextwave had a duty to disclose the '320 patent and the '320 patent priority patents and applications essential to standards drafted and revised by TSG RAN as a result of Nextwave's membership in ETSI, ATIS, and 3GPP, including its obligation to disclose essential IPRs under the IPR policies of ETSI, ATIS, and 3GPP.

93.    Nextwave's failure to disclose led to the adoption and propagation of 3GPP standards without consideration of the '320 patent or any of the '320 patent priority patents and applications.

94.    Wi-LAN and Ensemble disclosed the '518 application to ETSI as essential to the HiperMAN (TS 102 177 and TS 102 178) standard, but never disclosed the '518 application to ETSI as being essential to any 3GPP standard.  Other than the above

disclosures to ETSI, neither Wi-LAN, nor Ensemble, nor any of their representatives ever disclosed the '924 patent, the '743 patent, or any of the '924 patent and '743 patent priority patents and applications.

95.    Wi-LAN, Ensemble, and their representatives intentionally and knowingly failed to disclose the '924 patent, the '743 patent, and the '924 patent and '743 patent priority patents and applications as essential, or potentially essential, to the specifications being drafted and revised by TSG RAN, including TS 36.300 and TS 36.321.

96.    The foregoing failure to disclose the '924 and '743 patents, and any of the '924 patent and '743 patent priority patents and applications was made in bad faith with the intent to deceive and induce reliance.

97.    Wi-LAN, Ensemble, and/or Mr. Stanwood had a duty to disclose the '924 and '743 patents, and the '924 patent and '743 patent priority patents and applications essential to standards drafted and revised by TSG RAN as a result of Wi-LAN's and Ensemble's membership in ETSI, Ensemble's membership in 3GPP, because Mr. Stanwood was listed as an inventor on the '924 and '743 patents and the '924 patent and '743 patent priority patents and applications, and because of Mr. Stanwood's participation in 3GPP meetings.

98.    Wi-LAN, Ensemble, and/or Mr. Stanwood's failure to disclose led to the adoption and propagation of 3GPP standards without consideration of the '924 and '743 patents, or any of the '924 patent and '743 patent priority patents and applications.

99.    As a consequence of Wi-LAN, its predecessors-in-interest Nextwave's and Ensemble's, and/or Mr. Stanwood's failure to disclose, ETSI members, ATIS members, 3GPP members, their successors, and customers throughout the supply chain, including LG and relevant third parties, thereafter designed, manufactured, and marketed products meant to comply with the relevant 3GPP standards, thereby reasonably and justifiably relying on Wi-LAN and its predecessors-in-interest Nextwave and Ensemble's promises to abide by ETSI, ATIS and/or 3GPP IPR policies, to their detriment.

100.   The foregoing actions and conduct have caused damage and continue to cause damage to LG and relevant third parties.

**Wi-LAN Also Asserts That the '924 Patent, the '743 Patent, the '320 Patent, and Related Patents and Applications are Essential to the IEEE 802.16 Standard**

101.   Wi-LAN asserts that the '924 patent, the '743 patent, the '320 patent, and their related patents and applications are essential to the IEEE 802.16 standard.

102.   Wi-LAN has previously asserted that the '068 patent and the '834 patent—two of the parent patents to the '924 and '743 patents—are essential to the IEEE 802.16 standard.

103.   The '924 and '743 patents list submissions to the IEEE 802.16 Broadband Wireless Access Working Group on the face of the patents.

104.   The '320 patent states "[t]he descriptions contained herein generally focus on Orthogonal Frequency Division Multiple Access (OFDMA) wireless communication systems, and particularly are directed towards IEEE 802.16 wireless communication systems."

**Wi-LAN, Wi-LAN's Predecessors-in-Interest Ensemble and Nextwave, and Their Representatives Were Members of the IEEE**

105.   The IEEE is a professional association and leading developer of technical standards.  IEEE members include engineers, scientists, and allied professionals whose technical interests relate to electrical and computer sciences, engineering, and related disciplines.  Members may participate in the standards-setting process in working groups and/or subgroups called task groups.

106.   Wi-LAN, Wi-LAN's predecessors-in-interest Ensemble and Nextwave, and their representatives were or are members of the IEEE, as discussed in detail below.

**The IEEE's Rules and Policies**

107.   The IEEE instituted policies and rules regarding the disclosure and licensing of patents, in part to protect against unscrupulous conduct by any member who seeks to benefit from, or to manipulate to its advantage, the IEEE's standard-setting process, and

to enable the IEEE and its members to develop standards free from potentially blocking patents.

108.   The IEEE's rules and policies require fairness and candor with respect to intellectual property.  By way of example only, the IEEE requires its members to submit letters of assurance ("LOAs") including either a general disclaimer to the effect that the patentee will not enforce any of its present or future patents the use of which would be required to implement the proposed IEEE standard against any person or entity using the patents to comply with the standard, or a statement that a license will be made available to all applicants without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.  For example, the IEEE's 802.16 Patent Policy and Procedures states "IEEE standards may include the known use of patent(s), including patent applications, if there is technical justification in the opinion of the standards-developing committee and provided the IEEE receives assurance from the patent holder that it will license applicants under reasonable terms and conditions for the purpose of implementing the standard."

109.   Additionally, the IEEE's Standards Board Bylaws state that the assurance "shall be a letter that is in the form of either a) A general disclaimer to the effect that the patentee will not enforce any of its present or future patent(s) whose use would be required to implement the proposed IEEE standard against any person or entity using the patent(s) to comply with the standard or b) A statement that a license will be made available to all applicants without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination."

110. The IEEE 802.16 Patent Policy and Procedures further states: "Early disclosure to the Working Group of patent information that might be relevant to the standard is essential to reduce the possibility for delays in the development process and increase the likelihood that the draft publication will be approved for publication.  Please notify the Chair as early as possible, in written or electronic form, of any patents (granted

or under application) that may cover technology that is under consideration by or has been approved by IEEE 802.16."

111.   As a result of their membership and/or participation in the IEEE, Wi-LAN, Wi-LAN's predecessors-in-interest Ensemble and Nextwave, and their representatives agreed, both explicitly and implicitly, that they would abide by the rules and policies of the IEEE.

### Jay Klein's, Kenneth Stanwood's, James Mollenauer's, and Ensemble's Participation in the IEEE Standard-Setting Process

112.   The IEEE formed the 802.16 working group in 1999.  The 802.16 working group is further divided into the MAC and PHY task groups.  Three of the four named inventors on the '924 and '743 patents—Jay Klein, Kenneth Stanwood, and James Mollenauer—participated in the standard-setting process for 802.16.  Moreover, Jay Klein and Kenneth Stanwood appeared as representatives for Ensemble, a predecessor-in-interest of Wi-LAN.

113.   Jay Klein, Kenneth Stanwood, and James Mollenauer are all listed as inventors on the face of the '518 application, the parent application of the '924 and '743 patents.  The '518 application was filed on May 21, 1999.

114.   On or about July 6, 1999, the first official meeting of the 802.16 working group was held in Montreal, Canada.

115.   Jay Klein and James Mollenauer attended the July 1999 802.16 meeting in Montreal.

116.   On or about August 4, 1999, the second meeting of the 802.16 working group was held in Denver, Colorado.

117.   James Mollenauer attended the August 1999 802.16 meeting in Denver.

118.   On or about September 13, 1999, the third meeting of the 802.16 working group was held in Boulder, Colorado.

119.   Jay Klein and James Mollenauer attended the September 1999 802.16 meeting in Boulder.

120.   On or about November 8, 1999, the fourth meeting of the 802.16 working group was held in Kauai, Hawaii.

121.   Jay Klein and James Mollenauer attended the November 1999 802.16 meeting in Hawaii.

122.   On or about January 10, 2000, the fifth meeting of the 802.16 working group was held in Richardson, Texas.

123.   Jay Klein and James Mollenauer attended the January 2000 802.16 meeting in Richardson.

124.   On or about March 6, 2000, the sixth meeting of the 802.16 working group was held in Albuquerque, New Mexico.

125.   Jay Klein and James Mollenauer attended the March 2000 802.16 meeting in Albuquerque.

126.   On or about May 1, 2000, the seventh meeting of the 802.16 working group was held in Gaithersburg, Maryland.

127.   Kenneth Stanwood, Jay Klein, and James Mollenauer attended the May 2000 802.16 meeting in Gaithersburg.

128.   On or about July 10, 2000, the eighth meeting of the 802.16 working group was held in La Jolla, California.

129.   Kenneth Stanwood, Jay Klein, and James Mollenauer attended the July 2000 802.16 meeting in La Jolla.

130.   At each of the above 802.16 working group meetings, the Chairman of the 802.16 working group explained the IEEE Patent Policy and specifically asked for notification from members as to any patents and/or applications applicable to standards or draft standards.

131.   Kenneth Stanwood, Jay Klein, and James Mollenauer were heavily involved in the development of the 802.16 standard.  For example, Jay Klein was named chairman of the 802.16 PHY task group, and James Mollenauer and Kenneth Stanwood were named to the 802.16 MAC task group editorial team.  Additionally, Kenneth Stanwood

served as Vice Chair of the IEEE 802.16 standards committee for WiMAX from 2003-2006, and as a principal contributor to the original IEEE 802.16 standard for 4G cellular networks and mobile devices.

132.   Several proposals authored by Kenneth Stanwood, Jay Klein, and/or James Mollenauer were submitted to the 802.16 MAC task group for consideration.  Each of the proposals submitted states that the "contributor is familiar with the IEEE 802.16 Patent Policy and Procedures."

133.   The "An Efficient Media Access Control Protocol for Broadband Wireless Access Systems" proposal submitted before the fourth 802.16 meeting by Jay Klein and James Mollenauer, and the "MAC Proposal for IEEE 802.16.1" proposal submitted before the fifth 802.16 meeting by Jay Klein, James Mollenauer, and Kenneth Stanwood, are both listed on the faces of the '924 and '743 patents.

134.   Several proposals authored by Jay Klein were submitted to the 802.16 PHY task group for consideration.  Each of the proposals submitted states that the "contributor is familiar with the IEEE 802.16 Patent Policy and Procedures."

135.   During the eighth 802.16 working group meeting, Kenneth Stanwood, Jay Klein, and James Mollenauer, among others, submitted a proposal called "Media Access Control Layer Proposal for the 802.16 Air Interface Specification" to the 802.16 MAC task group.  The proposal states that the "contributor is familiar with the IEEE 802.16 Patent Policy and Procedures," and reproduces the relevant IEEE 802.16 Patent Policy and Procedures.

136.   During the eighth 802.16 working group meeting, the 802.16 MAC task group voted in favor of pursuing the Stanwood et al. proposal, and decided not to pursue other proposals.

**Jay Klein, Kenneth Stanwood, James Mollenauer, and Ensemble Failed to Disclose the '924 Patent, the '743 Patent, and Related Patents and Applications to the IEEE**

137.   Jay Klein, Kenneth Stanwood, James Mollenauer, and/or Wi-LAN's predecessor-in-interest Ensemble intentionally and knowingly failed to disclose the '924

patent, the '743 patent, and patents and applications related to those patents to the IEEE, as alleged below.

138.   On March 29, 2004, Ensemble submitted a LOA to the IEEE identifying the '518 application as essential to the 802.16 standard.

139.   On July 12, 2004, Wi-LAN submitted a LOA to the IEEE identifying the '518 application as essential to the 802.16 standard.

140.   The '518 application was never disclosed to the IEEE before March 29, 2004—nearly five years after the '518 application was filed with the PTO, and nearly four years after the 802.16 MAC task group adopted the proposal submitted by Kenneth Stanwood, Jay Klein, and James Mollenauer.

141.   The '924 patent, the '743 patent, and the '924 patent and '743 patent priority patents and application (excluding the '518 application) were never disclosed to the IEEE.

142.   The IEEE 802.16 working group never considered the '518 application when it adopted the proposal submitted by Kenneth Stanwood, Jay Klein, and James Mollenauer.

143.   Kenneth Stanwood, Jay Klein, James Mollenauer, and Wi-LAN's predecessor-in-interest Ensemble intentionally and knowingly failed to disclose the '924 patent, the '743 patent, and patents and applications related to those patents—including the '518 application that eventually led to the '924 patent and the '743 patent—to the IEEE 802.16 working group.

144.   Kenneth Stanwood, Jay Klein, James Mollenauer, and Wi-LAN's predecessor-in-interest Ensemble had a duty to disclose facts regarding their alleged intellectual property, including as a result of their representations and commitments to the IEEE.

145.   The foregoing failure to disclose was made in bad faith with the intent to deceive and to induce reliance.

146.   The IEEE, its members, their successors, and customers throughout the supply chain who rely on 802.16 activities, including LG and relevant third parties, reasonably and justifiably relied on the foregoing failure to disclose in adopting 802.16 standards and by investing substantial resources designing, developing, and marketing products accused of alleged infringement in this action.

147.   The foregoing actions and conduct have caused damage and continue to cause damage to LG and relevant third parties.

**Yair Bourlas's, Lei Wang's, Srikanth Gummadi's, and Nextwave's Participation in the IEEE Standard-Setting Process**

148.   Three of the four named inventors on the '320 patent—Yair Bourlas, Lei Wang, and Srikanth Gummadi—participated in the standard-setting process for 802.16. Yair Bourlas, Lei Wang, and Srikanth Gummadi appeared as representatives for Nextwave, a predecessor-in-interest of Wi-LAN.

149.   Yair Bourlas, Lei Wang, and Srikanth Gummadi are all listed as inventors on the face of the '794 application, the parent application of the '320 patent.  The '794 application was filed on September 1, 2006.

150.   On or about January 12, 2009, the 59th meeting of the 802.16 working group was held in La Jolla, California.  Lei Wang and Nextwave hosted the meeting.

151.   On or about May 4, 2009, the 61st meeting of the 802.16 working group was held in Cairo, Egypt.

152.   At each of the above 802.16 working group meetings, the Chairman of the 802.16 working group explained the IEEE Patent Policy and specifically asked for notification from members as to any patents and/or applications applicable to standards or draft standards.

153.   The IEEE 802.16-2009 standard was approved at the May 2009 meeting in Cairo.

154.   The face of the IEEE 802.16-2009 standard states that Lei Wang "participated in the Working Group Letter Ballot in which the draft of this standard was prepared and finalized for IEEE Ballot"

155.   The face of the IEEE 802.16-2000 standard states that Yair Bourlas "voted on this standard."

156.   Yair Bourlas, Lei Wang, and Srikanth Gummadi were involved in the setting and development of the 802.16-2009 standard.  For example, several proposals authored by Yair Bourlas, Lei Wang, and/or Srikanth Gummadi were submitted to the 802.16 working group for consideration.  Each of the proposals submitted states that the "contributor is familiar with the IEEE 802.16 Patent Policy and Procedures."

157.   On information and belief, one or more of the proposals authored by Yair Bourlas, Lei Wang, and/or Srikanth Gummadi were incorporated into the IEEE 802.16-2009 standard.

**Yair Bourlas, Lei Wang, Srikanth Gummadi, and Nextwave Failed to Disclose the '320 Patent and Related Patents and Applications to the IEEE**

158.   Yair Bourlas, Lei Wang, Srikanth Gummadi, and/or Wi-LAN's predecessor-in-interest Nextwave intentionally and knowingly failed to disclose the '320 patent and the '320 patent priority patents and applications to the IEEE, as alleged below.

159.   The '320 patent, and the '320 patent priority patents and applications (including the '794 application) were never disclosed to the IEEE, despite the fact that the '794 application was filed several years before the IEEE 802.16-2009 standard was approved.

160.   The IEEE 802.16 working group never considered the '794 application when it adopted the 802.16-2009 standard.

161.   Yair Bourlas, Lei Wang, Srikanth Gummadi, and Wi-LAN's predecessor-in-interest Nextwave intentionally and knowingly failed to disclose the '320 patent and the '320 patent priority patents and applications—including the '794 application that eventually led to the '320 patent—to the IEEE 802.16 working group.

162.   Yair Bourlas, Lei Wang, Srikanth Gummadi, and Wi-LAN's predecessor-in-interest Nextwave had a duty to disclose facts regarding their alleged intellectual property, including as a result of their representations and commitments to the IEEE.

163.   The foregoing failure to disclose was made in bad faith with the intent to deceive and to induce reliance.

164.   The IEEE, its members, their successors, and customers throughout the supply chain who rely on 802.16 activities, including LG and relevant third parties, reasonably and justifiably relied on the foregoing failure to disclose in adopting 802.16 standards and by investing substantial resources designing, developing, and marketing products accused of alleged infringement in this action.

165.   The foregoing actions and conduct have caused damage and continue to cause damage to LG and relevant third parties.

166.   Wi-LAN, Wi-LAN's predecessors-in-interest Ensemble, Nextwave, and SOMA, and/or one or more of the inventors of the Patents-in-Suit, were or are a member of a SSO involved with the setting of a standard (or standards) that Wi-LAN asserts, or has asserted, is necessarily covered by one or more claims of the Patents-in-Suit.  Wi-LAN, Wi-LAN's predecessors-in-interest Ensemble, Nextwave, and SOMA, and/or one or more of the inventors of the Patents-in-Suit participated in the setting of such standard (or standards).   Despite this participation, the Patents-in-Suit, and the patents and applications that led to the Patents-in-Suit, including any priority patents and/or applications, were never disclosed to the applicable SSOs.  Accordingly, the standards that Wi-LAN asserts, or has asserted, are necessarily covered by one or more claims of the Patents-in-Suit were set without consideration of the Patents-in-Suit, or the patents and applications that led to the Patents-in-Suit.  Wi-LAN, Wi-LAN's predecessors-in-interest Ensemble, Nextwave, and SOMA, and/or one or more of the inventors of the Patents-in-Suit knowingly and in bad faith failed to disclose the Patents-in-Suit and the patents and applications that led to the Patents-in-Suit with the intent to deceive and to

induce reliance.  The foregoing actions and conduct have caused damage and continue to cause damage to LG and relevant third parties.

167.   As a result of the conduct described above, the '924 patent, the '743 patent, and the '320 patent are unenforceable against LG on the grounds of estoppel, fraud, laches, waiver, implied waiver, unclean hands, patent exhaustion, implied license, and/or other equitable defenses.

## COUNT X

## DECLARATORY JUDGMENT THAT LG IS ENTITLED TO LICENSE THE PATENTS-IN-SUIT FROM WI-LAN ON FRAND/RAND TERMS AND CONDITIONS

168.   Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-167, above, as if set forth fully herein.

169.   On information and belief, Wi-LAN has undertaken, in accordance with the relevant rules and IPR polices of applicable SSOs, to grant licenses to some entities under each of the Patents-in-Suit on reasonable and non-discriminatory ("RAND") or fair, reasonable, and non-discriminatory ("FRAND") terms and conditions.  These RAND/FRAND obligations are found in IPR policies adopted by ETSI, including but not limited to Clause 6.1 of the ETSI IPR policy, and the IEEE Standards Board Bylaws.

170.   The IEEE Standards Board Bylaws require IEEE members to submit letters of assurance ("LOAs") including either a general disclaimer to the effect that the patentee will not enforce any of its present or future patents the use of which would be required to implement an IEEE standard against any person or entity using the patents to comply with the standard, or a statement that a license will be made available to all applicants without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.

171.   Additionally, the IEEE Standards Board Bylaws state that the assurance "shall be a letter that is in the form of either a) A general disclaimer to the effect that the patentee will not enforce any of its present or future patent(s) whose use would be

required to implement the proposed IEEE standard against any person or entity using the patent(s) to comply with the standard or b) A statement that a license will be made available to all applicants without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination."

172.   Clause 6.1 of the ETSI IPR policy states that "When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory ('FRAND') terms and conditions under such IPR."   The ETSI IPR policy further states that "FRAND licensing undertakings made pursuant to Clause 6 shall be interpreted as encumbrances that bind all successors-in-interest," and that "[a]n undertaking pursuant to Clause 6.1 with regard to a specified member of a PATENT FAMILY shall apply to all existing and future ESSENTIAL IPRs of that PATENT FAMILY."   The ETSI IPR policy defines "PATENT FAMILY" as "all documents having at least one priority in common."

173.   On information and belief, Wi-LAN has asserted, or is asserting, that the Patents-in-Suit are essential to the IEEE 802.16 standard, as discussed above.

174.   On July 12, 2004, Wi-LAN submitted an LOA to the IEEE stating "that it intends to license under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination" any patents issuing from the '518 application.

175.   On April 1, 2011, Wi-LAN submitted an LOA to the IEEE stating that it "will grant a license under reasonable rates to an unrestricted number of applicants on a worldwide basis with reasonable terms and conditions that are demonstrably free of unfair discrimination" to "any and all claims determined to be essential to the [802.16-2009 standard] that [Wi-LAN] may own now or in the future."

176.   On February 17, 2005, Wi-LAN submitted an IPR declaration to ETSI stating that Wi-LAN is "prepared to grant irrevocable licenses … on terms and

conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy" to the '518 application.

177.   On July 13, 2007, Wi-LAN submitted a blanket LOA to the IEEE stating that it will "grant a license under reasonable rates to an unrestricted number of applicants on a worldwide basis with reasonable terms and conditions that are demonstrably free of unfair discrimination" for all patent claims essential to the IEEE 802.16 standard.

178.   Despite Wi-LAN's commitments to grant licenses to the Patents-in-Suit on FRAND/RAND terms and conditions, Wi-LAN has not offered to LG reasonable and non-discriminatory royalty terms and rates that are proportionate to royalty terms and rates offered to similarly situated companies.  As a third party beneficiary of the rules and IPR policies of the relevant SSOs, LG has the right to be granted license(s) to the Patents-in-Suit on FRAND/RAND terms and conditions.

179.   Wi-LAN has failed to comply with its FRAND/RAND obligations under the relevant rules and IPR policies of the relevant SSOs with respect to LG (which is claiming the benefit thereof) by refusing to offer a license (or licenses) on FRAND/RAND terms.

180.   As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

181.   In the event that one or more claims of the Patents-in-Suit are found valid and infringed, a judicial declaration that LG is entitled to license the Patents-in-Suit under FRAND/RAND terms and conditions is necessary and appropriate.

**COUNT XI**

**<u>BREACH OF CONTRACT</u>**

182.   Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-181, above, as if set forth fully herein.

183.   For consideration, including IEEE and ETSI membership and participation, Wi-LAN entered into express and/or implied contracts with the IEEE and ETSI's

members, or alternatively, with the IEEE and ETSI, to which IEEE and ETSI members and others are third-party beneficiaries, in which Wi-LAN agreed, among other things, to abide by the IEEE and ETSI's policies and rules. The IEEE and ETSI rules and policies, whether formal or informal, including all stipulations, requirements and representations in any form, constitute a contract between Wi-LAN and the IEEE and ETSI's members, or alternatively between Wi-LAN and the IEEE and ETSI, to which IEEE and ETSI members and others are third-party beneficiaries.

184.   In accordance with the foregoing, the IEEE and ETSI's rules and policies require its members to submit LOAs including statements that a license will be made available to all applicants under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.

185.   Furthermore, Wi-LAN's representations and other conduct, including the LOAs offering licenses on fair, reasonable and non-discriminatory terms that Wi-LAN submitted to the IEEE and ETSI, created express and/or implied contracts with the IEEE, ETIS, and their members, or alternatively between Wi-LAN and the IEEE and ETSI, to which IEEE and ETSI members and others are third-party beneficiaries.

186.   Wi-LAN breached its contractual obligations, including by failing to offer licenses for the Patents-in-Suit on fair, reasonable and non-discriminatory terms, by seeking to enjoin LG from making and selling 802.16 and/or 3GPP LTE compliant products, failing to disclose certain of the Patents-in-Suit, and through misrepresentations and/or omissions regarding its patents and/or patent applications.

187.   LG has incurred damages, and will be further damaged in the future due to Wi-LAN's breach of its contractual obligations.

## COUNT XI

## UNFAIR BUSINESS PRACTICES UNDER CAL. BUS. & PROF. CODE § 17200

188.   Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-187, above, as if set forth fully herein.

189.   Unfair business practices under Cal. Bus. & Prof. Code § 17200 *et seq.* include any unfair, unlawful, or fraudulent business act or practice.   The conduct described above in paragraphs 1-187 comprises unfair business practices under Section 17200 *et seq.*

190.   Misconduct and injuries pertaining to the above-referenced conduct have occurred within California, either of which gives rise to a § 17200 claim.   With respect to injury in California, LG conducts business related to the accused standards and products in California, and sells accused products to customers located in California.

191.   In addition to injuries in California, various acts of misconduct alleged in the preceding counts occurred in California, including relevant meetings of standards-setting organizations and Wi-LAN's bad faith assertion of the Patents-in-Suit against LG.

192.   LG is entitled to remedies, including attorneys' fees and disgorgement of Wi-LAN's ill-gotten gains, including investments, licensing royalties, or any recoveries obtained through the inappropriate conduct set forth in paragraphs 1-186 above.

## COUNT XII

## MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

193.   Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-192, above, as if set forth fully herein.

194.   For years, continuing through to today, Wi-LAN has made objectively baseless claims that products having components designed based upon any one of a number of technical standards (including the IEEE 802.16 standard and the 3GPP LTE standard) necessarily infringe the patents that Wi-LAN asserts in this action.   Those claims are false—Wi-LAN's asserted patents are **not** infringed by products having components designed based upon the IEEE 802.16 standard or the 3GPP LTE standard, necessarily or otherwise.   Nevertheless, Wi-LAN is and has been engaged in a long-standing campaign to improperly assert its patents, including patents that it knows and has known for some time to be invalid and/or unenforceable, in an attempt to extract

licensing revenues to which Wi-LAN knows it is not entitled and to obtain additional patents that have also become part of Wi-LAN's improper campaign.

195.   At least three of the four patents asserted by Wi-LAN in this action are unenforceable as a result of fraudulent misrepresentations and/or omissions to various SSOs.   Wi-LAN has nevertheless improperly asserted those patents against LG and others.   Wi-LAN's assertions of those patents were and are objectively baseless, including because Wi-LAN was and is in possession of information confirming that those patents are invalid and unenforceable.   Through Wi-LAN's improper assertions of its patents, it has obtained not only licensing revenue to which it is not entitled, but also additional patents that it uses as part of its improper licensing campaign.

196.  Wi-LAN's misconduct has forced the many targets of its improper assertions to either stand and fight Wi-LAN's objectively baseless claims, at great expense, or else give in to those improper claims and either leave the market or pay Wi-LAN substantial license fees to which it is not entitled.  As a result, Wi-LAN's unlawful conduct alleged herein has caused and continues to cause harm to legitimate competition, as alleged more fully below, including by improperly increasing barriers to entry such that potential competitors who would or might have produced products designed based upon the accused standards have been dissuaded from doing so and/or making investments in such activities, by forcing unnecessary defense expenditures by competitors or potential competitors who are unwilling to surrender to Wi-LAN's extortionate scheme to extract licensing revenue for patents that Wi-LAN has asserted in bad faith despite knowing them to be invalid and unenforceable, by facilitating Wi-LAN's demand for and extraction of improper license payments when Wi-LAN is not entitled to any such license payments including because its Patents-in-Suit do not cover products designed based upon the accused standards, by causing increased prices to consumers for products designed based upon the accused standards as a result of unnecessary defense expenditures and/or exorbitant licensing fees for those who accede to Wi-LAN's improper demands, and by decreasing or eliminating competition from

alternative technologies that would or might have had increased viability but for Wi-LAN's unlawful conduct.  Unless Wi-LAN's continuing campaign of unlawful conduct is put to a stop, these harmful effects will continue unabated.

### Wi-LAN's Improper Claims of Market Power

197.   Technical standards, such as the IEEE 802.16 standard and the 3GPP LTE standard, can, in the right circumstances facilitate the adoption and advancement of technology as well as the development and commercialization of products that can interoperate with one another.  Technical standards also can lower costs by increasing product manufacturing volume and increase price competition by eliminating "switching costs" for consumers who desire to switch from products manufactured by one company to those manufactured by another.  Once a standard has been adopted and a sufficiently large number of products designed based upon that standard have been deployed in a sufficiently widespread fashion for a sufficient amount of time, companies that have structured their businesses to produce products having components designed based on technical standards, such as the IEEE 802.16 standard and the 3GPP LTE standard, can in some circumstances become "locked in" to the technologies included in the standards if, because of costs, sales schedules, and/or other considerations, it is no longer practical or possible to develop or switch to other technologies at that point due to the widespread, long standing adoption of the standard, or if customers for their products have no practical choice at that point other than to purchase products having components designed based upon the standard due to the widespread, long standing adoption of the standard.

198.   When a technical standard mandates use of a particular technology in order to implement the standard, it is possible that a patent may be held or obtained covering that technology.  Once a standard has been adopted and a sufficiently large number of products designed based upon that standard have been deployed in a sufficiently widespread fashion for a sufficiently long period of time, at that point there may no longer be readily substitutable alternatives to a particular technology the use of which is

mandated by the standard.  Accordingly, when a sufficiently large number of products designed based upon a standard have been deployed in a sufficiently widespread fashion for a sufficiently long period of time, the owner of a patent whose claims cover technology mandated by the standard can at that point gain market power in the market for that particular technology that is unrelated to any inherent value of the subject matter claimed in its patent and is instead derived merely from the fact that use of the claimed subject matter was previously mandated by a standard which has now been incorporated into a sufficiently large number of products.  If left unconstrained, the owner of such a patent may, after such "lock-in" occurs, demand supracompetitive monopoly rents for the use of the technology covered by its patent claims.

199.   While viable alternative technologies may exist prior to the adoption and widespread deployment of a standard, once a standard that requires use of a patented technology has been adopted and a sufficiently large number of products designed based upon that standard have been deployed in a sufficiently widespread fashion for a sufficiently long period of time, previously viable alternatives to that patented technology may no longer be as feasible and/or available to those who wish to implement the standard.  Thus, the inclusion in a standard of a requirement that a particular patented technology be used to implement the standard may, if a standard has been deployed widely enough for a long enough period of time, confer on the patent owner market power in the market for technologies that perform the functionalities covered by the patent's claims.  Such market power is unlawful under Section 2 of the Sherman Act, 15 U.S.C. § 2, when it is acquired and/or maintained through anticompetitive, exclusionary conduct.

200.   As noted above, Wi-LAN has made and makes objectively baseless claims in this action and elsewhere that products having components designed based upon the IEEE 802.16 standard and/or 3GPP LTE standard necessarily infringe the Patents-in-Suit.  Those claims are not accurate—the Patents-in-Suit are *not* infringed by products having components designed based upon the IEEE 802.16 standard and/or 3GPP LTE standard,

necessarily or otherwise.  If Wi-LAN's improper allegations are taken as true, however, then in light of the longstanding and widespread adoption and use of products designed based on the IEEE 802.16 standard and/or the 3GPP LTE standard, and in light of Wi-LAN's improper assertions of its patents, Wi-LAN currently possesses market power in the relevant market for these purposes, namely the market for technologies that perform the functionalities covered by the Patents-in-Suit's claims under Wi-LAN's improper assertions of infringement and improper application of the claims.  The geographic scope of that market is at least the United States.

### Wi-LAN's Anticompetitive and Exclusionary Conduct

201.   Wi-LAN acquired and maintained its current alleged position in an unlawful manner, through at least two distinct types of anticompetitive and exclusionary conduct, both of which independently violate Section 2 of the Sherman Act, 15 U.S.C. § 2: (1) deceptive conduct before the IEEE 802.16 and 3GPP LTE standards bodies; and (2) objectively baseless assertions of invalid and unenforceable patents, despite Wi-LAN's knowledge of their invalidity and unenforceability, for improper purposes.

### Standards Body Deception

202.   Wi-LAN's misconduct extends to deceptive conduct before the IEEE 802.16 and 3GPP LTE standards bodies.  As set forth in detail above, Wi-LAN fraudulently deceived the IEEE, 3GPP (and 3GPP's Organizational Partners), and their members.

203.   In order to reduce the likelihood that owners of patents will abuse the standards process, and to guard against unscrupulous conduct by the manipulation of the standard-setting process, SSOs, such as the IEEE and 3GPP, have rules requiring members to disclose the existence of patents or patent applications that they believe are relevant to standards under consideration and to either (a) disclaim the right to enforce any of its present or future patents against any person or entity using the patents to comply with the standard; or (b) promise to license their technologies on fair, reasonable, and non-discriminatory terms.   These disclosures and licensing declarations permit standards-setting organizations, such as the IEEE and 3GPP, to evaluate and select from

competing technologies with full knowledge of claimed intellectual proprietary rights that may affect the costs of implementing the standard.   As alleged above, Wi-LAN engaged in fraudulent deception of the IEEE, 3GPP, and their members, including in violation of the IEEE and 3GPP rules and policies.

204.   Absent Wi-LAN's fraud on the IEEE, 3GPP, and their members, the IEEE 802.16 working group would not have adopted the current form of the IEEE 802.16 standard, and 3GPP would not have adopted the current form of its LTE standard—standards which Wi-LAN now alleges, or has alleged, require use of the subject matter claimed in the Patents-in-Suit in products designed based upon those standards (an allegation with which LG strongly disagrees).   Rather, absent Wi-LAN's deceptive conduct before the IEEE 802.16 and 3GPP LTE standards bodies, the IEEE and 3GPP would have adopted alternative versions of the standards.

**Assertion of Invalid and Unenforceable Patents Despite Knowledge of Their Invalidity and Unenforceability**

205.   Notwithstanding the fact that the Patents-in-Suit are unenforceable based on Wi-LAN's fraudulent misrepresentations and/or omissions to various SSOs, and notwithstanding the fact that Wi-LAN knew or should have known that the Patents-in-Suit are invalid, Wi-LAN has nevertheless improperly asserted and asserts those patents against LG and others.   Additionally, Wi-LAN's assertions of those patents were and are objectively baseless and made for an improper purpose, including because Wi-LAN made those assertions despite knowing that the Patents-in-Suit are invalid and unenforceable in an effort to obtain license revenues it knows it is not entitled to, as well as additional patents to use as part of its improper licensing campaign.

206. Notwithstanding   Wi-LAN's   knowledge   of   the   invalidity   and unenforceability of the Patents-in-Suit, Wi-LAN has nevertheless asserted claims for infringement of the Patents-in-Suit against LG and others as part of a long-standing and ongoing bad faith campaign, including by initiating and maintaining the present

objectively baseless litigation, to improperly extract licenses, acquire additional patents, and extort money from LG and others.

207. To this day, Wi-LAN continues to assert these patents against LG in bad faith through this litigation, knowing full well that those patents are invalid and unenforceable. Wi-LAN's conduct is objectively baseless and unlawful.

208. Wi-LAN's bad faith assertion of its patents, including those which Wi-LAN knows to be invalid and unenforceable, has also facilitated Wi-LAN's acquisition of a number of additional patents which Wi-LAN also improperly alleges are necessarily infringed by products having components designed based upon certain technical standards. Hence, Wi-LAN's exclusionary conduct also allowed Wi-LAN to amass additional patents that Wi-LAN now alleges are necessarily infringed by products having components designed based upon certain technical standards.

**Harm to Competition Caused by Wi-LAN's Exclusionary Conduct**

209. Through the acts, practices and conduct described herein, Wi-LAN, through its own conduct and that of its predecessors-in-interest Ensemble and Nextwave, has engaged in unlawful anticompetitive and exclusionary conduct, including through (a) fraudulent misrepresentations and/or omissions to the IEEE 802.16 and 3GPP LTE standards bodies, and failure and refusal to abide by its FRAND/RAND licensing commitments made to the IEEE, ETSI, and their members; and (b) bad faith assertion of the Patents-in-Suit against LG and others in an objectively baseless fashion and despite the fact that those patents are invalid and/or unenforceable, or through a continuous campaign to improperly extract licenses, all in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

210. Wi-LAN's violations of Section 2 of the Sherman Act caused and continue to cause harm to competition, including by improperly increasing barriers to entry such that potential competitors who would or might have produced products designed based upon the accused standards have been dissuaded from doing so and/or making

investments in such activities, by forcing unnecessary defense expenditures by competitors or potential competitors who are unwilling to surrender to Wi-LAN's extortionate scheme to extract licensing revenue for patents that Wi-LAN has asserted in bad faith despite knowing them to be invalid and/or unenforceable, by facilitating Wi-LAN's demand for and extraction of improper supracompetitive license payments when Wi-LAN is not properly entitled to any such license payments including because its Patents-in-Suit do not cover products designed based upon the accused standards, by causing increased prices to consumers for products designed based upon the accused standards as a result of unnecessary defense expenditures and/or exorbitant licensing fees for those who accede to Wi-LAN's improper demands, by chilling participation in the markets in which it operates and related markets, and by decreasing or eliminating competition from alternative technologies that would or might have had increased viability but for Wi-LAN's exclusionary conduct.  In addition, Wi-LAN's abuse of the standards-setting process also damages competition through chilling effects on standards participation, thereby reducing or eliminating the pro-competitive impacts that standards organizations can have in the right circumstances when the process is not abused.

211.   Wi-LAN's violations of Section 2 of the Sherman Act have also caused injury to LG in its business and property, including by forcing LG to incur great expense in defending against Wi-LAN's bad faith and objectively baseless assertions of its alleged patents, and also through the loss of past, present and future profits and other harm to LG's business.

212.   LG has suffered irreparable injury by reason of the acts, practices and conduct of Wi-LAN alleged herein, and will continue to suffer such injury until and unless the Court enjoins such acts, practices, and conduct.

213.   Wi-LAN's anticompetitive conduct has affected and is affecting a substantial volume of interstate and foreign commerce, including commerce in this District.

**COUNT XIII**

## ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

214.   Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-213, above, as if set forth fully herein.

215.   Wi-LAN has willfully engaged in the anticompetitive conduct described above with the specific intent of acquiring and maintaining market power in a relevant antitrust market—namely, the market for Wi-LAN's allegedly patented technology. There is a dangerous probability that, unless restrained, Wi-LAN's conduct will (according to its allegations) succeed, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

216.   Wi-LAN's violations of Section 2 of the Sherman Act caused and continue to cause harm to competition, including by improperly increasing barriers to entry such that potential competitors who would or might have produced products designed based upon the accused standards have been dissuaded from doing so and/or making investments in such activities, by forcing unnecessary defense expenditures by competitors or potential competitors who are unwilling to surrender to Wi-LAN's extortionate scheme to extract licensing revenue for patents that Wi-LAN has asserted in bad faith despite knowing them to be invalid and unenforceable, by facilitating Wi-LAN's demand for and extraction of improper supracompetitive license payments when Wi-LAN is not properly entitled to any such license payments including because its Patents-in-Suit do not cover products designed based upon the accused standards, by causing increased prices to consumers for products designed based upon the accused standards as a result of unnecessary defense expenditures and/or exorbitant licensing fees for those who accede to Wi-LAN's improper demands, by chilling participation in the markets in which it operates and related markets, and by decreasing or eliminating competition from alternative technologies that would or might have had increased viability but for Wi-LAN's exclusionary conduct.  In addition, Wi-LAN's abuse of the standards-setting process also damages competition through chilling effects on standards

participation, thereby reducing or eliminating the pro-competitive impacts that standards organizations can have in the right circumstances when the process is not abused.

217. Wi-LAN's violations of Section 2 of the Sherman Act have also caused injury to LG in its business and property, including by forcing LG to incur great expense in defending against Wi-LAN's bad faith and objectively baseless assertions of its alleged patents, and also through the loss of past, present and future profits and other harm to LG's business. LG has suffered irreparable injury by reason of the acts, practices and conduct of Wi-LAN alleged herein, and will continue to suffer such injury until and unless the Court enjoins such acts, practices and conduct.

218. Wi-LAN's anticompetitive conduct has affected and is affecting a substantial volume of interstate and foreign commerce, including commerce in this District.

## **PRAYER FOR RELIEF**

WHEREFORE, LG respectfully requests the following relief:

A. Dismissal of Wi-LAN's Complaint with prejudice, granting LG's Affirmative Defenses and Counterclaims, and denying each request for relief made by Wi-LAN;

B. Entry of judgment in LG's favor on each and every count of Wi-LAN's Complaint;

C. Entry of an Order directing that LG is not liable to Wi-LAN for any damages pursuant to Wi-LAN's Complaint;

D. Entry of judicial declarations in favor of LG under Counts I through IX of Counterclaim-Plaintiff LG's Counterclaims that:

1. No claims of the Patents-in-Suit are infringed by LG;

2. The claims of the Patents-in-Suit are invalid; and

3. The '924 patent, the '743 patent, and the '320 patent are unenforceable.

E.     An award to LG of compensatory damages, attorneys' fees and costs, and interest on its Affirmative Defenses and Counterclaims;

F.     Entry of an Order that LG is the prevailing party, that this is an exceptional case under 35 U.S.C. § 285 because Wi-LAN brought this action with wrongful intent, or at least gross negligence, and with knowledge that LG's accused products do not and cannot infringe any valid claim of the Patents-in-Suit, with knowledge that the claims of the Patents-in-Suit are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112, with knowledge that the claims of the '924 patent, the '743 patent, and the '320 patent are unenforceable, and/or based on any other facts and circumstances warranting a finding of an exceptional case, in favor of LG;

G.     A judgment requiring Wi-LAN's specific performance under its contracts with the IEEE, ETSI, and/or IEEE and ETSI members to grant licenses to the Patents-in-Suit to LG on fair, reasonable, and non-discriminatory terms and conditions;

H.     A decree that LG is entitled to license the Patents-in-Suit from Wi-LAN on fair, reasonable, and non-discriminatory terms and conditions;

I.     An award to LG of its reasonable attorney fees and costs pursuant to 35 U.S.C. § 285; and

J.     Such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

LG requests a trial by jury on all issues so triable.

DATED:  May 22, 2017          By:     /s/ Joseph S. Leventhal
                                       Joseph S. Leventhal
                                       joseph.leventhal@dinsmore.com
                                       Dinsmore & Shohl LLP
                                       655 West Broadway,
                                       Suite 840
                                       San Diego, CA 92101
                                       Tel: 619-356-3518
                                       Fax: 619-615-2082

Richard D. Harris
harrisr@gtlaw.com
James J. Lukas, Jr.
lukasj@gtlaw.com
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 3100
Chicago, IL 60601
Tel: 312-456-8400
Fax: 312-456-8435

*Attorneys for Defendants and Counterclaim-
Plaintiffs, LG Electronics, Inc., LG
Electronics U.S.A., Inc., and LG Electronics
Mobilecomm U.S.A., Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2017, I electronically filed:

**DEFENDANTS LG ELECTRONICS, INC., LG ELECTRONICS U.S.A., INC., AND LG ELECTRONICS MOBILECOMM U.S.A., INC.'S ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS,**

with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to the following:

| | |
|---|---|
| **Victor M. Felix** | **Christopher M. First** |
| Procopio Cory Hargreaves and Savitch LLP | **Eric J. Enger** |
| | **Leslie V. Payne** |
| 525 B Street | Heim, Payne & Chorush LLP |
| Suite 2200 | 1111 Bagby Street |
| San Diego, CA 92101 | Suite 2100 |
| (619) 515-3229 | Houston, TX 77002 |
| Fax: (619) 744-5409 | 713-221-2000 |
| Email: vmf@procopio.com | Email: cfirst@hpcllp.com |
| | eenger@hpcllp.com |
| | lpayne@hpcllp.com |
| *Attorney for Plaintiffs* | |
| | *Attorneys for Plaintiffs* |

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 22, 2017, at San Diego, California.

By:  */s/ Joseph S. Leventhal*
Joseph S. Leventhal

Joseph S. Leventhal
Joseph.leventhal@dinsmore.com
DINSMORE & SHOHL LLP
655 West Broadway, Suite 840
San Diego, CA 92101
(619) 356-3518 (T) / (619) 400-0501 (F)

Richard D. Harris (*pro hac vice*)
harrisr@gtlaw.com
James J. Lukas, Jr. (*pro hac vice*)
lukasj@gtlaw.com
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
(312) 456-8400 (T) / (312) 456-8435 (F)

*Attorneys for Defendants and Counterclaim-Plaintiffs,*
*LG Electronics, Inc., LG Electronics U.S.A., Inc., and LG*
*Electronics Mobilecomm U.S.A., Inc.*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WI-LAN, INC., WI-LAN USA, INC., and WI-LAN LABS, INC., | CASE NO. 3:17-cv-00358-BEN-BGS |
| Plaintiffs, | **DEFENDANTS LG ELECTRONICS, INC., LG ELECTRONICS U.S.A., INC., AND LG ELECTRONICS MOBILECOMM U.S.A., INC.'S ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS** |
| v. | |
| LG ELECTRONICS, INC., LG ELECTRONICS U.S.A., INC., and LG ELECTRONICS MOBILECOMM U.S.A., INC., | |
| Defendants. | Judge: Hon. Roger T. Benitez |

LG ELECTRONICS, INC., LG
ELECTRONICS U.S.A., INC., and LG
ELECTRONICS MOBILECOMM
U.S.A., INC.,

    Counterclaim-Plaintiffs,

v.

WI-LAN, INC., WI-LAN USA, INC.,
and WI-LAN LABS, INC.,

    Counterclaim-Defendants.

Defendants LG Electronics, Inc., LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc. (collectively, "LG") by and through their undersigned counsel of record and for its Answer to the Complaint of Plaintiffs Wi-LAN, Inc., Wi-LAN USA, Inc., and Wi-LAN Labs, Inc. (collectively, "Wi-LAN") herein states as follows:

### NATURE OF ACTION

1.     This is an action for infringement of U.S. Patent Nos. 8,787,924 ("the '924 Patent"), 8,867,351 ("the '351 Patent"), 9,226,320 ("the '320 Patent"), and 9,497,743 ("the '743 Patent").   The '924 Patent, '351 Patent, '320 Patent, and '743 Patent are hereby incorporated by reference.

**Answer:**     LG admits that the Complaint purports to state causes of action for infringement of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent against LG.   LG denies that any such claims are meritorious with respect to LG.   LG admits that the Complaint purports to incorporate the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent by reference, but denies that they can be incorporated because they are not attached to the Complaint.   LG denies all of the remaining allegations of this Paragraph.

### THE PARTIES

2.     Plaintiff Wi-LAN, Inc. is a corporation organized and existing under the laws of Canada with its principal place of business at 303 Terry Fox Drive, Suite 300, Ottawa, ON, K2K 3J1, Canada.

**Answer:**     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

3.     Plaintiff Wi-LAN USA, Inc. is a corporation organized and existing under the laws of Florida with its principal executive office at 303 Terry Fox Drive, Suite 300, Ottawa, ON, K2K 3J1, Canada, and a principal business office at 600 Anton Blvd., Suite 1350, Costa Mesa, CA, 92626.

**Answer:**     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

4.     Plaintiff Wi-LAN Labs, Inc. is a corporation organized and existing under the laws of Delaware with its principal executive office at 303 Terry Fox Drive, Suite 300, Ottawa, ON, K2K 3J1, Canada, and a principal business office at 5962 La Place Court Suite 265, Carlsbad, CA 92008.

**Answer:**     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

5.     LG Electronics, Inc. is incorporated under the laws of South Korea with its principal place of business at LG Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  Upon information and belief, LG Electronics, Inc. owns and controls, directly and/or indirectly, LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc.

**Answer:**     Admitted that LG Electronics, Inc. is a South Korean corporation and has a principal place of business in Seoul, South Korea.  Admitted that LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc. are wholly owned subsidiaries of LG Electronics, Inc.  LG denies all of the remaining allegations of this Paragraph.

6.     LG Electronics U.S.A., Inc. is a Delaware corporation with its principal place of business at 1000 Sylvan Ave, Englewood Cliffs, New Jersey.  LG Electronics U.S.A., Inc. may be served via its registered agent, United States Corporation Company, 2711 Centerville Rd. Ste. 400, Wilmington, DE 19808.

**Answer:**     Admitted that LG Electronics U.S.A., Inc. is a Delaware corporation and has a principal place of business in Englewood Cliffs, New Jersey.  To the extent the remaining allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG admits that LG Electronics U.S.A., Inc. may be served via its registered agent.

7.     LG Electronics Mobilecomm U.S.A., Inc. is a California corporation with its principal place of business at 10225 Willow Creek Rd., San Diego, California 92131. LG Electronics Mobilecomm U.S.A., Inc. may be served via its registered agent,

Corporation Service Company (Which will do Business in California as CSC - Lawyers Incorporating Service), 2710 Gateway Oaks Dr. Ste. 150N Sacramento, CA 95833.

**Answer:**    Admitted that LG Electronics Mobilecomm U.S.A., Inc. is a California corporation and has a principal place of business in San Diego, California.  To the extent the remaining allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG admits that LG Electronics Mobilecomm U.S.A., Inc. may be served via its registered agent.

### JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 101 *et seq*.

**Answer:**    To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG admits that 28 U.S.C. §§ 1331 and 1338(a) provide jurisdiction to this Court for cases arising under federal patent law.

9.    This Court has personal jurisdiction over LG as personal jurisdiction over LG in this action comports with due process.  LG has conducted and regularly conducts business within the United States and this judicial district.  LG has continuous and systematic contacts with California and this judicial district.  Furthermore, LG has purposefully availed itself of the privileges of conducting business in the United States and this judicial district.  LG has sought protection and benefit from the laws of the State of California by maintaining offices in California and this judicial district, by selling products with the expectation and/or knowledge that they will be purchased by consumers in this judicial district, and/or by offering advertisements targeted at consumers in this judicial district, and/or by having partners and customers in this judicial district.  In California and in this judicial district, LG regularly does or solicits business and engages in other persistent courses of conduct. LG derives substantial

revenue from services provided to individuals in California and in this judicial district. Plaintiff's causes of action arise directly from LG's activities in this judicial district. In particular, LG's research and development division is based in San Diego. And LG's San Diego-based division is the center of LG's 3GPP and standardization efforts. LG has even sought to transfer other patent cases involving LTE technology to the Southern District of California.

**Answer:**   To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required. To the extent a response is deemed to be required, LG denies the allegations of this Paragraph, but states that it does not contest personal jurisdiction over LG.

10.   Joinder of Defendants is proper because Defendants are related parties who are either jointly and severally liable for infringement, or who make, use, sell, offer for sale, or import the same or similar accused products that practice the same 4G LTE standards. Further, upon information and belief, Defendants use the same chip suppliers and chipsets in their infringing products, meaning the factual question of infringement will substantially overlap between Defendants. Further, Plaintiffs anticipate that there will be substantial overlap during the discovery process.

**Answer:**   To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required. To the extent a response is deemed to be required, LG denies the allegations of this Paragraph.

11.   Venue is proper in this federal district pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b) in that one or all Defendants reside in this District, have done business in this District, have regular and established places of business in this District, have committed acts of infringement in this District, and continue to commit acts of infringement in this District, entitling Plaintiffs to relief.

**Answer:**   To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required. To the extent a response is deemed to be

required, LG admits that 28 U.S.C. §§ 1391(b) and (c) and 1400(b) provide for venue in this District.  LG denies all of the remaining allegations of this Paragraph.

12.     No other venue is more convenient than the Southern District of California.  Plaintiff Wi-LAN Labs, Inc. resides in this district.  Two of the three patents in suit were developed in this district (and the other was developed elsewhere in California).  Further, many of the inventors of the patents-in-suit, including Ken Stanwood, Yair Bourlas, Adam Newham, and Lei Wang currently reside in this district.  And Wi-LAN's current U.S. headquarters is also located in California (600 Anton Boulevard, Suite 1350, Costa Mesa, California 92626).   Also, important third-party suppliers for Defendants' infringing products reside in this district.

**Answer:**     To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG states that it does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.  LG also denies that any of its products are infringing.

## **BACKGROUND OF THE TECHNOLOGY**

13.     Wi-LAN Labs developed advanced 4G technologies and products for Wi-LAN and others in the wireless industry that enhance the capacity, quality of user experience, and connectivity of 4G (and next generation 5G) mobile devices and networks.

**Answer:**     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

14.     Several of the 4G patents asserted in this action were developed by Wi-LAN's own Ken Stanwood, the former president of Wi-LAN Labs and current CTO at Wi-LAN, Inc., and his team.

**Answer:**     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

15.    Mr. Stanwood has played a leadership role in the development of 4G technologies and standards for more than a decade, starting with the industry's first major 4G cellular initiative, referred to as WiMAX.  He served as Vice Chair of the IEEE 802.16 standards committee for WiMAX from 2003-2006 and as a principal contributor to the original IEEE 802.16 standard for 4G cellular networks and mobile devices.

**Answer**:    LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

16.    Mr. Stanwood has written extensively on 4G technologies, including coauthoring a popular textbook on the subject, and has been awarded 125 U.S. patents, with many more patent applications currently pending before the United States Patent Office and worldwide, many of which relate to 4G technologies.

**Answer**:    LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

17.    Like Ken Stanwood, Wi-LAN's founders, Michel Fattouche and Hatim Zaghloul, are widely recognized and acknowledged as wireless industry pioneers.  Their technologies, patents and writings have been cited in patents and publications written by thousands of engineers and scientists in the wireless industry.

**Answer**:    LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

18.    Wi-LAN's founders developed key cellular "data" technologies, including the W-OFDM air interface, to enable data to be exchanged at desktop speeds over a wireless channel, such as in Wi-Fi networks, or from mobile devices in 4G cellular networks.  Wi-LAN's technologies have made Wi-Fi and 4G in mobile devices possible.[1]

**Answer**:    LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph (including footnote 1) and, therefore, denies same.

---

[1] *See, e.g.*, Ergen, Mustafa, *Mobile Broadband: Including WiMAX and LTE*, John Wiley & Sons, 2009 at p. 110, Section 4.1 "Principles of OFDM: Introduction" (recognizing one of Wi-LAN's first patents, U.S. Patent No. 5,282,222, to WOFDM as a major milestone in the development of Wi-Fi and 4G technologies, turning a single lane wireless communication channel into a multi-lane super highway, and enabling mobile devices to transmit and receive data at desktop speeds).

19.     The Wi-LAN success story is featured in major publications worldwide, including in such publications as Scientific American[2] and Time Magazine,[3] and in many others.   Wi-LAN and its founders have also been the subject of numerous industry awards for their wireless innovations, and for their contribution to the growth in wireless data capability present in today's smartphones, tablets, and other mobile devices.

**Answer:**     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph (including footnotes 2 and 3) and, therefore, denies same.

20.     One of Wi-LAN's co-founders is featured in one of Canada's leading business publications as among the Top 100 Canadians of the 20th century for Wi-LAN's wireless innovations.[4]   And Wi-LAN's original wireless designs and first wireless mobile device have been displayed in the Canadian equivalent of the Smithsonian Institution.

**Answer**:     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph (including footnote 4) and, therefore, denies same.

21.     Enabling high-speed wireless data capability in mobile devices was no small task–it posed incredible challenges–something we take for granted today with desktop speeds now standard in 4G mobile devices.

**Answer**:     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

22.     Over the years, Wi-LAN, Wi-LAN Labs, and their predecessors have invested hundreds of millions of dollars in developing, making and selling many of the

---

[2] The Future of Wireless, *Scientific American*, October 2000 at p. 57 ("To date, wireless multiplexing hasn't been exploited for cellular systems…. That may change soon…. Wi LAN holds a number of key patents for multiplexing technology known as wideband orthogonal frequency division multiplexing, or WOFDM").

[3] Wi-LAN Shows How to be Successful-and-Canadian-in the Global Economy, *Time Magazine*, April 3, 2000.

[4] Great Canadians, *Maclean's*, July 1, 2000 ("Riding the wave of invention ... Wi-LAN is one of those next generation companies.  Its technology may well become the base for what some call the coming wireless revolution: the ability to e-mail, surf the Net, adjust the lights in your home and order theater tickets from a cellphone or handheld computer.")

world's first fixed and mobile devices capable of transmitting and receiving wireless data at desktop speeds.

**Answer:**   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

23.   Wi-LAN's products which had 4G data speeds include, among others, the I.WILL, BWS 300, LIBRA 3000, LIBRA 5800, LIBRA MX, and the LIBRA Mobilis.

**Answer:**   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

24.   Wi-LAN was the first company in the world to build Wi-Fi and 4G data speeds into mobile devices, with speeds reaching up to 100 megabits per second (Mbps), and it did so a decade before 4G would become the standard in the wireless industry that it is today.

**Answer:**   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

25.   A number of Wi-LAN's advanced 4G technologies have their origin in work started by Wi-LAN's Ken Stanwood and his team while at Ensemble Communications ("Ensemble"), a San Diego company that Mr. Stanwood helped grow (then, as Ensemble's Chief Technology Officer) to over 200 engineers, scientists, and support personnel.

**Answer**:   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

26.   Others of Wi-LAN's advanced 4G technologies have their origin in work created at NextWave Communications, another San Diego company where Mr. Stanwood served as a Vice President.  And yet other technologies were first developed at SOMA network, a California-based company involved in 4G technologies.

**Answer**:   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

27.     The advanced 4G technologies developed by Mr. Stanwood and his team were employed in the network stacks utilizing the 4G WiMAX cellular standard, and were subsequently adopted for use in the network stacks utilizing the 4G LTE cellular standard used in today's 4G mobile devices.

**Answer**:     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

28.     These advanced 4G technologies include:

(i) the bandwidth-on-demand and periodic bandwidth services built into 4G mobile devices to enable apps installed on such devices to have the bandwidth they need, when they need it, in real-time;

(ii) the quality-of-service functions built into 4G mobile devices to enable mobile devices to prioritize the services that have the most pressing need for bandwidth; and

(iii) the handoff functionality built into 4G mobile devices to identify particular devices and use pre-allocated codes to respond faster to requests from mobile devices.

**Answer**:     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

29.     The efforts of Mr. Stanwood and other Wi-LAN inventors in developing these advanced 4G technologies have enabled 4G mobile devices to support a variety of services popular among users of Defendants' 4G LTE mobile devices, such as voice, conversational video, live streaming of video and music, real-time gaming, video and photo sharing, email, and instant messaging, all in the palm of your hand ("4G Network Services").

**Answer**:     LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

30.     Wi-LAN's wireless technologies and patents, including its advanced 4G technologies, have been licensed by nearly all companies in the wireless industry, comprising more than 130 companies.

**Answer**:   LG does not have sufficient information to admit or deny the allegations set forth in this Paragraph and, therefore, denies same.

31.   Defendants' infringement gives them an unfair advantage over their competitors, many of whom have chosen to do the right thing and license their use of Wi-LAN's wireless technologies and patents. Many of Defendants' major competitors in the mobile device industry, including Samsung, HTC, Nokia and BlackBerry have licensed Wi-LAN's wireless technologies and patents.

**Answer**:   To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG states that it does not have sufficient information to admit or deny the allegation that LG's competitors have licensed Wi-LAN's wireless technologies and patents and, therefore, denies same.  LG denies the remaining allegations set forth in this Paragraph.

32.   Wi-LAN has made numerous efforts to license the unauthorized use of its wireless technologies by the Defendants, but Defendants have consistently refused to take a license, choosing to use Wi-LAN's 4G technologies without paying anything for that right.

**Answer**:   LG admits that Wi-LAN sought to license its wireless patent portfolio to LG.  LG denies the remaining allegations set forth in this Paragraph.

33.   Defendants have willfully chosen to not respect the intellectual property of Wi-LAN, including the three 4G patents asserted in this action directed to Wi-LAN's advanced 4G technologies, and it does so despite understanding the importance of intellectual property.

**Answer**:   Denied.

34.   Before initiating litigation, Wi-LAN made substantial efforts to license Defendants' use of Wi-LAN's advanced 4G technologies and patents in their 4G LTE mobile devices, expecting that Defendants would proceed in good faith.

**Answer**:   Denied.

35.     During the spring of 2016, Wi-LAN contacted the Defendants to engage in licensing the patents-in-suit relating to LTE and 4G wireless technology.   Defendants initially expressed interest.   But despite Wi-LAN's repeated efforts, Defendants failed to take a license.

**Answer**:     LG admits that Wi-LAN contacted LG in the spring of 2016 to renew its license to Wi-LAN's wireless patent portfolio, and that LG did not renew its license. LG denies the remaining allegations set forth in this Paragraph.

36.     Defendants' actions have forced Wi-LAN's hand, leaving it with no choice but to protect its intellectual property through litigation.

**Answer**:     Denied.

## DEFENDANTS' INFRINGING PRODUCTS

37.     LG directly or indirectly through subsidiaries or affiliated companies markets, distributes, manufactures, imports, sells, and/or offers for sale wireless communication products, such as products compliant with the 3rd Generation Partnership Project ("3GPP") 4G LTE standard, including but not limited to the LG V20, LG Watch Urbane 2nd Edition LTE, LG Stylus 3, LG Stylo 2 V, LG Stylo 2 Plus, LG Stylo 3, LG K3 2017, LG K4 2017, LG K8 2017, LG K10 2017, LG K8V, LG G Stylo, LG Stylo 2, LG Tribute HD, LG Aristo, LG G5, LG G4, LG G4c, LG G3, LG G3 S, LG G3 Beat, LG G3 Vigor, LG G2, LG K7, LG X Power, LG X Mach, LG X cam, LG X screen, LG Leon LTE, LG K10, LG B470, LG B471, LG Escape 3, LG Volt, LG Premier LTE, LG Treasure LTE, LG Classic, LG Rebel, LG Treasure, LG X style, LG Premier, LG K3, LG K8, LG K4, LG Optimus Zone 3, LG Optimus G Pro, LG K8 V, LG K8, LG Phoenix 2, LG Tribute 5, LG Wine 4, LG V10, LG Tribute 5, LG Spree, LG G Vista 2, LG Risio, LG Terra, LG Exalt II, LG Sunrise, LG G Flex 2, LG Destiny, LG Sunset, LG 441G, LG Access, LG Envoy III, LG 450, LG True, LG Revere 3, LG Extravert 2, LG XPression 2, LG G Flex, LG Cosmos 3, LG G Pad X II, LG G Pad X, LG G Pad F, and LG G Pad, in the United States and in this district.   As some of these products, and additional LG LTE devices, are known by internal model numbers, codenames, or have alternate versions

and iterations, discovery will be necessary to finalize a list of devices that infringe the patents-in-suit. LG's products support at least Release 8, et seq. of the 4G LTE standard.

**Answer**:    LG admits that LG Electronics, Inc. makes the above-listed products and LG Electronics Mobilecomm U.S.A., Inc. sells the above-listed products, but LG states that LG Electronics U.S.A., Inc. does not market, distribute, manufacture, import, sell, or offer for sale any of the above-listed products. LG denies the remaining allegations set forth in this Paragraph.

38. Upon information and belief, LG's products also include software and associated hardware that prioritize the transmission of data generated by various applications that run on these LG products, and in doing such prioritization utilize the claimed inventions of the patents asserted in this action.

**Answer**:    Denied.

**WILLFUL INFRINGEMENT**

39. Prior to the filing of this complaint, Defendants knew or should have known that they infringed the patents-in-suit. On April 7, 2016, Wi-LAN invited LG to renew its license to Wi-LAN's "wireless portfolio," including its patents covering "LTE." LG knew or reasonably should have known based on its prior license that such patents in the "wireless portfolio" covering "LTE" included the three patents-in-suit. Yet despite repeated requests from Wi-LAN on May 16, June 10, and June 27, 2016, LG declined to substantively engage in licensing negotiations with Wi-LAN or take a license.

**Answer**:    LG admits that Wi-LAN contacted LG in the spring of 2016 to renew its license to Wi-LAN's wireless patent portfolio, and that LG did not renew its license. LG denies the remaining allegations set forth in this Paragraph.

40. Accordingly, LG has had knowledge, or reasonably should have had knowledge, of the patents-in-suit since at least April 7, 2016 and certainly by the filing of this complaint. Despite such knowledge, Defendants have proceeded to infringe the patents-in-suit with full and complete knowledge of their applicability to their respective 4G LTE products without taking a license and without a good faith belief that the

patents-in-suit are invalid and not infringed.  Defendants' infringement of the patents-in-suit thus occurs with knowledge of infringement and/or objective recklessness and has been and continues to be willful and deliberate.  Thus, Defendants' infringement of the patents-in-suit is willful and deliberate, entitling Wi-LAN to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

**Answer**:   Denied.

## INFRINGEMENT OF U.S. PATENT NO. 8,787,924

41.   Wi-LAN incorporates the allegations of paragraphs 1 through 40 above as if set forth verbatim herein.

**Answer**:   LG incorporates by reference its answers to Paragraphs 1 through 40, *supra*, as if set forth in full herein.

42.   On July 22, 2014, United States Patent No. 8,787,924 ("the '924 Patent") was duly and legally issued for inventions entitled "Methods and Systems for Transmission of Multiple Modulated Signals Over Wireless Networks."  Wi-LAN owns the '924 Patent and holds the right to sue and recover damages for infringement thereof.

**Answer**:   LG admits that the '924 Patent is titled "Methods and Systems for Transmission of Multiple Modulated Signals Over Wireless Networks."  LG admits that the face of the '924 Patent indicates that it was issued on July 22, 2014.  LG admits that the face of the '924 Patent indicates that Wi-LAN, Inc. is the applicant and assignee of the '924 Patent at least as of the issue date.  LG denies that the '924 Patent was duly and legally issued.  LG denies the remaining allegations set forth in this Paragraph, and notes that the '924 Patent was not attached to the Complaint.

43.   On information and belief, Defendants have directly infringed and continue to directly infringe numerous claims of the '924 Patent, including at least claims 1 and 17, by manufacturing, using, selling, offering to sell, and/or importing their respective accused 4G LTE devices.  Defendants are liable for infringement of the '924 Patent pursuant to 35 U.S.C. § 271(a).

1      **Answer**:      Denied.

2      44.    For example, the LG accused 4G LTE devices comply with the 4G LTE

3   standards, including the UL-SCH data transfer procedure specified by 3GPP TS 36.321 at

4   section 5.4.   In particular, the accused 4G LTE devices first transmit a Scheduling

5   Request (*i.e.*, "a one bit message to the base station to request an allocation of UL

6   bandwidth in which to transmit a bandwidth request") and then subsequently transmit a

7   Buffer Status Report (*i.e.*, a "bandwidth request indicative of an amount of pending UL

8   data").   Thereafter, the accused devices dynamically allocate the assigned UL bandwidth

9   amongst their respective "UL services based on a QoS parameter of a respective service."

10     **Answer**:      Denied.

11     45.    Defendants have been and are now indirectly infringing at least one claim of

12   the '924 Patent in accordance with 35 U.S.C. § 271(b) in this district and elsewhere in the

13   United States.   More specifically, Defendants have been and are now actively inducing

14   direct infringement by other persons (*e.g.*, Defendants' customers who use, sell or offer

15   for sale products that embody and/or otherwise practice one or more claims of the '924

16   Patent).

17     **Answer**:      Denied.

18     46.    By at least the filing of this complaint, Defendants had knowledge of the

19   '924 Patent, and that their actions resulted in a direct infringement of the '924 Patent, and

20   knew or were willfully blind that their actions would induce direct infringement by others

21   and intended that their actions would induce direct infringement by others.

22     **Answer**:      To the extent the allegations of this Paragraph purport to state a legal

23   conclusion, no response thereto is required.   To the extent a response is deemed to be

24   required, LG admits that LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm

25   U.S.A., Inc. were aware of the '924 Patent as of the date of service of Wi-LAN's

26   Complaint, but states that LG Electronics, Inc. was not aware of the '924 Patent as of the

27   date of service of Wi-LAN's Complaint.   LG denies all of the remaining allegations of

28   this Paragraph.

47.     Defendants actively induce such infringement by, among other things, providing user manuals and other instruction material for their devices that induce their customers to use Defendants' devices in their normal and customary way to infringe the '924 Patent.  For example, LG's website provides instructions for using the LG devices on 4G LTE networks.  *See*, *e.g.*, http://www.lg.com/us/4glte-phones (noting that "LG 4G LTE phones feature forward-thinking designs and innovative technology" and emphasizing the "4G LTE phone Network," which permits the accused LG 4G LTE devices to "stay connected wherever you go on a super-fast LTE network, for seamless and reliable use.").  As does LG's user documentation for the accused devices.  *See*, *e.g.*, http://www.lg.com/us/supportmobile/lg-H910-Silver (encouraging customers to use the "Enhanced LTE Service").    Through its manufacture and sales of their devices, Defendants specifically intended for their customers to infringe the '924 Patent. Further, Defendants were aware that these normal and customary activities would infringe the '924 Patent.  Defendants performed the acts that constitute induced infringement, and that would induce actual infringement, with knowledge of the '924 Patent and with the knowledge or willful blindness that the induced acts would constitute direct infringement.

**Answer**:     Denied.

48.     Accordingly, a reasonable inference is that Defendants specifically intend for others, such as their customers, to directly infringe one or more claims of the '924 Patent in the United States because Defendants had knowledge of, and were aware of Wi-LAN's infringement allegations concerning, the '924 Patent and actively induced others (*e.g.*, its customers) to directly infringe the '924 Patent by using, selling, or offering to sell Defendants' 4G LTE devices.

**Answer**:     Denied.

49.     Defendants have been and are now indirectly infringing at least one claim of the '924 Patent in accordance with 35 U.S.C. § 271(c) in this district and elsewhere in the United States.  More specifically, Defendants have been and are now providing non-staple articles of commerce to others for use in an infringing system or method with

knowledge of the '924 Patent, and with knowledge that the use of their products resulted in a direct infringement of the '924 Patent by their customers, and with knowledge that these non-staple articles of commerce are used as a material part of the claimed invention of the '924 Patent.

**Answer**:    Denied.

50.    Defendants' devices compliant with 4G LTE include components comprising an application processor and a baseband processor specifically designed to support communication and transmission of data over 4G LTE-compliant networks. These components are mounted to a circuit board in Defendants' accused devices and, absent these components, Defendants' devices compliant with 4G LTE would not function in an acceptable manner to send or receive data over 4G LTE networks.   A reasonable inference to be drawn from the facts set forth is that these components in Defendants' devices are especially made or especially adapted to operate in the accused devices to provide wireless communication, including the transmission of data in accordance with the 4G LTE standard.  Further, a reasonable inference to be drawn from the facts is that these components comprising an application processor and a baseband processor are intended to support communication of data over a 4G LTE network and are not staple articles or commodities of commerce, and that the use of the components is required for operation of the devices to send or receive data over a 4G LTE-compliant network.  Any other use would be unusual, far-fetched, illusory, occasional, aberrant, or experimental.

**Answer**:    Denied.

51.    The components comprising an application processor and a baseband processor designed to support communication of data using 4G LTE in Defendants' devices are each a material part of the invention of the '924 Patent and are especially made for the infringing manufacture, sale, and use of Defendants' accused devices. Defendants' devices, including those components, are especially made or adapted to infringe the '924 Patent, and have no substantial non-infringing uses.

1   **Answer**:    Denied.

2   52.    The '924 Patent is valid and enforceable.

3   **Answer**:    Denied.

4   53.    Defendants' infringement of the '924 Patent has damaged Wi-LAN, and

5   Defendants are liable to Wi-LAN in an amount to be determined at trial that compensates

6   Wi-LAN for the infringement, which by law can be no less than a reasonable royalty.

7   **Answer**:    Denied.

8   54.    As a result of Defendants' infringement of the '924 Patent, Wi-LAN has

9   suffered irreparable harm and will continue to suffer loss and injury unless Defendants

10  are enjoined by this Court.

11  **Answer**:    Denied.

12  **INFRINGEMENT OF U.S. PATENT NO. 9,497,743**

13  55.    Wi-LAN incorporates the allegations of paragraphs 1 through 40 above as if

14  set forth verbatim herein.

15  **Answer**:    LG incorporates by reference its answers to Paragraphs 1 through 54,

16  *supra*, as if set forth in full herein.

17  56.    On November 15, 2016, United States Patent No. 9.497.743 ("the '743

18  Patent") was duly and legally issued for inventions entitled "Methods and Systems for

19  Transmission of Multiple Modulated Signals Over Wireless Networks."  Wi-LAN owns

20  the '743 Patent and holds the right to sue and recover damages for infringement thereof.

21  **Answer**:    LG admits that the '743 Patent is titled "Methods and Systems for

22  Transmission of Multiple Modulated Signals Over Wireless Networks."  LG admits that

23  the face of the '743 Patent indicates that it was issued on November 15, 2016.  LG admits

24  that the face of the '743 Patent indicates that Wi-LAN, Inc. is the applicant and assignee

25  of the '743 Patent at least as of the issue date.  LG denies that the '743 Patent was duly

26  and legally issued.  LG denies the remaining allegations set forth in this Paragraph, and

27  notes that the '743 Patent was not attached to the Complaint.

28

57.    On information and belief, Defendants have directly infringed and continue to directly infringe numerous claims of the '743 Patent, including at least claims 1 and 6, by manufacturing, using, selling, offering to sell, and/or importing their respective accused 4G LTE devices.  Defendants are liable for infringement of the '743 Patent pursuant to 35 U.S.C. § 271(a).

**Answer**:    Denied.

58.    For example, the LG accused 4G LTE devices comply with the 4G LTE standards, including the UL-SCH data transfer procedure specified by 3GPP TS 36.321 at section 5.4.  In particular, the accused 4G LTE devices first transmit a Scheduling Request (*i.e.*, "an explicit message to the base station informing the base station that the cellular telephone has data awaiting transmission to the base station over the UL connection between the cellular telephone and the base station") and then subsequently transmit a Buffer Status Report (*i.e.*, a "information indicative of an amount of data awaiting transmission to the base station over the UL connection between the cellular telephone and the base station").

**Answer**:    Denied.

59.    Defendants have been and are now indirectly infringing at least one claim of the '743 Patent in accordance with 35 U.S.C. § 271(b) in this district and elsewhere in the United States.  More specifically, Defendants have been and are now actively inducing direct infringement by other persons (*e.g.*, Defendants' customers who use, sell or offer for sale products that embody and/or otherwise practice one or more claims of the '743 Patent).

**Answer**:    Denied.

60.    By at least the filing of this complaint, Defendants had knowledge of the '743 Patent, and that their actions resulted in a direct infringement of the '743 Patent, and knew or were willfully blind that their actions would induce direct infringement by others and intended that their actions would induce direct infringement by others.

**Answer**:      To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG admits that LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc. were aware of the '743 Patent as of the date of service of Wi-LAN's Complaint, but states that LG Electronics, Inc. was not aware of the '743 Patent as of the date of service of Wi-LAN's Complaint.  LG denies all of the remaining allegations of this Paragraph.

61.    Defendants actively induce such infringement by, among other things, providing user manuals and other instruction material for their devices that induce their customers to use Defendants' devices in their normal and customary way to infringe the '743 Patent.  For example, LG's website provides instructions for using the LG devices on 4G LTE networks.  *See, e.g.*, http://www.lg.com/us/4glte-phones (noting that "LG 4G LTE phones feature forward-thinking designs and innovative technology" and emphasizing the "4G LTE phone Network," which permits the accused LG 4G LTE devices to "stay connected wherever you go on a super-fast LTE network, for seamless and reliable use.").  As does LG's user documentation for the accused devices.  *See, e.g.*, http://www.lg.com/us/supportmobile/lg-H910-Silver (encouraging customers to use the "Enhanced LTE Service").    Through its manufacture and sales of their devices, Defendants specifically intended for their customers to infringe the '743 Patent.  Further, Defendants were aware that these normal and customary activities would infringe the '743 Patent.  Defendants performed the acts that constitute induced infringement, and that would induce actual infringement, with knowledge of the '743 Patent and with the knowledge or willful blindness that the induced acts would constitute direct infringement.

**Answer**:      Denied.

62.    Accordingly, a reasonable inference is that Defendants specifically intend for others, such as their customers, to directly infringe one or more claims of the '743 Patent in the United States because Defendants had knowledge of, and were aware of Wi-LAN's infringement allegations concerning, the '743 Patent and actively induced others

(*e.g.*, its customers) to directly infringe the '743 Patent by using, selling, or offering to sell Defendants' 4G LTE devices.

**Answer**:     Denied.

63.     Defendants have been and are now indirectly infringing at least one claim of the '743 Patent in accordance with 35 U.S.C. § 271(c) in this district and elsewhere in the United States.   More specifically, Defendants have been and are now providing non-staple articles of commerce to others for use in an infringing system or method with knowledge of the '743 Patent, and with knowledge that the use of their products resulted in a direct infringement of the '743 Patent by their customers, and with knowledge that these non-staple articles of commerce are used as a material part of the claimed invention of the '743 Patent.

**Answer**:     Denied.

64.     Defendants' devices compliant with 4G LTE include components comprising an application processor and a baseband processor specifically designed to support communication and transmission of data over 4G LTE-compliant networks. These components are mounted to a circuit board in Defendants' accused devices and, absent these components, Defendants' devices compliant with 4G LTE would not function in an acceptable manner to send or receive data over 4G LTE networks.   A reasonable inference to be drawn from the facts set forth is that these components in Defendants' devices are especially made or especially adapted to operate in the accused devices to provide wireless communication, including the transmission of data in accordance with the 4G LTE standard.   Further, a reasonable inference to be drawn from the facts is that these components comprising an application processor and a baseband processor are intended to support communication of data over a 4G LTE network and are not staple articles or commodities of commerce, and that the use of the components is required for operation of the devices to send or receive data over a 4G LTE-compliant network.   Any other use would be unusual, far-fetched, illusory, occasional, aberrant, or experimental.

**Answer**:      Denied.

65.    The components comprising an application processor and a baseband processor designed to support communication of data using 4G LTE in Defendants' devices are each a material part of the invention of the '743 Patent and are especially made for the infringing manufacture, sale, and use of Defendants' accused devices. Defendants' devices, including those components, are especially made or adapted to infringe the '743 Patent, and have no substantial non-infringing uses.

**Answer**:      Denied.

66.    The '743 Patent is valid and enforceable.

**Answer**:      Denied.

67.    Defendants' infringement of the '743 Patent has damaged Wi-LAN, and Defendants are liable to Wi-LAN in an amount to be determined at trial that compensates Wi-LAN for the infringement, which by law can be no less than a reasonable royalty.

**Answer**:      Denied.

68.    As a result of Defendants' infringement of the '743 Patent, Wi-LAN has suffered irreparable harm and will continue to suffer loss and injury unless Defendants are enjoined by this Court.

**Answer**:      Denied.

### **INFRINGEMENT OF U.S. PATENT NO. 8,867,351**

69.    Wi-LAN incorporates the allegations of paragraphs 1 through 40 above as if set forth verbatim herein.

**Answer**:      LG incorporates by reference its answers to Paragraphs 1 through 68, *supra*, as if set forth in full herein.

70.    On October 21, 2014, United States Patent No. 8,867,351 ("the '351 Patent") was duly and legally issued for inventions entitled "Apparatus, System, and Method for the Transmission of Data with Different QoS Attributes."  Wi-LAN owns the '351 Patent and holds the right to sue and recover damages for infringement thereof.

1    **Answer**:    LG admits that the '351 Patent is titled "Apparatus, System, and

2    Method for the Transmission of Data with Different QoS Attributes." LG admits that the

3    face of the '351 Patent indicates that it was issued on October 21, 2014. LG admits that

4    the face of the '351 Patent indicates that Wi-LAN, Inc. is the applicant and assignee of

5    the '351 Patent at least as of the issue date. LG denies that the '351 Patent was duly and

6    legally issued. LG denies the remaining allegations set forth in this Paragraph, and notes

7    that the '351 Patent was not attached to the Complaint.

8    71.    On information and belief, Defendants have directly infringed and continue

9    to directly infringe numerous claims of the '351 Patent, including at least claims 1 and 7,

10    by manufacturing, using, selling, offering to sell, and/or importing their respective

11    accused 4G LTE devices. Defendants are liable for infringement of the '351 Patent

12    pursuant to 35 U.S.C. § 271(a).

13    **Answer**:    Denied.

14    72.    For example, the LG accused 4G LTE devices comply with the 4G LTE

15    standards, including the UL-SCH data transfer procedure specified by 3GPP TS 36.321 at

16    section 5.4 and, even more specifically, the Logical Channel Prioritization procedure

17    specified at section 5.4.3.1. In particular, the accused 4G LTE devices transfer data on

18    "logical channels." Prior to transfer, the MAC entity (*i.e.*, "link controller") queues data

19    into "logical channel queues" that can have a "priority" and a prioritized bit rate (*i.e.*,

20    "traffic shaping rate"). The accused 4G LTE devices then examine the available

21    channels to determine which queues to assign to which channels, and attempt to fill the

22    transmission capacity of the channels. In this way, highest priority transmissions will be

23    made first.

24    **Answer**:    Denied.

25    73.    Defendants have been and are now indirectly infringing at least one claim of

26    the '351 Patent in accordance with 35 U.S.C. § 271(b) in this district and elsewhere in the

27    United States. More specifically, Defendants have been and are now actively inducing

28    direct infringement by other persons (*e.g.*, Defendants' customers who use, sell or offer

for sale products that embody and/or otherwise practice one or more claims of the '351 Patent).

**Answer**:     Denied.

74.     By at least the filing of this complaint, Defendants had knowledge of the '351 Patent, and that their actions resulted in a direct infringement of the '351 Patent, and knew or were willfully blind that their actions would induce direct infringement by others and intended that their actions would induce direct infringement by others.

**Answer**:     To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG admits that LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc. were aware of the '351 Patent as of the date of service of Wi-LAN's Complaint, but states that LG Electronics, Inc. was not aware of the '351 Patent as of the date of service of Wi-LAN's Complaint.  LG denies all of the remaining allegations of this Paragraph.

75.     Defendants actively induce such infringement by, among other things, providing user manuals and other instruction material for their devices that induce their customers to use Defendants' devices in their normal and customary way to infringe the '351 Patent.  For example, LG's website provides instructions for using the LG devices on 4G LTE networks.  *See*, *e.g.*, http://www.lg.com/us/4glte-phones (noting that "LG 4G LTE phones feature forward-thinking designs and innovative technology" and emphasizing the "4G LTE phone Network," which permits the accused LG 4G LTE devices to "stay connected wherever you go on a super-fast LTE network, for seamless and reliable use.").  As does LG's user documentation for the accused devices.  *See*, *e.g.*, http://www.lg.com/us/supportmobile/lg-H910-Silver (encouraging customers to use the "Enhanced LTE Service").   Through its manufacture and sales of their devices, Defendants specifically intended for their customers to infringe the '351 Patent.  Further, Defendants were aware that these normal and customary activities would infringe the '351 Patent.  Defendants performed the acts that constitute induced infringement, and

that would induce actual infringement, with knowledge of the '351 Patent and with the knowledge or willful blindness that the induced acts would constitute direct infringement.

**Answer**:   Denied.

76.   Accordingly, a reasonable inference is that Defendants specifically intend for others, such as their customers, to directly infringe one or more claims of the '351 Patent in the United States because Defendants had knowledge of, and were aware of Wi-LAN's infringement allegations concerning, the '351 Patent and actively induced others (*e.g.*, its customers) to directly infringe the '351 Patent by using, selling, or offering to sell Defendants' 4G LTE devices.

**Answer**:   Denied.

77.   Defendants have been and are now indirectly infringing at least one claim of the '351 Patent in accordance with 35 U.S.C. § 271(c) in this district and elsewhere in the United States.   More specifically, Defendants have been and are now providing non-staple articles of commerce to others for use in an infringing system or method with knowledge of the '351 Patent, and with knowledge that the use of their products resulted in a direct infringement of the '351 Patent by their customers, and with knowledge that these non-staple articles of commerce are used as a material part of the claimed invention of the '351 Patent.

**Answer**:   Denied.

78.   Defendants' devices compliant with 4G LTE include components comprising an application processor and a baseband processor specifically designed to support communication and transmission of data over 4G LTE-compliant networks. These components are mounted to a circuit board in Defendants' accused devices and, absent these components, Defendants' devices compliant with 4G LTE would not function in an acceptable manner to send or receive data over 4G LTE networks.   A reasonable inference to be drawn from the facts set forth is that these components in Defendants' devices are especially made or especially adapted to operate in the accused devices to provide wireless communication, including the transmission of data in

accordance with the 4G LTE standard.  Further, a reasonable inference to be drawn from the facts is that these components comprising an application processor and a baseband processor are intended to support communication of data over a 4G LTE network and are not staple articles or commodities of commerce, and that the use of the components is required for operation of the devices to send or receive data over a 4G LTE-compliant network.  Any other use would be unusual, far-fetched, illusory, occasional, aberrant, or experimental.

   **Answer**:  Denied.

  79. The components comprising an application processor and a baseband processor designed to support communication of data using 4G LTE in Defendants' devices are each a material part of the invention of the '351 Patent and are especially made for the infringing manufacture, sale, and use of Defendants' accused devices.  Defendants' devices, including those components, are especially made or adapted to infringe the '351 Patent, and have no substantial non-infringing uses.

   **Answer**:  Denied.

  80. The '351 Patent is valid and enforceable.

   **Answer**:  Denied.

  81. Defendants' infringement of the '351 Patent has damaged Wi-LAN, and Defendants are liable to Wi-LAN in an amount to be determined at trial that compensates Wi-LAN for the infringement, which by law can be no less than a reasonable royalty.

   **Answer**:  Denied.

  82. As a result of Defendants' infringement of the '351 Patent, Wi-LAN has suffered irreparable harm and will continue to suffer loss and injury unless Defendants are enjoined by this Court.

   **Answer**:  Denied.

## INFRINGEMENT OF U.S. PATENT NO. 9,226,320

  83. Wi-LAN incorporates the allegations of paragraphs 1 through 40 above as if set forth verbatim herein.

1   **Answer**:   LG incorporates by reference its answers to Paragraphs 1 through 82,
2   *supra*, as if set forth in full herein.

3   84.   On December 29, 2015, United States Patent No. 9,226,320 ("the '320
4   Patent") was duly and legally issued for inventions entitled "Pre-Allocated Random
5   Access Identifiers."  Wi-LAN owns the '320 Patent and holds the right to sue and recover
6   damages for infringement thereof.

7   **Answer**:   LG admits that the '320 Patent is titled "Pre-Allocated Random
8   Access Identifiers."  LG admits that the face of the '320 Patent indicates that it was
9   issued on December 29, 2015.  LG admits that the face of the '320 Patent indicates that
10  Wi-LAN, Inc. is the applicant and assignee of the '320 Patent at least as of the issue date.
11  LG denies that the '320 Patent was duly and legally issued.  LG denies the remaining
12  allegations set forth in this Paragraph, and notes that the '320 Patent was not attached to
13  the Complaint.

14  85.   On information and belief, Defendants LG have directly infringed and
15  continue to directly infringe numerous claims of the '320 Patent, including at least claim
16  27, by manufacturing, using, selling, offering to sell, and/or importing their respective
17  accused 4G LTE devices. Defendants are liable for infringement of the '320 Patent
18  pursuant to 35 U.S.C. § 271(a).

19  **Answer**:   Denied.

20  86.   For example, the LG accused 4G LTE devices comply with the 4G LTE
21  standards, including the non-contention based random access procedure specified by
22  3GPP TS 36.300 at section 10.1.5.2.  In particular, during handover, the accused 4G LTE
23  devices receive an information element (IE) message (RACH-ConfigDedicated) that
24  explicitly signals the non-contention Random Access Preamble for use on the random
25  access channel (*i.e.*, "an indication of a non-contention reserved access identifier") that
26  uniquely identifies the mobile device, as well as System Information Blocks containing
27  Random Access Channel related configuration information (*i.e.*, "information about a
28  shared random access channel").  The accused 4G LTE devices then transmit the

assigned non-contention Random Access preamble to the target base station.  Next, the accused 4G LTE devices receive from the target base station a Random Access Response that conveys Timing Alignment information (*i.e.*, a feedback message comprising a timing adjustment"), including a timing advance command.  Finally, the accused 4G LTE devices adjust uplink transmission timing (*i.e.*, "adjust uplink transmission timing").

**Answer**:   Denied.

87.   Defendants have been and are now indirectly infringing at least one claim of the '320 Patent in accordance with 35 U.S.C. § 271(b) in this district and elsewhere in the United States.  More specifically, Defendants have been and are now actively inducing direct infringement by other persons (*e.g.*, Defendants' customers who use, sell or offer for sale products that embody and/or otherwise practice one or more claims of the '320 Patent).

**Answer**:   Denied.

88.   By at least the filing of this complaint, Defendants had knowledge of the '320 Patent, and that their actions resulted in a direct infringement of the '320 Patent, and knew or were willfully blind that their actions would induce direct infringement by others and intended that their actions would induce direct infringement by others.

**Answer**:   To the extent the allegations of this Paragraph purport to state a legal conclusion, no response thereto is required.  To the extent a response is deemed to be required, LG admits that LG Electronics U.S.A., Inc. and LG Electronics Mobilecomm U.S.A., Inc. were aware of the '320 Patent as of the date of service of Wi-LAN's Complaint, but states that LG Electronics, Inc. was not aware of the '320 Patent as of the date of service of Wi-LAN's Complaint.  LG denies all of the remaining allegations of this Paragraph.

89.   Defendants actively induce such infringement by, among other things, providing user manuals and other instruction material for their devices that induce their customers to use Defendants' devices in their normal and customary way to infringe the '320 Patent.  For example, LG's website provides instructions for using the LG devices

on 4G LTE networks. *See*, *e.g.*, http://www.lg.com/us/4glte-phones (noting that "LG 4G LTE phones feature forward-thinking designs and innovative technology" and emphasizing the "4G LTE phone Network," which permits the accused LG 4G LTE devices to "stay connected wherever you go on a super-fast LTE network, for seamless and reliable use."). As does LG's user documentation for the accused devices. *See*, *e.g.*, http://www.lg.com/us/supportmobile/lg-H910-Silver (encouraging customers to use the "Enhanced LTE Service"). Through its manufacture and sales of their devices, Defendants specifically intended for their customers to infringe the '320 Patent. Further, Defendants were aware that these normal and customary activities would infringe the '320 Patent. Defendants performed the acts that constitute induced infringement, and that would induce actual infringement, with knowledge of the '320 Patent and with the knowledge or willful blindness that the induced acts would constitute direct infringement.

**Answer**:    Denied.

90.    Accordingly, a reasonable inference is that Defendants specifically intend for others, such as their customers, to directly infringe one or more claims of the '320 Patent in the United States because Defendants had knowledge of, and were aware of Wi-LAN's infringement allegations concerning, the '320 Patent and actively induced others (*e.g.*, its customers) to directly infringe the '320 Patent by using, selling, or offering to sell Defendants' 4G LTE devices.

**Answer**:    Denied.

91.    Defendants have been and are now indirectly infringing at least one claim of the '320 Patent in accordance with 35 U.S.C. § 271(c) in this district and elsewhere in the United States. More specifically, Defendants have been and are now providing non staple articles of commerce to others for use in an infringing system or method with knowledge of the '320 Patent, and with knowledge that the use of their products resulted in a direct infringement of the '320 Patent by their customers, and with knowledge that these non-staple articles of commerce are used as a material part of the claimed invention of the '320 Patent.

**Answer**:    Denied.

92.    Defendants' devices compliant with 4G LTE include components comprising an application processor and a baseband processor specifically designed to support communication and transmission of data over 4G LTE-compliant networks. These components are mounted to a circuit board in Defendants' accused devices and, absent these components, Defendants' devices compliant with 4G LTE would not function in an acceptable manner to send or receive data over 4G LTE networks.   A reasonable inference to be drawn from the facts set forth is that these components in Defendants' devices are especially made or especially adapted to operate in the accused devices to provide wireless communication, including the transmission of data in accordance with the 4G LTE standard.   Further, a reasonable inference to be drawn from the facts is that these components comprising an application processor and a baseband processor are intended to support communication of data over a 4G LTE network and are not staple articles or commodities of commerce, and that the use of the components is required for operation of the devices to send or receive data over a 4G LTE-compliant network.   Any other use would be unusual, far-fetched, illusory, occasional, aberrant, or experimental.

**Answer**:    Denied.

93.    The components comprising an application processor and a baseband processor designed to support communication of data using 4G LTE in Defendants' devices are each a material part of the invention of the '320 Patent and are especially made for the infringing manufacture, sale, and use of Defendants' accused devices. Defendants' devices, including those components, are especially made or adapted to infringe the '320 Patent, and have no substantial non-infringing uses.

**Answer**:    Denied.

94.    The '320 Patent is valid and enforceable.

**Answer**:    Denied.

95. Defendants' infringement of the '320 Patent has damaged Wi-LAN, and Defendants are liable to Wi-LAN in an amount to be determined at trial that compensates Wi-LAN for the infringement, which by law can be no less than a reasonable royalty.

**Answer**: Denied.

96. As a result of Defendants' infringement of the '320 Patent, Wi-LAN has suffered irreparable harm and will continue to suffer loss and injury unless Defendants are enjoined by this Court.

**Answer**: Denied.

## PRAYER FOR RELIEF

WHEREFORE, Wi-LAN prays for relief as follows:

97. A judgment in favor of Wi-LAN that Defendants have infringed and are infringing U.S. Patent Nos. 8,787,924; 8,867,351; 9,226,320; and 9.497,743.

**Answer**: LG denies that Wi-LAN is entitled to any relief from LG, much less the relief set forth above, at least because the claims of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not valid or infringed, either directly or indirectly, by LG, and the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not enforceable. LG specifically denies all of the allegations in paragraph 97 of Wi-LAN's Prayer for Relief.

98. An order permanently enjoining Defendants, their respective officers, agents, employees, and those acting in privity with it, from further direct and/or indirect infringement of U.S. Patent Nos. 8,787,924; 8,867,351; 9,226,320; and 9.497,743.

**Answer**: LG denies that Wi-LAN is entitled to any relief from LG, much less the relief set forth above, at least because the claims of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not valid or infringed, either directly or indirectly, by LG, and the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not enforceable. LG specifically denies all of the allegations in paragraph 98 of Wi-LAN's Prayer for Relief.

99.    An award of damages to Wi-LAN arising out of Defendants' infringement of U.S. Patent Nos. 8,787,924; 8,867,351; 9,226,320; and 9.497,743, including enhanced damages pursuant to 35 U.S.C. § 284, together with prejudgment and post-judgment interest, in an amount according to proof;

**Answer**:    LG denies that Wi-LAN is entitled to any relief from LG, much less the relief set forth above, at least because the claims of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not valid or infringed, either directly or indirectly, by LG, and the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not enforceable.  LG specifically denies all of the allegations in paragraph 99 of Wi-LAN's Prayer for Relief.

100.    An award of an ongoing royalty for Defendants' post-judgment infringement in an amount according to proof;

**Answer**:    LG denies that Wi-LAN is entitled to any relief from LG, much less the relief set forth above, at least because the claims of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not valid or infringed, either directly or indirectly, by LG, and the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not enforceable.  LG specifically denies all of the allegations in paragraph 100 of Wi-LAN's Prayer for Relief.

101.    Declaring that Defendants' infringement is willful and that this is an exceptional case under 35 U.S.C. § 285 and awarding attorneys' fees and costs in this action.

**Answer**:    LG denies that Wi-LAN is entitled to any relief from LG, much less the relief set forth above, at least because the claims of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not valid or infringed, either directly or indirectly, by LG, and the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not enforceable.  LG specifically denies all of the allegations in paragraph 101 of Wi-LAN's Prayer for Relief.

102.   Granting Wi-LAN its costs and further relief as the Court may deem just and proper.

**Answer**:   LG denies that Wi-LAN is entitled to any relief from LG, much less the relief set forth above, at least because the claims of the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not valid or infringed, either directly or indirectly, by LG, and the '924 Patent, the '351 Patent, the '320 Patent, and the '743 Patent are not enforceable.  LG specifically denies all of the allegations in paragraph 102 of Wi-LAN's Prayer for Relief.

### WI-LAN'S DEMAND FOR JURY TRIAL

103.   Wi-LAN demands a trial by jury of any and all issues triable of right before a jury.

**Answer**:   LG admits that Wi-LAN requests a trial by jury.  LG denies any express or implied allegations of the Complaint not otherwise responded to in this Answer.

### GENERAL DENIAL

Except as explicitly admitted herein, LG denies each and every allegation contained in Wi-LAN's Complaint.

### LG'S AFFIRMATIVE DEFENSES

LG pleads the following affirmative defenses to the allegations in Wi-LAN's Complaint:

### First Affirmative Defense
### Non-Infringement

LG does not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claims of the '924, '351, '320, and/or '743 Patents ("Patents-in-Suit").

### Second Affirmative Defense
### Invalidity Pursuant to 35 U.S.C. § 101

At least one or more of the claims of each of the Patents-in-Suit is invalid for failure to meet the statutory requirements set forth in 35 U.S.C. § 101, including but not limited to improper inventorship and non-patentable subject matter.

### Third Affirmative Defense
### Invalidity Pursuant to 35 U.S.C. § 102

At least one or more of the claims of each of the Patents-in-Suit is invalid for failure to meet the statutory requirements set forth in 35 U.S.C. § 102, in view of prior art.

### Fourth Affirmative Defense
### Invalidity Pursuant to 35 U.S.C. § 103

At least one or more of the claims of each of the Patents-in-Suit is invalid for failure to meet the statutory requirements set forth in 35 U.S.C. § 103, in view of prior art.

### Fifth Affirmative Defense
### Invalidity Pursuant to 35 U.S.C. § 112

Each of the Patents-in-Suit does not meet the requirements set forth in 35 U.S.C. § 112 and is invalid and void against LG, for either or both of the following reasons:

(a) The specifications of the Patents-in-Suit are incomplete, vague and indefinite and do not contain a written description of the alleged invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable a person skilled in the art to which it pertains, to make and use the same; and

(b) The claims of the Patents-in-Suit are vague and indefinite and fail to particularly point out and distinctly claim the subject matter of the alleged invention.

### Sixth Affirmative Defense
### Limitation on Damages Pursuant to 35 U.S.C. §§ 286 and/or 288

Wi-LAN's claim for damages, if any, against LG is statutorily limited by 35 U.S.C. §§ 286 and/or 288.

### Seventh Affirmative Defense

### Failure to Mark Pursuant to 35 U.S.C. § 287

Any recovery by Wi-LAN is limited to any alleged infringement that occurred after the filing of the Complaint or after Wi-LAN provided actual notice of the Patents-in-Suit, as Wi-LAN, the prior owners of the Patents-in-Suit, and/or Wi-LAN's licensees have failed to mark any products made under the Patents-in-Suit in conformance with the requirements of 35 U.S.C. § 287.

### Eighth Affirmative Defense

### Limitation on Direct Infringement Claims

To the extent Wi-LAN's Complaint includes claims of direct infringement, such claims are barred because Wi-LAN's Complaint does not allege that any specific device, person, entity, and/or party directly infringes any asserted claim.  To the extent Wi-LAN's Complaint includes claims of direct infringement of any method claims, such claims are barred because Wi-LAN does not allege that all steps of any claimed method are performed by a single entity or that all steps are attributable to a single entity that directs or controls the performance of others.

### Ninth Affirmative Defense

### Unclean Hands

Wi-LAN's claims are barred by the equitable doctrine of unclean hands.

### Tenth Affirmative Defense

### Prosecution History Estoppel and Prosecution Disclaimer

Wi-LAN's claims are barred in whole or in part under the doctrines of prosecution history estoppel and/or prosecution disclaimer.

### Eleventh Affirmative Defense

### Patent Misuse

Wi-LAN's claims are barred under the doctrine of patent misuse.

### Twelfth Affirmative Defense

### Waiver, Implied License, Estoppel, and Acquiescence

Wi-LAN's claims are barred by the doctrines of waiver, acquiescence, implied license, and/or equitable estoppel.

### Thirteenth Affirmative Defense

### Failure to State a Claim

Wi-LAN's Complaint fails to state a claim upon which relief can be granted.

### Fourteenth Affirmative Defense

### Lack of Standing

Wi-LAN lacks standing to assert the Patents-in-Suit.

### Fifteenth Affirmative Defense

### Limitation on Indirect Infringement Claims

To the extent Wi-LAN's Complaint includes claims of indirect infringement, such claims are barred because Wi-LAN's Complaint does not allege that LG: (i) had actual knowledge of the Patents-in-Suit; (ii) had actual knowledge of the alleged infringement of the Patents-in-Suit by any third-parties; and/or (iii) had any specific intent for any third parties to infringe the Patents-in-Suit.

### Sixteenth Affirmative Defense

### No Willful Infringement or Enhanced Damages

Wi-LAN is not entitled to a willful infringement finding and enhanced damages because it has failed to plead the requirements for willful infringement and enhanced damages.  Further, Wi-LAN is not entitled to assert a charge of willful infringement and request enhanced damages because it cannot show LG's actual knowledge of the Patents-in-Suit prior to Wi-LAN's filing of the Complaint and/or LG's actual knowledge of the alleged infringement of the Patents-in-Suit, prior to Wi-LAN's filing of the Complaint.  Any claim and recovery for willful infringement is limited to the period after which Wi-LAN can make such a showing.

### Seventeenth Affirmative Defense

### No Injunctive Relief

Neither preliminary nor permanent injunctive relief is available to Wi-LAN under the legal standards for injunctions because, among other things, Wi-LAN is not likely to succeed on the merits, Wi-LAN will not suffer irreparable harm, and LG is not practicing the alleged invention(s) disclosed in the Patents-in-Suit.  In addition, the balance of hardships and public interest do not favor an injunction in this case.

## Eighteenth Affirmative Defense
### License

Wi-LAN's claims are barred because LG, its suppliers, and/or its customers are licensed.

## Nineteenth Affirmative Defense
### Judicial Estoppel, Collateral Estoppel, and Law of the Case

Wi-LAN's claims are barred in whole or in part under the doctrines of judicial estoppel, collateral estoppel, and/or law of the case.

## Twentieth Affirmative Defense
### Unenforceability Based on Waiver, Estoppel, Implied License, Implied Waiver, and/or Unclean Hands for Failure to Disclose

As set forth with particularity in the Counterclaims set forth below, which LG hereby incorporates as if set forth herein verbatim,  at least three of the four Patents-in are unenforceable because of Wi-LAN's and/or Wi-LAN's predecessors' failure to disclose them to the applicable standards-setting organizations prior to the voting, approval, and/or publication dates of the applicable standards.

## Twenty-first Affirmative Defense
### Limitation on Damages Based on FRAND Obligations

As set forth with particularity in the Counterclaims set forth below, which LG hereby incorporates as if set forth herein verbatim, on information and belief, Wi-LAN has undertaken, in accordance with the relevant rules and intellectual property rights policies of applicable Standard Setting Organizations ("SSOs"), to grant

licenses to some entities under each of the Patents-in-Suit on fair, reasonable, and nondiscriminatory ("FRAND") terms and conditions.  Wi-LAN has not, however, offered LG reasonable and nondiscriminatory royalty terms and rates that are proportionate to royalty terms and rates offered to similarly situated companies.  As a beneficiary of the rules and intellectual property rights policies of the relevant SSOs, LG has the right to be granted license(s) to the Patents-in-Suit on FRAND terms and conditions.  Wi-LAN has failed to do so.  Wi-LAN's failure to comply with its FRAND obligations limit the damages, if any, available to Wi-LAN in this action.

### Twenty-second Affirmative Defense

### Limitation on Damages Based on License

Wi-LAN may not recover damages, if any, for any alleged infringement that occurred while LG was licensed to the Patents-in-Suit.  LG was licensed to the Patents-in-Suit from December 21, 2010, to December 31, 2016.  Accordingly, Wi-LAN may recover pre-filing damages (if any) only from January 1, 2017, until the filing of its Complaint.

### Twenty-third Affirmative Defense

### Limitation on Damages Pursuant to 28 U.S.C. § 1498

Wi-LAN's requested relief is barred, at least in part, by 28 U.S.C. § 1498 to the extent it claims infringement of devices used by, sold to, and/or designed for the United States.

### Twenty-fourth Affirmative Defense

### Exhaustion, Express and Implied License, First Sale, and Double Recovery

Wi-LAN's requested relief is barred or otherwise limited based on patent exhaustion, express or implied license, the "first sale" doctrine, and/or restrictions on double recovery of the Patents-in-Suit.

### Reservation of Defenses

Further responding, LG states that it currently has insufficient knowledge or information on which to form a belief as to whether it may have additional, as yet

unstated, affirmative defenses available.   LG reserves the right to assert additional affirmative defenses in the event that discovery indicates it would be appropriate.

## DEFENDANTS LG ELECTRONICS, INC., LG ELECTRONICS U.S.A., INC., AND LG ELECTRONICS MOBILECOMM U.S.A., INC.'S COUNTERCLAIMS

For its Counterclaims against Wi-LAN, Inc., Wi-LAN USA, INC., and Wi-LAN Labs, Inc. (collectively, "Wi-LAN"), Counterclaim-Plaintiffs LG Electronics, Inc., LG Electronics U.S.A., Inc., and LG Electronics Mobilecomm U.S.A., Inc. (collectively, "LG") allege as follows:

### NATURE OF THE COUNTERCLAIMS

1.      Counterclaim-Plaintiffs LG's Counterclaims are for declarations of non-infringement and invalidity of U.S. Patent Nos. 8,787,924 ("the '924 patent"), 8,867,351 ("the '351 patent"), 9,226,320 ("the '320 patent"), and 9,497,743 ("the '743 patent") (collectively, the "Patents-in-Suit"); a declaration of unenforceability of the '924 patent, the '320 patent, and the '743 patent; a declaration that LG is entitled to license the Patents-in-Suit from Wi-LAN on fair, reasonable, and non-discriminatory terms and conditions; breach of contract; unfair business practices under Cal. Bus. & Prof. Code § 17200; monopolization in violation of Section 2 of the Sherman Act; and attempted monopolization in violation of Section 2 of the Sherman Act.

### THE PARTIES

2.      Counterclaim-Plaintiff LG Electronics, Inc. is a South Korean corporation, with its principal place of business in Seoul, South Korea.

3.      Counterclaim-Plaintiff LG Electronics U.S.A., Inc. is a Delaware corporation, with its principal place of business in Englewood Cliffs, New Jersey.

4.      Counterclaim-Plaintiff LG Electronics Mobilecomm U.S.A., Inc. is a California corporation, with its principal place of business in San Diego, California.

5.      On information and belief, Counterclaim-Defendant Wi-LAN, Inc. is a Canadian corporation, with its principal place of business in Ottawa, Ontario, Canada.

6.      On information and belief, Counterclaim-Defendant Wi-LAN USA, Inc. is a Florida corporation, with a principal business office in Costa Mesa, California.

7.      On information and belief, Counterclaim-Defendant Wi-LAN Labs, Inc. is a Delaware corporation, with a principal business office in Carlsbad, California.

## JURISDICTION

8.      Counterclaim-Plaintiffs LG's Counterclaims are for declaratory relief relating to the Patents-in-Suit, among other counterclaims arising under federal law. Accordingly, this Court has subject matter jurisdiction over the Counterclaim-Plaintiffs' Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202, as well as the Patent Act, 35 U.S.C. § 1, *et seq.*

9.      This Court has supplemental subject matter jurisdiction over the Counterclaim-Plaintiffs' state law counterclaims pursuant to 28 U.S.C. §§ 1367 because Counterclaim-Plaintiffs' state law counterclaims are so related to claims and counterclaims in this action that are within the original jurisdiction of this Court such that they form part of the same case or controversy under Article III of the United States Constitution.

10.      Wi-LAN alleges that it owns all right, title and interest in, and has standing to sue for infringement of the Patents-in-Suit.

11.      Wi-LAN has submitted itself to this Court's jurisdiction by alleging, in the present lawsuit, that LG infringes the Patents-in-Suit.  Accordingly, an actual case or controversy between Counterclaim-Plaintiffs LG and Wi-LAN exists and is of such immediacy and reality to warrant the issuance of a declaratory judgment.

## COUNT I

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT
## OF U.S. PATENT NO. 8,787,924

12.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-11, above, as if set forth fully herein.

13.     Counterclaim-Plaintiffs LG do not infringe and have not infringed, directly or indirectly, literally or pursuant to the doctrine of equivalents, any claim of the '924 patent.

14.     Counterclaim-Plaintiffs LG seek a declaratory judgment that they have not and do not infringe any claim of the '924 patent.

**COUNT II**

**<u>DECLARATORY JUDGMENT OF INVALIDITY</u>**

**<u>OF U.S. PATENT NO. 8,787,924</u>**

15.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-14, above, as if set forth fully herein.

16.     The claims of the '924 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

17.     Counterclaim-Plaintiffs LG seek a declaratory judgment that the claims of the '924 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

**COUNT III**

**<u>DECLARATORY JUDGMENT OF NON-INFRINGEMENT</u>**

**<u>OF U.S. PATENT NO. 8,867,351</u>**

18.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-15, above, as if set forth fully herein.

19.     Counterclaim-Plaintiffs LG do not infringe and have not infringed, directly or indirectly, literally or pursuant to the doctrine of equivalents, any claim of the '351 patent.

20.     Counterclaim-Plaintiffs LG seek a declaratory judgment that they have not and do not infringe any claim of the '351 patent.

## COUNT IV

## DECLARATORY JUDGMENT OF INVALIDITY

## OF U.S. PATENT NO. 8,867,351

21.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-20, above, as if set forth fully herein.

22.     The claims of the '351 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

23.     Counterclaim-Plaintiffs LG seek a declaratory judgment that the claims of the '351 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

## COUNT V

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT

## OF U.S. PATENT NO. 9,226,320

24.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-23, above, as if set forth fully herein.

25.     Counterclaim-Plaintiffs LG do not infringe and have not infringed, directly or indirectly, literally or pursuant to the doctrine of equivalents, any claim of the '320 patent.

26.     Counterclaim-Plaintiffs LG seek a declaratory judgment that they have not and do not infringe any claim of the '320 patent.

## COUNT VI

## DECLARATORY JUDGMENT OF INVALIDITY

## OF U.S. PATENT NO. 9,226,320

27.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-26, above, as if set forth fully herein.

28.     The claims of the '320 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

29.     Counterclaim-Plaintiffs LG seek a declaratory judgment that the claims of the '320 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

**COUNT VII**

**<u>DECLARATORY JUDGMENT OF NON-INFRINGEMENT</u>**

**<u>OF U.S. PATENT NO. 9,497,743</u>**

30.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-29, above, as if set forth fully herein.

31.     Counterclaim-Plaintiffs LG do not infringe and have not infringed, directly or indirectly, literally or pursuant to the doctrine of equivalents, any claim of the '743 patent.

32.     Counterclaim-Plaintiffs LG seek a declaratory judgment that they have not and do not infringe any claim of the '743 patent.

**COUNT VIII**

**<u>DECLARATORY JUDGMENT OF INVALIDITY</u>**

**<u>OF U.S. PATENT NO. 9,497,743</u>**

33.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-32, above, as if set forth fully herein.

34.     The claims of the '743 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

35.     Counterclaim-Plaintiffs LG seek a declaratory judgment that the claims of the '743 patent are invalid for failure to meet the conditions of patentability or to otherwise comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

## COUNT IX

## DECLARATORY JUDGMENT OF UNENFORCEABILITY FOR FAILURE TO DISCLOSE TO STANDARD SETTING ORGANIZATIONS

36.     Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-35, above, as if set forth fully herein.

37.     Wi-LAN and/or Wi-LAN's predecessors-in-interest with respect to one or more of the Patents-in-Suit have engaged in standards-setting misconduct, including without limitation breach of the commitment to disclose standard-essential patents.

**Wi-LAN Alleges That the Patents-in-Suit are Essential to the 3GPP LTE and IEEE 802.16 Standards**

38.     Wi-LAN alleges, or has alleged, that the Patents-in-Suit are essential to, read on, and/or require the Third Generation Partnership Project ("3GPP") LTE standard—specifically, the 3GPP TS 36.300 and 36.321 standards—and the Institute of Electrical and Electronics Engineers ("IEEE") 802.16 standard.  Wi-LAN has also alleged that certain products that purportedly have wireless capability compliant with the 3GPP LTE and IEEE 802.16 standards infringe the Patents-in-Suit.

**The Patents-in-Suit, the Related Patents, and Wi-LAN's Predecessors-in-Interest**

39.     Wi-LAN has represented that it is the owner or assignee of the Patents-in-Suit.

40.     The '924 patent is a continuation of U.S. App. No. 12/645,937 (filed December 23, 2009, now U.S. Patent No. 8,315,640), which is a continuation of U.S. App. No. 11/170,392 (filed June 29, 2005, now U.S. Patent No. 8,189,514), which is a continuation of U.S. App. No. 09/859,561 (filed May 16, 2001, now U.S. Patent No. 6,956,834 ("the '834 patent")), which is a continuation of U.S. App. No. 09/316,518

("the '518 application") (filed May 21, 1999, now U.S. Patent No. 6,925,068 ("the '068 patent")) (collectively, "the '924 patent priority patents and applications").

41.     As continuation patents and applications, the '924 patent and the '924 patent priority patents and applications all have similar specifications that purportedly do not contain any new matter.

42.     The '743 patent is a continuation of U.S. App. No. 14/523,573 (filed on October 24, 2014, now U.S. Patent No. 9,414,368) and U.S. App. No. 14/523,755 (filed on October 24, 2014, now U.S. Patent No. 9,420,573), which are a continuation of U.S. App. No. 14/338,103 (filed on July 22, 2014), which is a continuation of U.S. App. No. 14/170,271 (filed on January 31, 2014), which is a divisional of U.S. App. No. 14/139,159 (filed December 23, 2013, now U.S. Patent No. 8,929,905), which is a divisional of U.S. App. No. 13/089,075 (filed April 18, 2011, now U.S. Patent No. 8,654,664), which is a divisional of U.S. App. No. 12/645,937 (filed December 23, 2009, now U.S. Patent No. 8,315,640), which is a continuation of U.S. App. No. 11/170,392 (filed June 29, 2005, now U.S. Patent No. 8,189,514), which is a continuation of U.S. App. No. 09/859,561 (filed May 16, 2001, now the '834 patent), said U.S. App. No. 14/338,103 is also a continuation of U.S. App. No. 13/649,986 (filed October 11, 2012, now the '924 patent), which is a continuation of U.S. App. No. 12/645,937 (filed December 23, 2009, now U.S. Patent No. 8,315,640), which is a continuation of U.S. App. No. 11/170,392 (filed June 29, 2005, now U.S. Patent No. 8,189,514), which is a continuation of the '518 application (filed May 21, 1999, now the '068 patent) (collectively, "the '743 patent priority patents and applications").

43.     The '924 patent and the '743 patent both claim priority to the '518 application.

44.     James Mollenauer, Israel Jay Klein, Sheldon Gilbert, and Wi-LAN's Kenneth Stanwood are listed as inventors on the face of the '924 and '743 patents, as well as on the face of the '518 application.

45.     The '518 application was previously assigned to Ensemble Communications, Inc. ("Ensemble").     Ensemble assigned its interest in the '518 application to Wi-LAN on May 25, 2004.  Accordingly, Ensemble is a predecessor-in-interest of Wi-LAN with respect to the '924 and '743 patents.

46.     The '351 patent is a continuation of U.S. App. No. 14/102,120 (filed on December 10, 2013), which is a continuation of U.S. App. No. 13/468,925 (filed May 10, 2012, now U.S. Patent No. 8,630,238), which is a continuation of U.S. App. No. 12/028,365 ("the '365 application") (filed February 8, 2008, now U.S. Patent No. 8,184,661), which is a continuation of U.S. App. No. 10/521,581 (filed as App. No. PCT/CA03/01043 on July 11, 2003, now U.S. Patent No. 7,333,435) ("the '435 patent") (collectively, "the '351 patent priority patents and applications").

47.     As continuation patents and applications, the '351 patent and the '351 patent priority patents and applications all have similar specifications that purportedly do not contain any new matter.

48.     Anthony Gerkis is listed as the sole inventor on the face of the '351 patent.

49.     The '365 application and the '435 patent were originally assigned to SOMA Networks, Inc. ("SOMA").  SOMA assigned its interest in the '365 application and the '435 patent to Turtlebones Inc. ("Turtlebones") on November 10, 2010.  Turtlebones assigned its interest in the '365 application and the '435 patent to Wi-LAN on the very same day (*i.e.,* November 10, 2010).   Accordingly, SOMA and Turtlebones are predecessors-in-interest of Wi-LAN with respect to the '351 patent.

50.     The '320 patent is a continuation of U.S. App. No. 13/957,173 (filed August 1, 2013), which is a continuation of U.S. App. No. 13/565,405 (filed August 2, 2012, now U.S. Patent No. 8,532,052), which is a continuation of U.S. App. No. 11/469,794 ("the '794 application") (filed September 1, 2006, now U.S. Patent No. 8,259,688) (collectively, "the '320 patent priority patents and applications").

51.     As continuation patents and applications, the '320 patent and the '320 patent priority patents and applications all have similar specifications that purportedly do not contain any new matter.

52.     The '794 application was previously assigned to Nextwave Broadband, Inc. ("Nextwave").  Nextwave assigned its interest in the '794 application to Wi-LAN on July 16, 2009.  Accordingly, Nextwave is a predecessor-in-interest of Wi-LAN with respect to the '320 patent.

53.     Yair Bourlas, Adam Newham, Lei Wang, and Srikanth Gummadi are listed as inventors on the face of the '320 patent, as well as on the '794 application.

54.     Yair Bourlas, Adam Newham, Lei Wang, and Srikanth Gummadi were employees or representatives of Nextwave.

## Wi-LAN and Wi-LAN's Predecessors-in-Interest Nextwave and Ensemble Were Members of 3GPP, ETSI, and/or ATIS

55.     During all relevant times herein, Wi-LAN and Wi-LAN's predecessors-in-interest Nextwave and Ensemble were members of the following Standard Setting Organizations ("SSO") and Industry Partnership Projects ("Industry Partnerships"): 3GPP, European Telecommunications Standards Institute ("ETSI"), and/or Alliance for Telecommunications Industry Solutions ("ATIS").

56.     During all or part of the time period it owned the '794 application, Nextwave was a member of 3GPP, ETSI, and ATIS.

57.     During all or part of the time period it owned the '518 application, Ensemble was a member of 3GPP and ETSI.

58.     During all or part of the time period it has owned the Patents-in-Suit and any priority patents and applications leading thereto, Wi-LAN has been a member of ETSI.

59.     SSOs collaborate with their members to create and establish global specifications for cellular telephone transmission technologies.

60.     SSOs also collaborate with other SSOs on Industry Partnerships to create and establish similar global specifications for these technologies.  In the cellular industry,

3GPP is a well-known example of such an Industry Partnership. The SSOs that comprise Industry Partnerships are also known as Organizational Partners.

61. As SSOs, ETSI and ATIS are both Organizational Partners of 3GPP. In order for Nextwave and Ensemble to be individual members of 3GPP, they must also be members of one of the Organizational Partners of 3GPP. During all or part of the time period it owned the '794 application, Nextwave was an individual member of 3GPP. Similarly, during all or part of the time period it owned the '518 application, Ensemble was an individual member of 3GPP.

### The 3GPP, ETSI, and ATIS IPR Rules and Policies

62. 3GPP, ETSI, and ATIS have written policies and disclosure requirements relating to the Intellectual Property Rights ("IPR") of their members.

63. 3GPP's IPR policy states that its Individual Members are bound by the IPR policy of their respective Organizational Partner. 3GPP's IPR policy further provides that "Individual Members should declare at the earliest opportunity any IPRs which they believe essential or potentially essential to any work ongoing within" the partnership project. "Declarations should be made by Individual Members to their respective Organizational Partners."

64. The ETSI IPR policy states, in part, "each MEMBER shall use its reasonable endeavors, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted." The ETSI IPR policy defines "IPR" as "any intellectual property right conferred by statute law including applications therefor." The ETSI IPR policy defines "ESSENTIAL" as "it is not possible on technical (but not commercial) grounds … to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR."

65.    The ATIS IPR policy states, in part, "[i]f reference to a patented invention shall be made in a standard, guideline, or other ATIS deliverable, disclosure of the patented invention should be encouraged at the earliest possible time in the development of the standard, guideline, or other ATIS deliverable."

66.    As individual members of 3GPP, Nextwave and Ensemble were required to comply with 3GPP's IPR policy.

67.    As members of ETSI, Wi-LAN and its predecessors-in-interest Nextwave and Ensemble were required to comply with ETSI's IPR policy.

68.    As a member of ATIS, Wi-LAN's predecessor-in-interest Nextwave was required to comply with ATIS's IPR policy.

69.    As members of 3GPP, ETSI, and/or ATIS, Wi-LAN and its predecessors-in-interest Ensemble and Nextwave were obligated to declare any patents and patent applications that they believed to be essential, or potentially essential, to the standardization efforts underway at 3GPP, ETSI, and ATIS, including the development of the 3GPP LTE and IEEE 802.16 standards.

70.    On information and belief, the members and other participants of 3GPP and 3GPP's Organizational Partners, including ATIS and ETSI, did understand, at all times mentioned herein, including all times during the development and standards-setting of the 3GPP standards mentioned herein, and would have understood the IPR policies of 3GPP and 3GPP's Organizational Partners, including ATIS and ETSI, as: 1) imposing a duty, in a timely fashion, to investigate all IPR, including patents and patent applications, owned by the member, participant, and relevant third parties; and 2) as imposing a duty, in a timely fashion, to disclose all known IPR, including patents and patent applications, that is essential or potentially essential to standards of 3GPP and 3GPP's Organizational Partners, including ATIS and ETSI.  On information and belief, those members and other participants also did understand and would have understood that, in the event that certain IPR is essential or potentially essential to implementing a standard or proposed standard of 3GPP and/or 3GPP's Organizational Partners, including ATIS and ETSI, and a license

to that IPR is not available on fair, reasonable, and non-discriminatory ("FRAND") terms, the 3GPP and 3GPP's Organizational Partners, including ATIS and ETSI, would modify the standard or otherwise refuse to implement the standard.

### Wi-LAN's, Nextwave's, and Ensemble's Participation in SSOs and Industry Partnerships

71.    Wi-LAN, its predecessors-in-interest Ensemble and Nextwave, and their representatives participated in the standards-setting process at 3GPP, ETSI, and/or ATIS.

72.    3GPP is composed of specification groups responsible for drafting and amending technical specifications associated with 3GPP.

73.    3GPP specification group TSG Radio Access Network ("TSG RAN") was responsible for drafting 3GPP Technical Specifications ("TS") 36.300 and 36.321.  Wi-LAN has alleged that certain LG products purportedly having wireless capability compliant with the TS 36.300 and 36.321 standards infringe the Patents-in-Suit.  Accordingly, Wi-LAN and its predecessors-in-interest Ensemble and Nextwave were obligated to disclose the Patents-in-Suit, their underlying applications, and any related patents and applications in accordance with the 3GPP, ETSI, and ATIS rules and policies.

74.    On information and belief, Nextwave and its representatives actively participated in numerous meetings of 3GPP, including through submissions, statements, communications, agreements, proposals, omissions, and/or other interactions.   On information and belief, these submissions, statements, communications, agreements, proposals, omissions, and/or other interactions of Nextwave to/with 3GPP, or parts thereof, were incorporated into 3GPP's TS 36.300 and 36.321 standards, at least as they are characterized by Wi-LAN's infringement claims (which LG expressly denies).

75.    The following Nextwave employees and representatives attended TSG RAN meetings on behalf of Nextwave: Martin Beale, Nicholas Anderson, Alan Jones, and Chandrika Worrall.

76.    Nextwave's Martin Beale attended a TSG RAN meeting on behalf of Nextwave on May 29, 2007, through June 1, 2007.

77.    Nextwave's Nicholas Anderson attended TSG RAN meetings on behalf of Nextwave on September 11-14, 2007; November 27-30, 2007; March 4-7, 2008; May 27-30, 2008; and September 9-12, 2008.

78.    Nextwave's Alan Jones attended a TSG RAN meeting on behalf of Nextwave on December 2-5, 2008.

79.    Nextwave's Chandrika Worrall attended TSG RAN meetings on behalf of Nextwave on June 25-29, 2007; and August 20-24, 2007.

80.    On information and belief, Ensemble, Wi-LAN, and/or their representatives actively participated in 3GPP meetings, including through submissions, statements, communications, agreements, proposals, omissions, and/or other interactions.    On information and belief, these submissions, statements, communications, agreements, proposals, omissions, and/or other interactions of Ensemble and/or Wi-LAN to/with 3GPP, or parts thereof, were incorporated into 3GPP's TS 36.300 and 36.321 standards, at least as they are characterized by Wi-LAN's infringement claims (which LG expressly denies).

81.    Wi-LAN's Kenneth Stanwood—who is listed as an inventor on the face of the '924 and '743 patents and is a former employee of Ensemble—participated in drafting and revising the TS 36.300 and 36.321 standards when he attended a TSG RAN meeting on November 27-30, 2007.

82.    During TSG RAN meetings attendees were informed that 3GPP Individual Members have the obligation under the IPR policies of their respective Organizational Partners to inform their respective Organizational Partners of essential IPRs of which they become aware.

**Wi-LAN, Nextwave, and Ensemble Failed to Disclose the '924 Patent, the '743 Patent, the '320 Patent, and Related Patents and Applications to SSOs and Industry Partnerships**

83.   Wi-LAN and its predecessors-in-interest Ensemble and Nextwave intentionally and knowingly failed to disclose the '924 patent, the '743 patent, the '320 patent, and any patents and applications related to those patents to 3GPP, ETSI, and ATIS, including as alleged below.

84.   The TS 36.300 specification was first published or released on October 27, 2006, and has been revised periodically since then.  The TS 36.321 specification was first published or released on September 24, 2007, and has been revised periodically since then.

85.   The '794 application, the parent application of the '320 patent, was filed on September 1, 2006, before the TS 36.300 and TS 36.321 standards were first published or released.

86.   The '518 application, the parent application of the '924 and '743 patents, was filed on May 21, 1999, many years before the TS 36.300 and TS 36.321 standards were first published or released.

87.   Nextwave knew or should have known of essential or potentially essential IPRs, including the '794 application, among others, because, *inter alia*, Nextwave had a duty to investigate its IPRs, and Nextwave's representatives attended and/or participated in numerous 3GPP meetings.  Wi-LAN knew or should have known of these patents and patent applications at least when Wi-LAN acquired any of its purported interest in the Patents-in-Suit from Nextwave, because Wi-LAN purports to be Nextwave's successor-in-interest and Nextwave was required to inform Wi-LAN of its IPR disclosure obligations.  Upon its alleged acquisition of rights to the Patents-in-Suit from Nextwave, Wi-LAN became co-obligated to perform the duties to timely investigate and timely disclose its essential or potentially essential IPRs to 3GPP.

88.   Ensemble and Wi-LAN knew or should have known of essential or potentially essential IPRs, including the '518 application, among others, because, *inter alia*, Ensemble and Wi-LAN had a duty to investigate its IPRs, and Ensemble and/or Wi-LAN's representatives, including Kenneth Stanwood—one of the inventors of the '924

patent and '732 patent—attended and/or participated in 3GPP meetings.  Wi-LAN knew or should have known of these patents and patent applications at least when Wi-LAN acquired any of its purported interest in the Patents-in-Suit from Ensemble, because Wi-LAN purports to be Ensemble's successor-in-interest, and Ensemble was required to inform Wi-LAN of its IPR disclosure obligations.  Upon its alleged acquisition of rights to the Patents-in-Suit from Ensemble, Wi-LAN became co-obligated to perform the duties to timely investigate and timely disclose its essential or potentially essential IPRs to 3GPP.

89.     Neither Nextwave nor Wi-LAN disclosed the '320 patent or any of the '320 patent priority patents and applications to 3GPP or any of the relevant Organizational Partners (*i.e.*, ETSI and ATIS).

90.     Nextwave representatives intentionally and knowingly failed to disclose the '320 patent and any of the '320 patent priority patents and applications as essential, or potentially essential, to the specifications being drafted and revised by TSG RAN, including TS 36.300 and TS 36.321.

91.     The foregoing failure to disclose the '320 patent and any of the '320 patent priority patents and applications was made in bad faith with the intent to deceive and induce reliance.

92.     Nextwave had a duty to disclose the '320 patent and the '320 patent priority patents and applications essential to standards drafted and revised by TSG RAN as a result of Nextwave's membership in ETSI, ATIS, and 3GPP, including its obligation to disclose essential IPRs under the IPR policies of ETSI, ATIS, and 3GPP.

93.     Nextwave's failure to disclose led to the adoption and propagation of 3GPP standards without consideration of the '320 patent or any of the '320 patent priority patents and applications.

94.     Wi-LAN and Ensemble disclosed the '518 application to ETSI as essential to the HiperMAN (TS 102 177 and TS 102 178) standard, but never disclosed the '518 application to ETSI as being essential to any 3GPP standard.  Other than the above

disclosures to ETSI, neither Wi-LAN, nor Ensemble, nor any of their representatives ever disclosed the '924 patent, the '743 patent, or any of the '924 patent and '743 patent priority patents and applications.

95.    Wi-LAN, Ensemble, and their representatives intentionally and knowingly failed to disclose the '924 patent, the '743 patent, and the '924 patent and '743 patent priority patents and applications as essential, or potentially essential, to the specifications being drafted and revised by TSG RAN, including TS 36.300 and TS 36.321.

96.    The foregoing failure to disclose the '924 and '743 patents, and any of the '924 patent and '743 patent priority patents and applications was made in bad faith with the intent to deceive and induce reliance.

97.    Wi-LAN, Ensemble, and/or Mr. Stanwood had a duty to disclose the '924 and '743 patents, and the '924 patent and '743 patent priority patents and applications essential to standards drafted and revised by TSG RAN as a result of Wi-LAN's and Ensemble's membership in ETSI, Ensemble's membership in 3GPP, because Mr. Stanwood was listed as an inventor on the '924 and '743 patents and the '924 patent and '743 patent priority patents and applications, and because of Mr. Stanwood's participation in 3GPP meetings.

98.    Wi-LAN, Ensemble, and/or Mr. Stanwood's failure to disclose led to the adoption and propagation of 3GPP standards without consideration of the '924 and '743 patents, or any of the '924 patent and '743 patent priority patents and applications.

99.    As a consequence of Wi-LAN, its predecessors-in-interest Nextwave's and Ensemble's, and/or Mr. Stanwood's failure to disclose, ETSI members, ATIS members, 3GPP members, their successors, and customers throughout the supply chain, including LG and relevant third parties, thereafter designed, manufactured, and marketed products meant to comply with the relevant 3GPP standards, thereby reasonably and justifiably relying on Wi-LAN and its predecessors-in-interest Nextwave and Ensemble's promises to abide by ETSI, ATIS and/or 3GPP IPR policies, to their detriment.

100.   The foregoing actions and conduct have caused damage and continue to cause damage to LG and relevant third parties.

**Wi-LAN Also Asserts That the '924 Patent, the '743 Patent, the '320 Patent, and Related Patents and Applications are Essential to the IEEE 802.16 Standard**

101.   Wi-LAN asserts that the '924 patent, the '743 patent, the '320 patent, and their related patents and applications are essential to the IEEE 802.16 standard.

102.   Wi-LAN has previously asserted that the '068 patent and the '834 patent—two of the parent patents to the '924 and '743 patents—are essential to the IEEE 802.16 standard.

103.   The '924 and '743 patents list submissions to the IEEE 802.16 Broadband Wireless Access Working Group on the face of the patents.

104.   The '320 patent states "[t]he descriptions contained herein generally focus on Orthogonal Frequency Division Multiple Access (OFDMA) wireless communication systems, and particularly are directed towards IEEE 802.16 wireless communication systems."

**Wi-LAN, Wi-LAN's Predecessors-in-Interest Ensemble and Nextwave, and Their Representatives Were Members of the IEEE**

105.   The IEEE is a professional association and leading developer of technical standards.  IEEE members include engineers, scientists, and allied professionals whose technical interests relate to electrical and computer sciences, engineering, and related disciplines.  Members may participate in the standards-setting process in working groups and/or subgroups called task groups.

106.   Wi-LAN, Wi-LAN's predecessors-in-interest Ensemble and Nextwave, and their representatives were or are members of the IEEE, as discussed in detail below.

**The IEEE's Rules and Policies**

107.   The IEEE instituted policies and rules regarding the disclosure and licensing of patents, in part to protect against unscrupulous conduct by any member who seeks to benefit from, or to manipulate to its advantage, the IEEE's standard-setting process, and

to enable the IEEE and its members to develop standards free from potentially blocking patents.

108.   The IEEE's rules and policies require fairness and candor with respect to intellectual property.  By way of example only, the IEEE requires its members to submit letters of assurance ("LOAs") including either a general disclaimer to the effect that the patentee will not enforce any of its present or future patents the use of which would be required to implement the proposed IEEE standard against any person or entity using the patents to comply with the standard, or a statement that a license will be made available to all applicants without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.  For example, the IEEE's 802.16 Patent Policy and Procedures states "IEEE standards may include the known use of patent(s), including patent applications, if there is technical justification in the opinion of the standards-developing committee and provided the IEEE receives assurance from the patent holder that it will license applicants under reasonable terms and conditions for the purpose of implementing the standard."

109.   Additionally, the IEEE's Standards Board Bylaws state that the assurance "shall be a letter that is in the form of either a) A general disclaimer to the effect that the patentee will not enforce any of its present or future patent(s) whose use would be required to implement the proposed IEEE standard against any person or entity using the patent(s) to comply with the standard or b) A statement that a license will be made available to all applicants without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination."

110. The IEEE 802.16 Patent Policy and Procedures further states: "Early disclosure to the Working Group of patent information that might be relevant to the standard is essential to reduce the possibility for delays in the development process and increase the likelihood that the draft publication will be approved for publication.  Please notify the Chair as early as possible, in written or electronic form, of any patents (granted

or under application) that may cover technology that is under consideration by or has been approved by IEEE 802.16."

111.   As a result of their membership and/or participation in the IEEE, Wi-LAN, Wi-LAN's predecessors-in-interest Ensemble and Nextwave, and their representatives agreed, both explicitly and implicitly, that they would abide by the rules and policies of the IEEE.

**Jay Klein's, Kenneth Stanwood's, James Mollenauer's, and Ensemble's Participation in the IEEE Standard-Setting Process**

112.   The IEEE formed the 802.16 working group in 1999.  The 802.16 working group is further divided into the MAC and PHY task groups.  Three of the four named inventors on the '924 and '743 patents—Jay Klein, Kenneth Stanwood, and James Mollenauer—participated in the standard-setting process for 802.16.  Moreover, Jay Klein and Kenneth Stanwood appeared as representatives for Ensemble, a predecessor-in-interest of Wi-LAN.

113.   Jay Klein, Kenneth Stanwood, and James Mollenauer are all listed as inventors on the face of the '518 application, the parent application of the '924 and '743 patents.  The '518 application was filed on May 21, 1999.

114.   On or about July 6, 1999, the first official meeting of the 802.16 working group was held in Montreal, Canada.

115.   Jay Klein and James Mollenauer attended the July 1999 802.16 meeting in Montreal.

116.   On or about August 4, 1999, the second meeting of the 802.16 working group was held in Denver, Colorado.

117.   James Mollenauer attended the August 1999 802.16 meeting in Denver.

118.   On or about September 13, 1999, the third meeting of the 802.16 working group was held in Boulder, Colorado.

119.   Jay Klein and James Mollenauer attended the September 1999 802.16 meeting in Boulder.

120.   On or about November 8, 1999, the fourth meeting of the 802.16 working group was held in Kauai, Hawaii.

121.   Jay Klein and James Mollenauer attended the November 1999 802.16 meeting in Hawaii.

122.   On or about January 10, 2000, the fifth meeting of the 802.16 working group was held in Richardson, Texas.

123.   Jay Klein and James Mollenauer attended the January 2000 802.16 meeting in Richardson.

124.   On or about March 6, 2000, the sixth meeting of the 802.16 working group was held in Albuquerque, New Mexico.

125.   Jay Klein and James Mollenauer attended the March 2000 802.16 meeting in Albuquerque.

126.   On or about May 1, 2000, the seventh meeting of the 802.16 working group was held in Gaithersburg, Maryland.

127.   Kenneth Stanwood, Jay Klein, and James Mollenauer attended the May 2000 802.16 meeting in Gaithersburg.

128.   On or about July 10, 2000, the eighth meeting of the 802.16 working group was held in La Jolla, California.

129.   Kenneth Stanwood, Jay Klein, and James Mollenauer attended the July 2000 802.16 meeting in La Jolla.

130.   At each of the above 802.16 working group meetings, the Chairman of the 802.16 working group explained the IEEE Patent Policy and specifically asked for notification from members as to any patents and/or applications applicable to standards or draft standards.

131.   Kenneth Stanwood, Jay Klein, and James Mollenauer were heavily involved in the development of the 802.16 standard.  For example, Jay Klein was named chairman of the 802.16 PHY task group, and James Mollenauer and Kenneth Stanwood were named to the 802.16 MAC task group editorial team.  Additionally, Kenneth Stanwood

served as Vice Chair of the IEEE 802.16 standards committee for WiMAX from 2003-2006, and as a principal contributor to the original IEEE 802.16 standard for 4G cellular networks and mobile devices.

132.   Several proposals authored by Kenneth Stanwood, Jay Klein, and/or James Mollenauer were submitted to the 802.16 MAC task group for consideration.  Each of the proposals submitted states that the "contributor is familiar with the IEEE 802.16 Patent Policy and Procedures."

133.   The "An Efficient Media Access Control Protocol for Broadband Wireless Access Systems" proposal submitted before the fourth 802.16 meeting by Jay Klein and James Mollenauer, and the "MAC Proposal for IEEE 802.16.1" proposal submitted before the fifth 802.16 meeting by Jay Klein, James Mollenauer, and Kenneth Stanwood, are both listed on the faces of the '924 and '743 patents.

134.   Several proposals authored by Jay Klein were submitted to the 802.16 PHY task group for consideration.  Each of the proposals submitted states that the "contributor is familiar with the IEEE 802.16 Patent Policy and Procedures."

135.   During the eighth 802.16 working group meeting, Kenneth Stanwood, Jay Klein, and James Mollenauer, among others, submitted a proposal called "Media Access Control Layer Proposal for the 802.16 Air Interface Specification" to the 802.16 MAC task group.  The proposal states that the "contributor is familiar with the IEEE 802.16 Patent Policy and Procedures," and reproduces the relevant IEEE 802.16 Patent Policy and Procedures.

136.   During the eighth 802.16 working group meeting, the 802.16 MAC task group voted in favor of pursuing the Stanwood et al. proposal, and decided not to pursue other proposals.

**Jay Klein, Kenneth Stanwood, James Mollenauer, and Ensemble Failed to Disclose the '924 Patent, the '743 Patent, and Related Patents and Applications to the IEEE**

137.   Jay Klein, Kenneth Stanwood, James Mollenauer, and/or Wi-LAN's predecessor-in-interest Ensemble intentionally and knowingly failed to disclose the '924

patent, the '743 patent, and patents and applications related to those patents to the IEEE, as alleged below.

138. On March 29, 2004, Ensemble submitted a LOA to the IEEE identifying the '518 application as essential to the 802.16 standard.

139. On July 12, 2004, Wi-LAN submitted a LOA to the IEEE identifying the '518 application as essential to the 802.16 standard.

140. The '518 application was never disclosed to the IEEE before March 29, 2004—nearly five years after the '518 application was filed with the PTO, and nearly four years after the 802.16 MAC task group adopted the proposal submitted by Kenneth Stanwood, Jay Klein, and James Mollenauer.

141. The '924 patent, the '743 patent, and the '924 patent and '743 patent priority patents and application (excluding the '518 application) were never disclosed to the IEEE.

142. The IEEE 802.16 working group never considered the '518 application when it adopted the proposal submitted by Kenneth Stanwood, Jay Klein, and James Mollenauer.

143. Kenneth Stanwood, Jay Klein, James Mollenauer, and Wi-LAN's predecessor-in-interest Ensemble intentionally and knowingly failed to disclose the '924 patent, the '743 patent, and patents and applications related to those patents—including the '518 application that eventually led to the '924 patent and the '743 patent—to the IEEE 802.16 working group.

144. Kenneth Stanwood, Jay Klein, James Mollenauer, and Wi-LAN's predecessor-in-interest Ensemble had a duty to disclose facts regarding their alleged intellectual property, including as a result of their representations and commitments to the IEEE.

145. The foregoing failure to disclose was made in bad faith with the intent to deceive and to induce reliance.

146.   The IEEE, its members, their successors, and customers throughout the supply chain who rely on 802.16 activities, including LG and relevant third parties, reasonably and justifiably relied on the foregoing failure to disclose in adopting 802.16 standards and by investing substantial resources designing, developing, and marketing products accused of alleged infringement in this action.

147.   The foregoing actions and conduct have caused damage and continue to cause damage to LG and relevant third parties.

**Yair Bourlas's, Lei Wang's, Srikanth Gummadi's, and Nextwave's Participation in the IEEE Standard-Setting Process**

148.   Three of the four named inventors on the '320 patent—Yair Bourlas, Lei Wang, and Srikanth Gummadi—participated in the standard-setting process for 802.16. Yair Bourlas, Lei Wang, and Srikanth Gummadi appeared as representatives for Nextwave, a predecessor-in-interest of Wi-LAN.

149.   Yair Bourlas, Lei Wang, and Srikanth Gummadi are all listed as inventors on the face of the '794 application, the parent application of the '320 patent.  The '794 application was filed on September 1, 2006.

150.   On or about January 12, 2009, the 59th meeting of the 802.16 working group was held in La Jolla, California.  Lei Wang and Nextwave hosted the meeting.

151.   On or about May 4, 2009, the 61st meeting of the 802.16 working group was held in Cairo, Egypt.

152.   At each of the above 802.16 working group meetings, the Chairman of the 802.16 working group explained the IEEE Patent Policy and specifically asked for notification from members as to any patents and/or applications applicable to standards or draft standards.

153.   The IEEE 802.16-2009 standard was approved at the May 2009 meeting in Cairo.

154.   The face of the IEEE 802.16-2009 standard states that Lei Wang "participated in the Working Group Letter Ballot in which the draft of this standard was prepared and finalized for IEEE Ballot"

155.   The face of the IEEE 802.16-2000 standard states that Yair Bourlas "voted on this standard."

156.   Yair Bourlas, Lei Wang, and Srikanth Gummadi were involved in the setting and development of the 802.16-2009 standard.  For example, several proposals authored by Yair Bourlas, Lei Wang, and/or Srikanth Gummadi were submitted to the 802.16 working group for consideration.  Each of the proposals submitted states that the "contributor is familiar with the IEEE 802.16 Patent Policy and Procedures."

157.   On information and belief, one or more of the proposals authored by Yair Bourlas, Lei Wang, and/or Srikanth Gummadi were incorporated into the IEEE 802.16-2009 standard.

**Yair Bourlas, Lei Wang, Srikanth Gummadi, and Nextwave Failed to Disclose the '320 Patent and Related Patents and Applications to the IEEE**

158.   Yair Bourlas, Lei Wang, Srikanth Gummadi, and/or Wi-LAN's predecessor-in-interest Nextwave intentionally and knowingly failed to disclose the '320 patent and the '320 patent priority patents and applications to the IEEE, as alleged below.

159.   The '320 patent, and the '320 patent priority patents and applications (including the '794 application) were never disclosed to the IEEE, despite the fact that the '794 application was filed several years before the IEEE 802.16-2009 standard was approved.

160.   The IEEE 802.16 working group never considered the '794 application when it adopted the 802.16-2009 standard.

161.   Yair Bourlas, Lei Wang, Srikanth Gummadi, and Wi-LAN's predecessor-in-interest Nextwave intentionally and knowingly failed to disclose the '320 patent and the '320 patent priority patents and applications—including the '794 application that eventually led to the '320 patent—to the IEEE 802.16 working group.

162.   Yair Bourlas, Lei Wang, Srikanth Gummadi, and Wi-LAN's predecessor-in-interest Nextwave had a duty to disclose facts regarding their alleged intellectual property, including as a result of their representations and commitments to the IEEE.

163.   The foregoing failure to disclose was made in bad faith with the intent to deceive and to induce reliance.

164.   The IEEE, its members, their successors, and customers throughout the supply chain who rely on 802.16 activities, including LG and relevant third parties, reasonably and justifiably relied on the foregoing failure to disclose in adopting 802.16 standards and by investing substantial resources designing, developing, and marketing products accused of alleged infringement in this action.

165.   The foregoing actions and conduct have caused damage and continue to cause damage to LG and relevant third parties.

166.   Wi-LAN, Wi-LAN's predecessors-in-interest Ensemble, Nextwave, and SOMA, and/or one or more of the inventors of the Patents-in-Suit, were or are a member of a SSO involved with the setting of a standard (or standards) that Wi-LAN asserts, or has asserted, is necessarily covered by one or more claims of the Patents-in-Suit.  Wi-LAN, Wi-LAN's predecessors-in-interest Ensemble, Nextwave, and SOMA, and/or one or more of the inventors of the Patents-in-Suit participated in the setting of such standard (or standards).   Despite this participation, the Patents-in-Suit, and the patents and applications that led to the Patents-in-Suit, including any priority patents and/or applications, were never disclosed to the applicable SSOs.  Accordingly, the standards that Wi-LAN asserts, or has asserted, are necessarily covered by one or more claims of the Patents-in-Suit were set without consideration of the Patents-in-Suit, or the patents and applications that led to the Patents-in-Suit.  Wi-LAN, Wi-LAN's predecessors-in-interest Ensemble, Nextwave, and SOMA, and/or one or more of the inventors of the Patents-in-Suit knowingly and in bad faith failed to disclose the Patents-in-Suit and the patents and applications that led to the Patents-in-Suit with the intent to deceive and to

induce reliance.  The foregoing actions and conduct have caused damage and continue to cause damage to LG and relevant third parties.

167.   As a result of the conduct described above, the '924 patent, the '743 patent, and the '320 patent are unenforceable against LG on the grounds of estoppel, fraud, laches, waiver, implied waiver, unclean hands, patent exhaustion, implied license, and/or other equitable defenses.

## COUNT X

## DECLARATORY JUDGMENT THAT LG IS ENTITLED TO LICENSE THE PATENTS-IN-SUIT FROM WI-LAN ON FRAND/RAND TERMS AND CONDITIONS

168.   Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-167, above, as if set forth fully herein.

169.   On information and belief, Wi-LAN has undertaken, in accordance with the relevant rules and IPR polices of applicable SSOs, to grant licenses to some entities under each of the Patents-in-Suit on reasonable and non-discriminatory ("RAND") or fair, reasonable, and non-discriminatory ("FRAND") terms and conditions.   These RAND/FRAND obligations are found in IPR policies adopted by ETSI, including but not limited to Clause 6.1 of the ETSI IPR policy, and the IEEE Standards Board Bylaws.

170.   The IEEE Standards Board Bylaws require IEEE members to submit letters of assurance ("LOAs") including either a general disclaimer to the effect that the patentee will not enforce any of its present or future patents the use of which would be required to implement an IEEE standard against any person or entity using the patents to comply with the standard, or a statement that a license will be made available to all applicants without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.

171.   Additionally, the IEEE Standards Board Bylaws state that the assurance "shall be a letter that is in the form of either a) A general disclaimer to the effect that the patentee will not enforce any of its present or future patent(s) whose use would be

required to implement the proposed IEEE standard against any person or entity using the patent(s) to comply with the standard or b) A statement that a license will be made available to all applicants without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination."

172.  Clause 6.1 of the ETSI IPR policy states that "When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory ('FRAND') terms and conditions under such IPR."  The ETSI IPR policy further states that "FRAND licensing undertakings made pursuant to Clause 6 shall be interpreted as encumbrances that bind all successors-in-interest," and that "[a]n undertaking pursuant to Clause 6.1 with regard to a specified member of a PATENT FAMILY shall apply to all existing and future ESSENTIAL IPRs of that PATENT FAMILY."  The ETSI IPR policy defines "PATENT FAMILY" as "all documents having at least one priority in common."

173.  On information and belief, Wi-LAN has asserted, or is asserting, that the Patents-in-Suit are essential to the IEEE 802.16 standard, as discussed above.

174.  On July 12, 2004, Wi-LAN submitted an LOA to the IEEE stating "that it intends to license under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination" any patents issuing from the '518 application.

175.  On April 1, 2011, Wi-LAN submitted an LOA to the IEEE stating that it "will grant a license under reasonable rates to an unrestricted number of applicants on a worldwide basis with reasonable terms and conditions that are demonstrably free of unfair discrimination" to "any and all claims determined to be essential to the [802.16-2009 standard] that [Wi-LAN] may own now or in the future."

176.  On February 17, 2005, Wi-LAN submitted an IPR declaration to ETSI stating that Wi-LAN is "prepared to grant irrevocable licenses … on terms and

conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy" to the '518 application.

177.   On July 13, 2007, Wi-LAN submitted a blanket LOA to the IEEE stating that it will "grant a license under reasonable rates to an unrestricted number of applicants on a worldwide basis with reasonable terms and conditions that are demonstrably free of unfair discrimination" for all patent claims essential to the IEEE 802.16 standard.

178.   Despite Wi-LAN's commitments to grant licenses to the Patents-in-Suit on FRAND/RAND terms and conditions, Wi-LAN has not offered to LG reasonable and non-discriminatory royalty terms and rates that are proportionate to royalty terms and rates offered to similarly situated companies.   As a third party beneficiary of the rules and IPR policies of the relevant SSOs, LG has the right to be granted license(s) to the Patents-in-Suit on FRAND/RAND terms and conditions.

179.   Wi-LAN has failed to comply with its FRAND/RAND obligations under the relevant rules and IPR policies of the relevant SSOs with respect to LG (which is claiming the benefit thereof) by refusing to offer a license (or licenses) on FRAND/RAND terms.

180.   As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

181.   In the event that one or more claims of the Patents-in-Suit are found valid and infringed, a judicial declaration that LG is entitled to license the Patents-in-Suit under FRAND/RAND terms and conditions is necessary and appropriate.

## COUNT XI

## **BREACH OF CONTRACT**

182.   Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-181, above, as if set forth fully herein.

183.   For consideration, including IEEE and ETSI membership and participation, Wi-LAN entered into express and/or implied contracts with the IEEE and ETSI's

members, or alternatively, with the IEEE and ETSI, to which IEEE and ETSI members and others are third-party beneficiaries, in which Wi-LAN agreed, among other things, to abide by the IEEE and ETSI's policies and rules. The IEEE and ETSI rules and policies, whether formal or informal, including all stipulations, requirements and representations in any form, constitute a contract between Wi-LAN and the IEEE and ETSI's members, or alternatively between Wi-LAN and the IEEE and ETSI, to which IEEE and ETSI members and others are third-party beneficiaries.

184. In accordance with the foregoing, the IEEE and ETSI's rules and policies require its members to submit LOAs including statements that a license will be made available to all applicants under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.

185. Furthermore, Wi-LAN's representations and other conduct, including the LOAs offering licenses on fair, reasonable and non-discriminatory terms that Wi-LAN submitted to the IEEE and ETSI, created express and/or implied contracts with the IEEE, ETIS, and their members, or alternatively between Wi-LAN and the IEEE and ETSI, to which IEEE and ETSI members and others are third-party beneficiaries.

186. Wi-LAN breached its contractual obligations, including by failing to offer licenses for the Patents-in-Suit on fair, reasonable and non-discriminatory terms, by seeking to enjoin LG from making and selling 802.16 and/or 3GPP LTE compliant products, failing to disclose certain of the Patents-in-Suit, and through misrepresentations and/or omissions regarding its patents and/or patent applications.

187. LG has incurred damages, and will be further damaged in the future due to Wi-LAN's breach of its contractual obligations.

## COUNT XI

## UNFAIR BUSINESS PRACTICES UNDER CAL. BUS. & PROF. CODE § 17200

188. Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-187, above, as if set forth fully herein.

189.   Unfair business practices under Cal. Bus. & Prof. Code § 17200 *et seq.* include any unfair, unlawful, or fraudulent business act or practice.   The conduct described above in paragraphs 1-187 comprises unfair business practices under Section 17200 *et seq.*

190.   Misconduct and injuries pertaining to the above-referenced conduct have occurred within California, either of which gives rise to a § 17200 claim.  With respect to injury in California, LG conducts business related to the accused standards and products in California, and sells accused products to customers located in California.

191.   In addition to injuries in California, various acts of misconduct alleged in the preceding counts occurred in California, including relevant meetings of standards-setting organizations and Wi-LAN's bad faith assertion of the Patents-in-Suit against LG.

192.   LG is entitled to remedies, including attorneys' fees and disgorgement of Wi-LAN's ill-gotten gains, including investments, licensing royalties, or any recoveries obtained through the inappropriate conduct set forth in paragraphs 1-186 above.

## COUNT XII

## MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

193.   Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-192, above, as if set forth fully herein.

194.   For years, continuing through to today, Wi-LAN has made objectively baseless claims that products having components designed based upon any one of a number of technical standards (including the IEEE 802.16 standard and the 3GPP LTE standard) necessarily infringe the patents that Wi-LAN asserts in this action.  Those claims are false—Wi-LAN's asserted patents are *not* infringed by products having components designed based upon the IEEE 802.16 standard or the 3GPP LTE standard, necessarily or otherwise.  Nevertheless, Wi-LAN is and has been engaged in a long-standing campaign to improperly assert its patents, including patents that it knows and has known for some time to be invalid and/or unenforceable, in an attempt to extract

licensing revenues to which Wi-LAN knows it is not entitled and to obtain additional patents that have also become part of Wi-LAN's improper campaign.

195.   At least three of the four patents asserted by Wi-LAN in this action are unenforceable as a result of fraudulent misrepresentations and/or omissions to various SSOs.   Wi-LAN has nevertheless improperly asserted those patents against LG and others.   Wi-LAN's assertions of those patents were and are objectively baseless, including because Wi-LAN was and is in possession of information confirming that those patents are invalid and unenforceable.   Through Wi-LAN's improper assertions of its patents, it has obtained not only licensing revenue to which it is not entitled, but also additional patents that it uses as part of its improper licensing campaign.

196.   Wi-LAN's misconduct has forced the many targets of its improper assertions to either stand and fight Wi-LAN's objectively baseless claims, at great expense, or else give in to those improper claims and either leave the market or pay Wi-LAN substantial license fees to which it is not entitled.   As a result, Wi-LAN's unlawful conduct alleged herein has caused and continues to cause harm to legitimate competition, as alleged more fully below, including by improperly increasing barriers to entry such that potential competitors who would or might have produced products designed based upon the accused standards have been dissuaded from doing so and/or making investments in such activities, by forcing unnecessary defense expenditures by competitors or potential competitors who are unwilling to surrender to Wi-LAN's extortionate scheme to extract licensing revenue for patents that Wi-LAN has asserted in bad faith despite knowing them to be invalid and unenforceable, by facilitating Wi-LAN's demand for and extraction of improper license payments when Wi-LAN is not entitled to any such license payments including because its Patents-in-Suit do not cover products designed based upon the accused standards, by causing increased prices to consumers for products designed based upon the accused standards as a result of unnecessary defense expenditures and/or exorbitant licensing fees for those who accede to Wi-LAN's improper demands, and by decreasing or eliminating competition from

alternative technologies that would or might have had increased viability but for Wi-LAN's unlawful conduct.  Unless Wi-LAN's continuing campaign of unlawful conduct is put to a stop, these harmful effects will continue unabated.

### Wi-LAN's Improper Claims of Market Power

197.   Technical standards, such as the IEEE 802.16 standard and the 3GPP LTE standard, can, in the right circumstances facilitate the adoption and advancement of technology as well as the development and commercialization of products that can interoperate with one another.  Technical standards also can lower costs by increasing product manufacturing volume and increase price competition by eliminating "switching costs" for consumers who desire to switch from products manufactured by one company to those manufactured by another.  Once a standard has been adopted and a sufficiently large number of products designed based upon that standard have been deployed in a sufficiently widespread fashion for a sufficient amount of time, companies that have structured their businesses to produce products having components designed based on technical standards, such as the IEEE 802.16 standard and the 3GPP LTE standard, can in some circumstances become "locked in" to the technologies included in the standards if, because of costs, sales schedules, and/or other considerations, it is no longer practical or possible to develop or switch to other technologies at that point due to the widespread, long standing adoption of the standard, or if customers for their products have no practical choice at that point other than to purchase products having components designed based upon the standard due to the widespread, long standing adoption of the standard.

198.   When a technical standard mandates use of a particular technology in order to implement the standard, it is possible that a patent may be held or obtained covering that technology.  Once a standard has been adopted and a sufficiently large number of products designed based upon that standard have been deployed in a sufficiently widespread fashion for a sufficiently long period of time, at that point there may no longer be readily substitutable alternatives to a particular technology the use of which is

mandated by the standard.  Accordingly, when a sufficiently large number of products designed based upon a standard have been deployed in a sufficiently widespread fashion for a sufficiently long period of time, the owner of a patent whose claims cover technology mandated by the standard can at that point gain market power in the market for that particular technology that is unrelated to any inherent value of the subject matter claimed in its patent and is instead derived merely from the fact that use of the claimed subject matter was previously mandated by a standard which has now been incorporated into a sufficiently large number of products.  If left unconstrained, the owner of such a patent may, after such "lock-in" occurs, demand supracompetitive monopoly rents for the use of the technology covered by its patent claims.

199.  While viable alternative technologies may exist prior to the adoption and widespread deployment of a standard, once a standard that requires use of a patented technology has been adopted and a sufficiently large number of products designed based upon that standard have been deployed in a sufficiently widespread fashion for a sufficiently long period of time, previously viable alternatives to that patented technology may no longer be as feasible and/or available to those who wish to implement the standard.  Thus, the inclusion in a standard of a requirement that a particular patented technology be used to implement the standard may, if a standard has been deployed widely enough for a long enough period of time, confer on the patent owner market power in the market for technologies that perform the functionalities covered by the patent's claims.  Such market power is unlawful under Section 2 of the Sherman Act, 15 U.S.C. § 2, when it is acquired and/or maintained through anticompetitive, exclusionary conduct.

200.  As noted above, Wi-LAN has made and makes objectively baseless claims in this action and elsewhere that products having components designed based upon the IEEE 802.16 standard and/or 3GPP LTE standard necessarily infringe the Patents-in-Suit.  Those claims are not accurate—the Patents-in-Suit are *not* infringed by products having components designed based upon the IEEE 802.16 standard and/or 3GPP LTE standard,

necessarily or otherwise.  If Wi-LAN's improper allegations are taken as true, however, then in light of the longstanding and widespread adoption and use of products designed based on the IEEE 802.16 standard and/or the 3GPP LTE standard, and in light of Wi-LAN's improper assertions of its patents, Wi-LAN currently possesses market power in the relevant market for these purposes, namely the market for technologies that perform the functionalities covered by the Patents-in-Suit's claims under Wi-LAN's improper assertions of infringement and improper application of the claims.  The geographic scope of that market is at least the United States.

### Wi-LAN's Anticompetitive and Exclusionary Conduct

201.  Wi-LAN acquired and maintained its current alleged position in an unlawful manner, through at least two distinct types of anticompetitive and exclusionary conduct, both of which independently violate Section 2 of the Sherman Act, 15 U.S.C. § 2: (1) deceptive conduct before the IEEE 802.16 and 3GPP LTE standards bodies; and (2) objectively baseless assertions of invalid and unenforceable patents, despite Wi-LAN's knowledge of their invalidity and unenforceability, for improper purposes.

### Standards Body Deception

202.  Wi-LAN's misconduct extends to deceptive conduct before the IEEE 802.16 and 3GPP LTE standards bodies.  As set forth in detail above, Wi-LAN fraudulently deceived the IEEE, 3GPP (and 3GPP's Organizational Partners), and their members.

203.  In order to reduce the likelihood that owners of patents will abuse the standards process, and to guard against unscrupulous conduct by the manipulation of the standard-setting process, SSOs, such as the IEEE and 3GPP, have rules requiring members to disclose the existence of patents or patent applications that they believe are relevant to standards under consideration and to either (a) disclaim the right to enforce any of its present or future patents against any person or entity using the patents to comply with the standard; or (b) promise to license their technologies on fair, reasonable, and non-discriminatory terms.   These disclosures and licensing declarations permit standards-setting organizations, such as the IEEE and 3GPP, to evaluate and select from

competing technologies with full knowledge of claimed intellectual proprietary rights that may affect the costs of implementing the standard.  As alleged above, Wi-LAN engaged in fraudulent deception of the IEEE, 3GPP, and their members, including in violation of the IEEE and 3GPP rules and policies.

204.   Absent Wi-LAN's fraud on the IEEE, 3GPP, and their members, the IEEE 802.16 working group would not have adopted the current form of the IEEE 802.16 standard, and 3GPP would not have adopted the current form of its LTE standard—standards which Wi-LAN now alleges, or has alleged, require use of the subject matter claimed in the Patents-in-Suit in products designed based upon those standards (an allegation with which LG strongly disagrees).  Rather, absent Wi-LAN's deceptive conduct before the IEEE 802.16 and 3GPP LTE standards bodies, the IEEE and 3GPP would have adopted alternative versions of the standards.

**Assertion of Invalid and Unenforceable Patents Despite Knowledge of Their Invalidity and Unenforceability**

205.   Notwithstanding the fact that the Patents-in-Suit are unenforceable based on Wi-LAN's fraudulent misrepresentations and/or omissions to various SSOs, and notwithstanding the fact that Wi-LAN knew or should have known that the Patents-in-Suit are invalid, Wi-LAN has nevertheless improperly asserted and asserts those patents against LG and others.  Additionally, Wi-LAN's assertions of those patents were and are objectively baseless and made for an improper purpose, including because Wi-LAN made those assertions despite knowing that the Patents-in-Suit are invalid and unenforceable in an effort to obtain license revenues it knows it is not entitled to, as well as additional patents to use as part of its improper licensing campaign.

206.  Notwithstanding   Wi-LAN's   knowledge   of   the   invalidity   and unenforceability of the Patents-in-Suit, Wi-LAN has nevertheless asserted claims for infringement of the Patents-in-Suit against LG and others as part of a long-standing and ongoing bad faith campaign, including by initiating and maintaining the present

objectively baseless litigation, to improperly extract licenses, acquire additional patents, and extort money from LG and others.

207.   To this day, Wi-LAN continues to assert these patents against LG in bad faith through this litigation, knowing full well that those patents are invalid and unenforceable.  Wi-LAN's conduct is objectively baseless and unlawful.

208.   Wi-LAN's bad faith assertion of its patents, including those which Wi-LAN knows to be invalid and unenforceable, has also facilitated Wi-LAN's acquisition of a number of additional patents which Wi-LAN also improperly alleges are necessarily infringed by products having components designed based upon certain technical standards.  Hence, Wi-LAN's exclusionary conduct also allowed Wi-LAN to amass additional patents that Wi-LAN now alleges are necessarily infringed by products having components designed based upon certain technical standards.

**Harm to Competition Caused by Wi-LAN's Exclusionary Conduct**

209.   Through the acts, practices and conduct described herein, Wi-LAN, through its own conduct and that of its predecessors-in-interest Ensemble and Nextwave, has engaged in unlawful anticompetitive and exclusionary conduct, including through (a) fraudulent misrepresentations and/or omissions to the IEEE 802.16 and 3GPP LTE standards bodies, and failure and refusal to abide by its FRAND/RAND licensing commitments made to the IEEE, ETSI, and their members; and (b) bad faith assertion of the Patents-in-Suit against LG and others in an objectively baseless fashion and despite the fact that those patents are invalid and/or unenforceable, or through a continuous campaign to improperly extract licenses, all in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

210.   Wi-LAN's violations of Section 2 of the Sherman Act caused and continue to cause harm to competition, including by improperly increasing barriers to entry such that potential competitors who would or might have produced products designed based upon the accused standards have been dissuaded from doing so and/or making

investments in such activities, by forcing unnecessary defense expenditures by competitors or potential competitors who are unwilling to surrender to Wi-LAN's extortionate scheme to extract licensing revenue for patents that Wi-LAN has asserted in bad faith despite knowing them to be invalid and/or unenforceable, by facilitating Wi-LAN's demand for and extraction of improper supracompetitive license payments when Wi-LAN is not properly entitled to any such license payments including because its Patents-in-Suit do not cover products designed based upon the accused standards, by causing increased prices to consumers for products designed based upon the accused standards as a result of unnecessary defense expenditures and/or exorbitant licensing fees for those who accede to Wi-LAN's improper demands, by chilling participation in the markets in which it operates and related markets, and by decreasing or eliminating competition from alternative technologies that would or might have had increased viability but for Wi-LAN's exclusionary conduct.  In addition, Wi-LAN's abuse of the standards-setting process also damages competition through chilling effects on standards participation, thereby reducing or eliminating the pro-competitive impacts that standards organizations can have in the right circumstances when the process is not abused.

211.  Wi-LAN's violations of Section 2 of the Sherman Act have also caused injury to LG in its business and property, including by forcing LG to incur great expense in defending against Wi-LAN's bad faith and objectively baseless assertions of its alleged patents, and also through the loss of past, present and future profits and other harm to LG's business.

212.  LG has suffered irreparable injury by reason of the acts, practices and conduct of Wi-LAN alleged herein, and will continue to suffer such injury until and unless the Court enjoins such acts, practices, and conduct.

213.  Wi-LAN's anticompetitive conduct has affected and is affecting a substantial volume of interstate and foreign commerce, including commerce in this District.

**COUNT XIII**

## ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

214.   Counterclaim-Plaintiffs LG incorporate and reallege the allegations set forth in Counterclaim Paragraphs 1-213, above, as if set forth fully herein.

215.   Wi-LAN has willfully engaged in the anticompetitive conduct described above with the specific intent of acquiring and maintaining market power in a relevant antitrust market—namely, the market for Wi-LAN's allegedly patented technology. There is a dangerous probability that, unless restrained, Wi-LAN's conduct will (according to its allegations) succeed, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

216.   Wi-LAN's violations of Section 2 of the Sherman Act caused and continue to cause harm to competition, including by improperly increasing barriers to entry such that potential competitors who would or might have produced products designed based upon the accused standards have been dissuaded from doing so and/or making investments in such activities, by forcing unnecessary defense expenditures by competitors or potential competitors who are unwilling to surrender to Wi-LAN's extortionate scheme to extract licensing revenue for patents that Wi-LAN has asserted in bad faith despite knowing them to be invalid and unenforceable, by facilitating Wi-LAN's demand for and extraction of improper supracompetitive license payments when Wi-LAN is not properly entitled to any such license payments including because its Patents-in-Suit do not cover products designed based upon the accused standards, by causing increased prices to consumers for products designed based upon the accused standards as a result of unnecessary defense expenditures and/or exorbitant licensing fees for those who accede to Wi-LAN's improper demands, by chilling participation in the markets in which it operates and related markets, and by decreasing or eliminating competition from alternative technologies that would or might have had increased viability but for Wi-LAN's exclusionary conduct.  In addition, Wi-LAN's abuse of the standards-setting process also damages competition through chilling effects on standards

participation, thereby reducing or eliminating the pro-competitive impacts that standards organizations can have in the right circumstances when the process is not abused.

217.   Wi-LAN's violations of Section 2 of the Sherman Act have also caused injury to LG in its business and property, including by forcing LG to incur great expense in defending against Wi-LAN's bad faith and objectively baseless assertions of its alleged patents, and also through the loss of past, present and future profits and other harm to LG's business.   LG has suffered irreparable injury by reason of the acts, practices and conduct of Wi-LAN alleged herein, and will continue to suffer such injury until and unless the Court enjoins such acts, practices and conduct.

218.   Wi-LAN's anticompetitive conduct has affected and is affecting a substantial volume of interstate and foreign commerce, including commerce in this District.

## **PRAYER FOR RELIEF**

WHEREFORE, LG respectfully requests the following relief:

A.   Dismissal of Wi-LAN's Complaint with prejudice, granting LG's Affirmative Defenses and Counterclaims, and denying each request for relief made by Wi-LAN;

B.   Entry of judgment in LG's favor on each and every count of Wi-LAN's Complaint;

C.   Entry of an Order directing that LG is not liable to Wi-LAN for any damages pursuant to Wi-LAN's Complaint;

D.   Entry of judicial declarations in favor of LG under Counts I through IX of Counterclaim-Plaintiff LG's Counterclaims that:

1.   No claims of the Patents-in-Suit are infringed by LG;

2.   The claims of the Patents-in-Suit are invalid; and

3.   The '924 patent, the '743 patent, and the '320 patent are unenforceable.

E.     An award to LG of compensatory damages, attorneys' fees and costs, and interest on its Affirmative Defenses and Counterclaims;

F.     Entry of an Order that LG is the prevailing party, that this is an exceptional case under 35 U.S.C. § 285 because Wi-LAN brought this action with wrongful intent, or at least gross negligence, and with knowledge that LG's accused products do not and cannot infringe any valid claim of the Patents-in-Suit, with knowledge that the claims of the Patents-in-Suit are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112, with knowledge that the claims of the '924 patent, the '743 patent, and the '320 patent are unenforceable, and/or based on any other facts and circumstances warranting a finding of an exceptional case, in favor of LG;

G.     A judgment requiring Wi-LAN's specific performance under its contracts with the IEEE, ETSI, and/or IEEE and ETSI members to grant licenses to the Patents-in-Suit to LG on fair, reasonable, and non-discriminatory terms and conditions;

H.     A decree that LG is entitled to license the Patents-in-Suit from Wi-LAN on fair, reasonable, and non-discriminatory terms and conditions;

I.     An award to LG of its reasonable attorney fees and costs pursuant to 35 U.S.C. § 285; and

J.     Such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

LG requests a trial by jury on all issues so triable.


DATED:  May 22, 2017              By:     /s/ Joseph S. Leventhal
                                          Joseph S. Leventhal
                                          joseph.leventhal@dinsmore.com
                                          Dinsmore & Shohl LLP
                                          655 West Broadway,
                                          Suite 840
                                          San Diego, CA 92101
                                          Tel: 619-356-3518
                                          Fax: 619-615-2082

Richard D. Harris
harrisr@gtlaw.com
James J. Lukas, Jr.
lukasj@gtlaw.com
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 3100
Chicago, IL 60601
Tel: 312-456-8400
Fax: 312-456-8435

*Attorneys for Defendants and Counterclaim-Plaintiffs, LG Electronics, Inc., LG Electronics U.S.A., Inc., and LG Electronics Mobilecomm U.S.A., Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2017, I electronically filed:

**DEFENDANTS LG ELECTRONICS, INC., LG ELECTRONICS U.S.A., INC., AND LG ELECTRONICS MOBILECOMM U.S.A., INC.'S ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS,**

with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to the following:

| | |
|---|---|
| **Victor M. Felix** | **Christopher M. First** |
| Procopio Cory Hargreaves and Savitch LLP | **Eric J. Enger** |
| 525 B Street | **Leslie V. Payne** |
| Suite 2200 | Heim, Payne & Chorush LLP |
| San Diego, CA 92101 | 1111 Bagby Street |
| (619) 515-3229 | Suite 2100 |
| Fax: (619) 744-5409 | Houston, TX 77002 |
| Email: vmf@procopio.com | 713-221-2000 |
| | Email: cfirst@hpcllp.com |
| *Attorney for Plaintiffs* | eenger@hpcllp.com |
| | lpayne@hpcllp.com |
| | *Attorneys for Plaintiffs* |

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 22, 2017, at San Diego, California.

By:  */s/ Joseph S. Leventhal*
       Joseph S. Leventhal